**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| PERRY APSLEY, et al.                    )<br>                                         )<br>                    Plaintiffs,         )<br>                                         )<br>v.                                       )<br>                                         )<br>THE BOEING COMPANY, THE ONEX,            )<br>CORPORATION, AND SPIRIT                  )<br>AEROSYSTEMS                              )<br>                                         )<br>                    Defendants.         )<br>_____) | **CIVIL ACTION**<br><br>No. 05-1368-MLB |

**MEMORANDUM AND ORDER**

This matter comes before the court on defendants' motion for judgment on the pleadings. (Doc. 99.) The motion has been fully briefed and is ripe for decision. (Docs. 100, 106, 117.) Defendants' motion is GRANTED in part, and DENIED in part, for reasons set forth herein.

**I.  JUDGMENT ON THE PLEADINGS STANDARD: FED. R. CIV. P. 12(c)**

In evaluating a motion pursuant to Federal Rule of Civil Procedure 12(c), the court applies the same standard as it would in deciding a motion for failure to state a claim under Rule 12(b)(6). Nelson v. State Farm Mut. Auto. Ins. Co., 419 F.3d 1117, 1119 (10th Cir. 2005). Under that standard, the court must

> accept all well-pleaded factual allegations in the complaint as true and view them in the light most favorable to the nonmoving party. A dismissal pursuant to 12(b)(6) will be [granted] only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief.

Id. (quotation omitted). Conclusory allegations, however, have no bearing upon the court's consideration. See Dunn v. White, 880 F.2d

1188, 1190 (10th Cir. 1989). In the end, the issue is not whether plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims. See Robinson v. Kansas, 117 F. Supp. 2d 1124, 1129 (D. Kan. 2000).

## II.  FACTS AND PROCEDURAL HISTORY

Plaintiffs, all former employees of The Boeing Company (Boeing), allege that defendants terminated their employment or refused to hire them for various unlawful reasons including age and race, in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634; Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e through 2000e-17; and the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001-1461. (Doc. 40.)

The parties agree that Boeing sold its commercial division assets to Spirit Aerosystems (Spirit) in mid-2005. These assets were located in the following cities: Wichita, Kansas; Tulsa, Oklahoma; and McAlester, Oklahoma. Id. at 32; (Doc. 100 at 1.) Spirit is a wholly-owned subsidiary of the Onex Corporation (Onex) created specifically for the purpose of purchasing the Boeing assets. (Doc. 40 at 32.)

As part of the sale Boeing alleges that it laid off all of its commercial division employees. (Doc. 100 at 4.) These Boeing employees were given the opportunity to apply for jobs with Spirit; however, a precondition to being considered for employment was that the employee complete a "Consent to Release Personnel Information Form" (Consent Form). (Doc. 40 at 40-41.) Plaintiffs are a number of former Boeing employees who were not offered jobs with Spirit. Id. at 31.

Plaintiffs allege that Boeing began considering the sale of its

commercial division at least by early 2002. (Doc. 40 at 35.) Presumably in order to make this asset more attractive to potential buyers, plaintiffs allege that Boeing conceived a plan to reduce the average age of its workforce. Id. at 34-38. This plan involved encouraging older workers to retire or quit, and terminating many who would not leave voluntarily. Id. Plaintiffs claim that Boeing undertook studies of the costs associated with healthcare and pension benefits for older workers, and that those studies showed Boeing that it could significantly reduce its labor costs by eliminating older workers. Id. at 42-43. Acting on this information, plaintiffs assert that Boeing began terminating older workers as early as January of 2002.

Plaintiffs further allege that, at some point, Onex and Spirit (as potential purchasers) became involved in this scheme and conspired with Boeing in furtherance of this plan, basically making the efforts to reduce the age of the workforce an integral part of the deal under which Boeing would sell its commercial division to Spirit. Id. Ultimately, the plan resulted in Boeing's decision to terminate its entire commercial division workforce in two mass layoffs that occurred in May and June of 2005.

