# EXHIBIT 39

Capital Reporting Company

Page 1

```
       IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF KANSAS


- - - - - - - - - - - - - - - - -x

APSLEY, et al.,           :
                          :
        Plaintiff         :
                          :
   vs.                    :  Case No.
                          :  05-1368-MLB-KMH
THE BOEING COMPANY AND SPIRIT  :
AEROSYSTEMS,              :
                          :
                          :
        Defendant         :
- - - - - - - - - - - - - - - - -x
              Washington, D.C.

           Friday, March 6, 2009
```

Deposition of:

   CAREN GOLDBERG, Ph.D.

called for oral examination by counsel for

Defendant, pursuant to notice, at 1150 Connecticut

Avenue, N.W., Suite 200, before Monica A. Voorhees,

of Capital Reporting, RPR/CSR, a Notary Public in

and for the District of Columbia, beginning at

9:10 a.m., when were present on behalf of the

respective parties:

Capital Reporting Company

Page 298

1  Q.  And how many aircraft companies have you
2  run?
3  A.  Not a whole lot.
4  Q.  How many businesses have you run?
5  A.  One.
6  Q.  Which one?
7  A.  My consulting practice.
8  Q.  How many businesses where you
9  manufactured anything have you run?
10  A.  None.
11  Q.  Other than the consulting services you
12  offer to whomever you do in conjunction with your
13  teaching, have you ever been responsible for the
14  management of, let me add to that, taking out
15  teaching assistants, I want to ignore your work in
16  academia.
17  A.  Okay.
18  Q.  You've never managed any aspect of a
19  business, right?
20  A.  What do you mean by manage?
21  Q.  Been entrusted with responsibility for
22  utilizing a set of resources, be they capital,

Page 299

1  physical or human, and delivering a good or a
2  service to a customer of the business?
3  A.  Doing all of that?
4  Q.  Or any of that?
5  A.  Yeah, when I worked at, when I was a
6  marketing coordinator I did that.
7  Q.  When you worked as a marketing -- and
8  that, you were responsible as marketing coordinator
9  for, was it Bind It Corporation?
10  A.  Correct.
11  Q.  And the Bind It Corporation was
12  primarily, or at least when you worked for them,
13  they offered their services to perhaps law firms to
14  bind be they briefs or presentations or documents?
15  A.  They were a manufacturer, they sold the
16  binders to law firms or, and they made, they had a
17  printing facility on site.
18  Q.  And you were a coordinator, you
19  coordinated, what, marketing activities?
20  A.  Yes.
21  Q.  Which involved?
22  A.  Where we were going to place our ads,

Page 300

1  what direct mail lists to buy, what trade shows to
2  attend, whether or not to keep our current
3  advertising agency, when we needed to invest in new
4  advertising materials.
5  Q.  And you didn't have any employees who
6  reported directly to you, right?
7  A.  Not exactly.
8  Q.  There was a sales team that reported to
9  the sales manager?
10  A.  Uh-huh.
11  Q.  And the work that you did certainly
12  impacted those salespeople, right?
13  A.  Right.
14  Q.  But you didn't, you weren't responsible
15  for hiring, for disciplining, for firing those
16  people, right?
17  A.  Correct.
18  Q.  And you worked as the, as a marketing
19  coordinator for about a year and a half; is that
20  right?
21  A.  That sounds about right.
22  Q.  And then the only other job you had --

Page 301

1  well, in addition to that work at Bind It
2  Corporation and excluding your work in academia,
3  since the time that you graduated from college, you
4  also worked on a project basis for United Health
5  Services --
6  A.  Right.
7  Q.  -- for a few months, right?
8  A.  About, I think it was closer to a year,
9  but I'll take your word for it.
10  Q.  It was about 10 months?
11  A.  Okay.
12  Q.  Right?  According to your CV?
13  A.  Okay.  I'm sure at one time when I put
14  my CV together I calculated it.
15  Q.  Were you actually a W-2 employee of
16  United Health Services?
17  A.  Yes.
18  Q.  And the project you were doing was
19  designed in implementation of a new compensation
20  system, is that it?
21  A.  No, it was, basically I was hired to do
22  a study on the feasibility of an attendance

76 (Pages 298 to 301)

Capital Reporting Company

Page 302

1  incentive program.
2  Q. As it related to compensation, right?  I
3  guess I'm wondering why the word compensation was in
4  your title?
5  A. Well, that's the department I was in.
6  Q. Didn't involve any kind of supervision
7  over anybody, right?
8  A. Correct.
9  Q. Didn't involve having to make decisions
10 regarding hiring or firing or promotion or anything
11 like that, right?
12 A. Correct.
13 Q. If we exclude your hiring, teaching
14 assistants that you've done during your time in
15 academia, you've never actually worked in a private
16 enterprise where you were entrusted with or
17 responsible for making personnel decisions, right?
18 A. Not internal.
19 Q. Well I believe you're referring to when
20 you were with Bind It Corporation, you were
21 responsible for deciding whether or not to continue
22 to use the advertising agency?

Page 303

1  A. Right.
2  Q. That would be vendor selection, right?
3  A. Right.
4  Q. Okay.  You certainly didn't dictate to
5  the advertising agency how much they should pay
6  their employees or whether somebody should be
7  promoted within their organization or whether
8  somebody should be hired by their organization or
9  fired by their organization, right?
10 A. It might have come up, actually.
11 Q. Well not saying might, did it I guess is
12 the --
13 A. There were performance issues for one of
14 the employees there.  Whether or not we actually
15 talked about firing her, I know we talked about, we
16 talked about concerns with one of the employee's
17 performance, with the performance of one of the
18 employees.
19 Q. I think my question, though, was if
20 you've ever been in a position where you were
21 responsible for making personnel decisions and the
22 answer to that is no, right?

Page 304

1       MR. WILLIAMSON:  Hold on, hold on, I'm
2  going to object to the form because your question
3  was outside of academia.
4       BY MR. TEDESCO:
5  Q. Yeah, outside of academia, you've never
6  been in a position of responsibility where you had
7  to, using real time information, make a business
8  decision concerning a personnel matter, right?
9  A. Right.
10 Q. Is your consulting, I see your
11 consulting work -- let me start that one over.
12      You offer your services as an expert --
13 well, yeah, as an expert witness or, and for
14 training, right?
15 A. Uh-huh, yes.
16 Q. And that's, and you give some examples,
17 well let me ask, well actually you list your
18 consulting, training and speaking activities on
19 pages 36, 37 and 38 of your Exhibit 2, which is your
20 expert report and accompanying CV, right?
21 A. Some of them, most of them.
22 Q. Some of these things listed under

Page 305

1  consulting, training and speaking are simply that,
2  they're speaking activities, right?
3  A. Yes.
4  Q. For example, right, the second one
5  listed, George Mason University 2008, you were
6  invited to speak at a conference on teaching and
7  training workplace diversity, right?
8  A. Right.
9  Q. But other than talking to a group about
10 how to teach and train workplace diversity, you were
11 not in a position as a result of that speaking
12 engagement or really any of your other speaking
13 engagements to have to make in real time decisions
14 concerning personnel matters, right?
15 A. Right.
16 Q. And the same would go for your training
17 that you do, perhaps for a group of, actually I
18 don't know what your, what the training is, why
19 don't you identify for us one of the training
20 activities or?
21 A. Center for Excellence in Public
22 Leadership, Council of Governments, Center for

77 (Pages 302 to 305)