Plaintiffs' theory is that once Boeing eliminated its workforce in a blanket termination of all employees, Onex and Spirit completed the scheme by selectively hiring back younger employees. Id. at 9, 31, 35. Accordingly, the theory appears to go, Boeing would appear not to have discriminated because it eliminated all employees, while Onex and Spirit would avoid the liability for discrimination because the case law generally holds that ERISA does not prohibit age

discrimination in hiring decisions.  (Doc. 106 at 13-14.)

In the present motion, defendants move for judgment on the claims in Counts Two, Three, and Four of the Second Amended Complaint.  (Doc. 99.)  In Count Two, plaintiffs seek a declaratory judgment that defendants failed to keep proper employee records in violation of Title VII.  In Count Three, plaintiffs seek a declaratory judgment that the Consent Form is invalid and that it violates both the ADEA and ERISA.  Finally, in Count Four, plaintiffs allege that defendants discharged them and discriminated against them for the purposes of interfering with their attainment of pension and healthcare benefits, in violation of ERISA.  (Doc. 40 at 44-45.)

### III.  ANALYSIS

A.  Count Two - Records-Keeping Violation

Ostensibly proceeding under 42 U.S.C. § 2000e-8(c), plaintiffs seek a declaratory judgment that Onex and/or Spirit failed to retain certain personnel records required to be maintained by that statute. Section 2000e-8(c) requires employers to "make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed," and to retain those records for time periods determined by the Equal Employment Opportunity Commission (EEOC).[1]  The statute also authorizes the EEOC to seek injunctive relief in the federal courts against employers who refuse to comply with these record-keeping requirements.  42 U.S.C. § 2000e-8(c).

Defendants maintain that plaintiffs' claim in Count II fails as

---

[1] The actual retention times prescribed by the EEOC are delineated at 29 C.F.R. § 1602.14.

a matter of law because section 2000e-8(c) does not create a private right of action.  (Doc. 100 at 6-7.)  Plaintiffs counter that, while the statute does not authorize a private action for enforcement, the court may nevertheless rule on the matter under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02.  (Doc. 106 at 14-16.)  Defendants respond that the Declaratory Judgment Act does not form an independent basis for federal jurisdiction, and that plaintiffs must satisfy the basic requirements for standing in order to obtain any relief, including a declaratory judgment.  (Doc. 117 at 6-7.)

Unfortunately for plaintiffs, they present no authority whatsoever for the notion that the court can use the Declaratory Judgment Act as a basis for relief under Count II.  Indeed, plaintiffs appear to rely on an Eighth Circuit case from 1937 for generalizations about the utility of a declaratory judgment.  (Doc. 106 at 16.)  However, a review of that case shows that the parenthetical quote upon which plaintiffs rely was taken from a footnote in a dissenting opinion, which footnote was nothing more than an extremely lengthy quote from a Senate Judiciary Committee Report issued by the 73d Congress.  <u>Columbian Nat. Life Ins. Co. v. Foulke</u>, 89 F.2d 261, 265 n.1 (8th Cir. 1937) (Stone, J., dissenting).  This authority is irrelevant, unpersuasive, and is, in fact, no authority at all.[2]

The few courts that have dealt with this question have made short shrift of the matter.  There is no private right of action under 42 U.S.C. § 2000e-8(c).  <u>See</u> <u>Catoire v. Caprock Telecomms. Corp.</u>, 2003

---

[2] Plaintiffs' counsel is strongly advised against continuing this practice in cases before this judge.  A lack of accuracy or candor diminishes the persuasiveness of the party's position and the credibility of his counsel.

-5-

WL 21223258, *2 (E.D. La. May 22, 2003); Branch v. County of Chesterfield, 2001 WL 1943878, *8 n.11 (E.D. Va. Oct. 12, 2001). When a plaintiff cannot maintain a suit for injunctive relief or monetary damages against a defendant, he cannot bring a claim under the Declaratory Judgment Act. United Food & Commercial Workers Union, Local 1564 of N. M. v. Albertson's, Inc., 207 F.3d 1193, 1197-98 (10th Cir. 2000). In fact, the situation in United Food was strikingly similar (though not identical) to the issue raised in Count II. In United Food, the plaintiff sought a declaratory judgment under section 217 of the Fair Labor Standards Act, 29 U.S.C. § 217. Id. at 1197. However, the Tenth Circuit noted that the federal government was the only entity authorized to seek relief under section 217. Id. at 1197-98. Since that section did not authorize a private entity to seek relief, the plaintiff could not overcome this limitation by pursuing a declaratory judgment. Id. at 1198.

The claim in Count Two is in a similar posture. Section 2000e-8(c) only authorizes the EEOC to seek injunctive relief in the district courts. Since plaintiffs clearly cannot seek the only relief authorized under that section, they cannot overcome this limitation by asking for a declaratory judgment. Accordingly, the court finds that plaintiffs could prove no facts entitling them to relief under Count Two. Therefore, defendants are entitled to judgment on the pleadings on that claim.

B. Count Three - Validity of the Consent Form

In this count, plaintiffs seek a declaratory judgment that the Consent Forms were invalid under ERISA, the ADEA, and the Older Workers Benefit Protection Act (OWBPA), 29 U.S.C. § 626(f)(1). Under

the OWBPA, an employee cannot waive ADEA rights "unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). In order to be considered knowing and voluntary, a waiver must be in writing, and it must comply with a number of additional requirements delineated in section 626(f)(1). However, before any of the waiver requirements become binding, there must be an effort to enforce a waiver of the rights at issue under the ADEA. Id.

Defendants argue that the Consent Form does not purport to waive any rights under the ADEA. (Doc. 100 at 8.) In fact, defendants conceded in their answer that the Consent Form did not waive those rights. (Doc. 54 at 35.) Hence, they argue, the OWBPA requirements simply do not apply. (Doc. 100 at 8-9.)

The relevant language of the Consent Form provides as follows:

> As a result of the proposed transaction whereby Mid-Western Aircraft Systems, Inc. ("Buyer") has agreed, subject to the satisfaction of certain conditions, to acquire the Wichita Division of Boeing Commercial Airplanes, Buyer desires to review personnel information and files of Boeing employees for the purpose of deciding whether to make job offers to them. I understand that a potential consequence of my not authorizing Boeing to furnish information to Buyer is that I will not receive an offer from Buyer.
>
> . . . .
>
> I authorize The Boeing Company to provide Buyer any and all information concerning my employment with Boeing, my education, or any other information that Boeing might have, personal or otherwise, with regard to my employment. <u>I hereby release Boeing, including its officers, directors, agents, and employees from any and all liability, claims and damages which may result from Boeing's furnishing such information to Buyer</u>.
> I understand that this Consent to Release Personnel Information and Records does not apply

> to, and will not authorize the release of, medical records, workers compensation records, Employee Assistance Program records, and Drug Free Workplace Act records.
> I further authorize Buyer to request, receive, and verify any and all information furnished to it by Boeing pursuant to this Consent to Release Personnel Information and Records.

(Doc. 100 exh. 1-A (emphasis added).)  Defendants argue that this language means precisely what it says - that by signing the waiver, plaintiffs were only waiving their rights to assert any claims "which may result from Boeing's furnishing such information to" Spirit. (Doc. 100 exh. 1-A.)  Thus, the waiver only operates to preclude plaintiffs from asserting claims related to a violation of their privacy rights for having released their employee information to Spirit.  (Doc. 100 at 9.)

Plaintiffs counter that the Consent Form purports to waive "any and all" claims against Boeing.  (Doc. 106 at 16 (quoting the Consent Form).)  However, plaintiffs deliberately and disingenuously fail to acknowledge that the "any and all" language is further qualified by the text of the Consent Form as limiting the waiver to claims resulting "from Boeing's furnishing such information to Buyer." (Doc. 100 exh. 1-A.)

The court agrees with defendants' interpretation.  Despite plaintiffs' bombastic and irrelevant arguments to the contrary, the Consent Form simply cannot be construed as an attempt by defendants to secure a waiver of rights under the ADEA by plaintiffs or anyone

else.[3]  By its own terms, the Consent Form waives only those claims related to Boeing's having released an individual's personnel information to Spirit.  The only possible types of claims that would seem capable of arising from the release of such information are those related to the unauthorized dissemination of personal information - claims including and similar to those based on an invasion of privacy.  Such claims are not cognizable under the ADEA; therefore, the OWBPA requirements do not apply to the Consent Form.

As an alternative argument for invalidating the Consent Form, plaintiffs argue that defendants procured plaintiffs' signature on the forms by way of threats and coercion, including threats that plaintiffs would not receive jobs with Spirit unless they signed the form. (Doc. 40 at 44-45.)  Plaintiffs further argue that such conduct amounts to retaliation under both the ADEA and ERISA, thereby rendering the Consent Forms unenforceable. (Id.; Doc. 106 at 17-18); see also 29 U.S.C. §§ 623(d), 1140.

The problem here is that, once again, the Consent Form cannot be read as an attempt to secure a waiver of any rights under the ADEA or ERISA.  As already noted, the Consent Form is simply an attempt to ensure that Boeing would not be subject to claims that it provided personnel information to Spirit without the authorization of the individuals whose information was being passed.  Such claims are not the concern of the ADEA or ERISA.

Plaintiffs appear to suggest that since they would not be

---

[3] One of plaintiffs' arguments is that they are entitled to represent ". . . any and all persons that the defendant [sic] may utilize the release against." (Doc. 106 at 17.)

-9-

considered for jobs with Spirit unless they signed the form, and since (pursuant to their theory) the entire exercise of laying off all workers and then re-hiring most of them was a veiled effort to discriminate against them on the basis of age, that any condition precedent to their being considered for employment by Spirit must amount to age discrimination. The court firmly rejects that argument. By its own terms, the Consent Form was a limited waiver of liability related only to the disclosure of personnel records to Spirit. It was universally applicable to all Boeing commercial division employees, all of whom were laid off.[4] The form cannot be construed as either an explicit or implicit effort to discriminate on the basis of age. The simple fact is that Spirit needed the employee records in order to make an informed decision about which employees it wanted to hire.

Since the Consent Form cannot be construed as, and is not asserted to be, a waiver of rights under the ADEA or ERISA, plaintiffs can prove no set of facts that would entitle them to relief under Count Three. Therefore, defendants' motion for judgment on the pleadings is granted as to this count of the Second Amended Complaint.

C.  Count Four - Interference with ERISA Rights

In this count, plaintiffs allege the substance of their ERISA theory – that defendants conspired to terminate them in an effort to prevent plaintiffs from obtaining and receiving pension and/or

---

[4] Compare, e.g., Kruchowski v. Weyerhauser Co., 446 F.3d 1090 (10th Cir. 2006), wherein a waiver form signed by employees involved in a RIF (i.e. not all the company's employees) was held to be non-compliant with 29 U.S.C. § 626(f)(1) and thus unenforceable against RIF'd employees' ADEA claims. In this case, defendants are expressly disclaiming any attempt to enforce the waiver as a bar to plaintiffs' claims.

healthcare benefits. (Doc. 40 at 45.) In responding to this charge, defendants stand on their argument that when a company terminates all its employees as part of a divestiture, section 510 of ERISA does not apply. Likewise, they contend the law is clear that a company is not liable under section 510 for failing to hire someone. (Doc. 100 at 11-16.)

> Section 510 of ERISA provides, in relevant part, that
>
>> [i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under [an employee benefit plan] . . . .

29 U.S.C. § 1140. Although the statute also proscribes retaliation for exercising ERISA-protected rights, Garratt v. Walker, 164 F.3d 1249, 1251 n.1 (10th Cir. 1998) (citing Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 143, 111 S. Ct. 478, 112 L. Ed. 2d 474 (1990)), plaintiffs rely on the interference prong for their theory in the present case. (Doc. 40 at 45.)

In applying section 510, the Supreme Court has adhered closely to the text of the statute. See Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co., 520 U.S. 510, 514-16, 117 S. Ct. 1513, 1515-16, 137 L. Ed. 2d 763 (1997). Consistent with that requirement, plaintiffs have alleged that defendants discharged or otherwise discriminated against them in order to interfere with their attainment of benefits. (Doc. 40 at 45.) Thus, the question presented on this aspect of the motion is whether Boeing's termination of all it commercial division employees, coupled with Spirit's selective re-hiring, amounts to discharging or discriminating against

plaintiffs in contravention of section 510.

While it seems elementary that these plaintiffs were "discharged," given that they were terminated and never re-hired by Boeing, the courts have not employed dictionary jurisprudence in interpreting this ERISA provision. In Andes v. Ford Motor Company, the Court of Appeals for the District of Columbia Circuit confronted the question of whether the divestiture of a subsidiary company amounted to a discharge under section 510. 70 F.3d 1332, 1336 (D.C. Cir. 1995). Relying on the text of the statute, legislative history, and a little bit of common sense, the court of appeals concluded that Congress never intended the term "discharge" in section 510 to encompass company- or division-wide layoffs related to the sale of assets. Id. at 1337-38. To do so would have been to impose ERISA liability almost every time a company is sold or a unit is divested. See id. at 1337-38, 1339. In so holding, the D.C. Circuit noted that its holding was in accord with a number of decisions by other courts of appeals. Id. at 1336-37 (citing Daughtrey v. Honeywell, Inc., 3 F.3d 1488 (11th Cir. 1993); Unida v. Levi Strauss & Co., 986 F.2d 970 (5th Cir. 1993); Varhola v. Doe, 820 F.2d 809 (6th Cir. 1987); West v. Greyhound Corp., 813 F.2d 951 (9th Cir. 1987); Aronson v. Servus Rubber, Div. of Chromalloy, 730 F.2d 12 (1st Cir.), cert. denied, 469 U.S. 1017, 105 S. Ct. 431, 83 L. Ed. 2d 357 (1984).

While Andes represents the proper view for divestitures where the termination of the workforce is a mere consequence of the transaction, courts have not been afraid to allow a case to proceed when the challenged actions were allegedly for the purpose of interfering with ERISA rights. For example, in Gavalik v. Cont'l Can Co., the Third

Circuit found the possibility of ERISA liability where an employer had concocted a "liability avoidance plan" to avoid having ERISA protected benefits vest in certain employees. 812 F.2d 834, 854-57 (3d Cir. 1987). The plan involved shifting work volume from plants with high unfunded pension liability to those with lower liability, as well as laying off younger workers whose pension rights had not vested. Id. at 840-42. It also involved closing at least one facility based on its high unfunded pension liability. Id. at 841. Although the latter action involved termination of all employees at the facility, the court found that the decision was specifically motivated by a desire to prevent vesting of pension benefits. Id. at 863-64.[5]

Similarly, in Millsap v. McDonnell Douglas Corp., a district court in this circuit concluded that the defendant violated section 510 of ERISA when it closed a plant for the purpose of avoiding millions of dollars in pension costs. 162 F. Supp. 2d 1262, 1307 (N.D. Okla. 2001). ERISA liability was imposed despite the fact that this was a plant-wide closure. Id. at 1264, 1268. Thus, contrary to defendants' assertions, the mere fact of a plant-wide or division-wide divestiture does not foreclose the possibility of liability under section 510.

---

[5] Although the Tenth Circuit has apparently not answered the precise question presented in this case, the court notes that the circuit has relied on Gavalik for its proposition that specific intent to interfere with ERISA-protected rights is a necessary element of a claim under section 510. Garratt, 164 F.3d at 1256; Phelps v. Field Real Estate Co., 991 F.2d 645, 649 (10th Cir. 1993); Card v. Hercules, Inc., 1993 WL 351337, *3 (10th Cir. Aug. 19, 1993); Dodson v. New York Life Ins. Co., 1991 WL 180090, *2 (10th Cir. Sept. 10, 1991); see also Cunningham v. Adams, 106 Fed. Appx. 693, 698 (10th Cir. Aug. 10, 2004). The Second Amended Complaint clearly alleged specific intent to interfere with rights protected by ERISA. (Doc. 40 at 45.)

Moreover, the views expressed in <u>Gavalik</u> and <u>Millsap</u> are not inconsistent with the general view expressed in <u>Andes</u>. In the latter case, the D.C. Circuit held out the possibility that some divestitures could result in ERISA liability if they specifically targeted workers for the purpose of interfering with the attainment of benefits. <u>Andes</u>, 70 F.3d at 1338. The situation alleged here simply adds a new twist to the scenario contemplated in <u>Andes</u>.

While the schemes in <u>Gavalik</u> and <u>Millsap</u> were specifically orchestrated to interfere with protected benefits, plaintiffs do not allege that the same is true here. Indeed, it seems that no one questions the legitimate business purpose behind Boeing's decision to divest its commercial division assets. Nevertheless, plaintiffs maintain that the elimination of older workers became a central part of the transaction. It was, in effect, part of the consideration for which Onex would purchase the Boeing assets through its newly created entity, Spirit.

In <u>Lessard v. Applied Risk Management</u>, the Ninth Circuit faced a situation quite similar to that presented here. 307 F.3d 1020 (9th Cir. 2002). The plaintiff was employed by Applied Risk Management, Inc. (ARM). Under the terms of her employment, the plaintiff was provided medical benefits that were protected by ERISA. ARM entered into an agreement with Professional Risk Management and its parent company, MMI Companies, Inc. (PRM/MMI) for the sale of all of ARM's assets. Under the terms of that agreement, most ARM employees would automatically transfer to PRM/MMI at the time of the sale and would continue to receive benefits under a similar plan. However, individuals, including the plaintiff, who were on medical leave at the

-14-

time of the sale would not be transferred and their benefits would be terminated. Id. at 1022-23.

The Ninth Circuit acknowledged that in a normal divestiture situation, where the seller terminates all its employees and the buyer refuses to hire some of them, no ERISA violation occurs. Id. at 1026. However, the court of appeals concluded that, where discriminatory intent had been shown, two or more companies would not be allowed to conspire to do what one of them could not do alone. Id. ("Following the Supreme Court's admonition in Inter-Modal Rail, 520 U.S. at 515, 117 S. Ct. 1513, we do not read [West v. Greyhound Corp., 813 F.2d 951 (9th Cir. 1987)] to permit two or more companies incident to an asset sale to take joint action that violates the express terms of the statute.")

Here, the net effect of the scheme, as alleged by plaintiffs, is that the bulk of Boeing's workforce was transferred to Spirit, but older workers were specifically targeted for elimination. Where defendants have allegedly used complicated schemes and formalities to hide otherwise unlawful conduct, courts have been cautioned not to accept form over substance. See, e.g., Keeler v. C.I.R., 243 F.3d 1212, 1217 (10th Cir. 2001) (looking past form and to substance of transactions for tax purposes); Crude Co. v. F.E.R.C., 135 F.3d 1445, 1452 (Fed. Cir. 1998) (agency, like courts, "may look beyond form to the economic substance [of a transaction], in order to further the regulatory purpose of Congress"); In re Eufaula Enters., Inc., 565 F.2d 1157, 1161 (10th Cir. 1977) ("When one legal entity is but an instrumentality or alter ego of another, by which it is dominated, a court may look beyond form to substance and may disregard the theory

of distinct legal entities in determining ownership of assets in a bankruptcy proceeding"). Lessard applied this guidance to ERISA, and the court finds that approach appropriate to the facts as alleged here. Boeing could not legally terminate its older employees in order to make itself more attractive to a potential purchaser, nor could it agree to get rid of its older workers as part of the consideration for a divestiture. The question here is whether Boeing could conspire with Onex and Spirit to do what it could not do alone.

In synthesizing ERISA section 510 cases discussed herein, the court concludes that Congress never intended for a normal, unbiased divestiture of business assets carried out for a business purpose to trigger ERISA liability based merely on the fact that ERISA benefits were incidentally affected. Under those circumstances, the loss of employment does not amount to a "discharge" under section 510. By contrast, when an employer specifically intends to interfere with the attainment of ERISA-protected benefits, ERISA liability may be possible, even in a divestiture. More specifically, when a seller and a buyer arrange an asset sale so that the net effect of the actions taken by both is to intentionally terminate the employment of older workers during the course of the asset transfer, they may be held liable under section 510 of ERISA for discharging or discriminating against employees for the purpose of interfering with the attainment of rights or benefits protected by ERISA. Under that view, Boeing's conduct here, if proven, could render it liable under section 510.

Defendants make much of the fact that hiring decisions are generally immune from liability under section 510. (Docs. 100 at 15; 117 at 5.) Thus, they argue, Onex and Spirit cannot possibly be held

liable, even if Boeing could be. However, the cases upon which defendants rely do not present the question whether a purchaser can conspire with the seller of a business to get rid of the older workers while retaining substantially the rest of the workforce.[6] (Doc. 100 at 15-16; 117 at 4-6.) That appears to be the case alleged by plaintiffs, here. According to plaintiffs' theory, Spirit and/or Onex did not want the economic burden caused by pension and healthcare benefits for Boeing's older workers, but they were otherwise willing to hire most of the existing younger employees. Spirit could not have accepted the entire Boeing workforce and then selectively fired the older employees. Instead, plaintiffs allege that Onex and Spirit made the elimination of the older workers a prerequisite for purchasing Boeing's commercial division, and that all defendants conspired to achieve that result in a way that would, technically speaking, appear to avoid liability for discharging or discriminating under section 510 of ERISA. (Doc. 40 at 42-43, 45.)

The court finds that under those unique circumstances, where the net result of the agreed upon conduct was the termination of older

---

[6] The one exception to this statement involves West v. Greyhound Corp., 813 F.2d 951 (9th Cir. 1987.) In that case, the seller terminated all employees and the buyer refused to hire them because they would not agree to a benefits package that was less attractive than what they previously held while employed by the seller. Id. at 952-53. The Ninth Circuit found no ERISA liability related to the hiring decision because the purchaser owed no duty to its potential employees. Id. at 955. However, in West, there was no suggestion that the parties had studied the pension and healthcare costs related to older workers and then devised a scheme to get rid of them while effectively continuing the employment of the younger workers. It is the agreement to violate ERISA that exposes the purchaser to liability. See Lassard, 307 F.3d at 1026 (distinguishing West and holding that a purchaser and seller could not conspire to do what neither of them could do alone).

workers for the purpose of interfering with attainment of rights protected by ERISA, both the seller and the buyers bear culpability for what amounts to discharging those individuals for reasons of age. Accordingly, Onex and/or Spirit may be held liable under ERISA section 510 if plaintiffs successfully prove they participated in the alleged scheme to get rid of the older workers. See Lessard, 307 F.3d at 1027.

The parties should note that this is only the pleading stage. The court offers no opinion regarding the truth or the provability of the allegations supporting Count Four. Rather, the court simply accepts as true the facts in the complaint, as it is required to do at this point in the proceedings. Under that standard, plaintiffs have pleaded a cause of action for interference with attainment of ERISA-protected benefits under section 510. Defendants' motion for judgment on the pleadings is denied as to Count Four.

A motion for reconsideration of this order under Local Rule 7.3 is not encouraged. The standards governing motions to reconsider are well established. A motion to reconsider is appropriate where the court has obviously misapprehended a party's position or the facts or applicable law, or where the party produces new evidence that could not have been obtained through the exercise of reasonable diligence. Revisiting the issues already addressed is not the purpose of a motion to reconsider and advancing new arguments or supporting facts which were otherwise available for presentation when the original motion was briefed or argued is inappropriate. Comeau v. Rupp, 810 F. Supp. 1172 (D. Kan. 1992). Any such motion shall not exceed three pages and shall strictly comply with the standards enunciated by this court in

Comeau v. Rupp.  The response to any motion for reconsideration shall not exceed three pages.  No reply shall be filed.

    IT IS SO ORDERED.

    Dated this ___18th___ day of December 2006, at Wichita, Kansas.

                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE