# EXHIBIT 43

## Capital Reporting Company

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

```
-----------------------------------:
APSLEY et al.,                     :
                                   :
        Plaintiffs,        :
                                   :
vs.                : Case No.
                   : 05-1368-MLB-KMH
THE BOEING COMPANY and SPIRIT      :
AEROSYSTEMS,                       :
                                   :
        Defendants.       :
-----------------------------------:
```

Washington, D.C.

Tuesday, January 27, 2009

Deposition of:

CHARLES R. MANN, PH.D.

called for oral examination by counsel for

Defendants, pursuant to notice, at Gibson, Dunn

& Crutcher, 1050 Connecticut Avenue, Northwest,

Suite 200, Washington, D.C., before Shari

R. Broussard, RPR, CSR, of Capital Reporting

Company, a Notary Public in and for the District of

Columbia, beginning at 10:13 a.m., when were present

on behalf of the respective parties:

# Capital Reporting Company

Page 2

1       A P P E A R A N C E S
2  On behalf of Plaintiffs:
3     UZO L. OHAEBOSIM, ESQUIRE
       The Law Offices of Uzo L. Ohaebosim
4      510 N. Topeka
       Wichita, Kansas 67214
5      (316) 633-4108
       u-ohaebosim@swolawfirm.com
6
   On behalf of Defendants:
7
       JAMES M. ARMSTRONG, ESQUIRE
8      Foulston Siefkin, L.L.P.
       Commerce Bank Center
9      1551 N. Waterfront Parkway, Suite 100
       Wichita, Kansas 67206-4466
10     (316) 291-9576
       jarmstrong@foulston.com
11
12
13
14
15
16
17
18
19
20
21
22

Page 3

1         C O N T E N T S
2  EXAMINATION BY:              PAGE
3     Counsel for Defendants        4
4
5
6  MANN DEPOSITION EXHIBITS:  *        PAGE
7  1 Expert Statistician Report, 1/14/02     6
8  2 E-mails                     8
9  3 Documents, Bates SAP236374 to 78     22
10 4 Testimony List              67
11
12
13 REQUEST FOR MATERIALS/DOCUMENTS TO BE PRODUCED
14 Page 18, Lines 1 through 8
15
16
17
18
19
20
21
22  (*Exhibits attached to transcript.)

Page 4

1         P R O C E E D I N G S
2  WHEREUPON,
3        CHARLES R. MANN, PH.D.
4  called as a witness, and having been first duly
5  sworn, was examined and testified as follows:
6        EXAMINATION BY COUNSEL FOR DEFENDANTS
7  BY MR. ARMSTRONG:
8     Q   Would you state your name and business
9  address for the record, please.
10    A   Charles R. Mann, M-A-N-N, 1111 14th
11 Street, Northwest, Suite 800, Washington, D.C.
12 20005.
13    Q   Dr. Mann, you have been retained as an
14 expert witness in a case pending in Federal
15 District Court in Wichita, Kansas, entitled Apsley
16 versus Spirit and The Boeing Company; is that
17 correct?
18    A   Yes.
19    Q   And you've submitted a written report
20 with regard to your work in this case; is that
21 correct?
22    A   Yes.

Page 5

1     Q   We discussed it off the record and you
2  wanted me to confirm on the record, but per the
3  usual procedure, we will be compensating you for
4  your time during the deposition here today, so
5  probably the best way to do that is I'll handle
6  that through Mr. Williamson at the conclusion.
7     A   I'm sorry, I couldn't hear you.
8     Q   I will handle that through Mr. Williamson
9  at the conclusion of the deposition if that's all
10 right with you.
11    A   Yes.
12    Q   Okay.  Very good.
13        What did you do to prepare for the
14 deposition today?
15    A   Actually nothing.
16    Q   Did you read over the report that you
17 submitted in the case?
18    A   No.
19    Q   When's the last time that you read that
20 report?
21    A   When I sent it to Mr. Williamson.  I
22 think that's about a week ago.

2 (Pages 2 to 5)

Capital Reporting Company

Page 6

1    Q   Okay.  Let's do this, let's go ahead and
2  mark the report now so that we all have it in front
3  of us.
4         (Mann Exhibit Number 1 was
5         marked for identification.)
6  BY MR. ARMSTRONG:
7    Q   I've got an extra if you want one for
8  some reason.
9         I've marked as Deposition Exhibit Number
10  1 a copy of the report that I received from
11  Mr. Williamson in this case.
12         If you would do me a favor and look
13  quickly through that and confirm for me that that
14  is the report that you submitted to Mr. Williamson
15  sometime in the last several weeks.
16    A   It appears to be, yes.
17    Q   Okay.  And calling your attention to
18  paragraph seven on the first page of that report,
19  it says that in February of 2008 you were retained
20  by Mr. Williamson and his law firm representing the
21  plaintiffs to provide statistical analysis services
22  in this matter.  Do you see that?

Page 7

1    A   I do.
2    Q   Did you have any written communication
3  with Mr. Williamson at that time in terms of either
4  e-mails or letters?
5    A   I -- I don't remember, but early on I'm
6  sure there was at least an exchange of contact
7  information, so I suspect the answer is yes.
8    Q   Okay.  And then in the next paragraph,
9  paragraph eight of the report, it says, "In May of
10  2008, counsel provided data files for analysis,"
11  and then, "In June of 2008" -- this is now
12  paragraph nine -- "we prepared analyses of the data
13  files and provided questions to counsel.  We were
14  told that we would be provided with additional
15  information."  Do you see that?
16    A   I do.
17    Q   During that May-June time frame do you
18  think that you had communications with
19  Mr. Williamson?
20    A   Yes.
21       MR. ARMSTRONG:  Let me do this and mark
22  the next exhibit as Exhibit 2.

Page 8

1         (Mann Exhibit Number 2 was
2         marked for identification.)
3  BY MR. ARMSTRONG:
4    Q   And, Dr. Mann, I will represent to you
5  that Exhibit 2 is a printout of e-mails that we
6  received from Mr. Williamson as a part of your work
7  in this case and he provided that to us, as I
8  recall, within a day or two after he sent us your
9  report, which is Exhibit 1.  And if you take a
10  quick look through Exhibit Number 2, you will see
11  that all of these e-mails going back and forth
12  between you and Mr. Williamson are basically
13  between December 11, 2008, which is the first
14  e-mail on the first page of Exhibit 2, and they run
15  through January 6th I believe it is.  Let me look
16  and see if that's correct.  Yeah, I believe the
17  last e-mail in that sequence -- and there are a
18  number of duplications you'll see, but we just
19  printed out the file that Mr. Williamson sent to
20  us.
21       My question -- that's a long lead into my
22  question -- this set of communications begins in

Page 9

1  December of 2008, but we can see from the face of
2  your report that you were in contact with
3  Mr. Williamson beginning back in February of 2008
4  and actually had some data files provided to you in
5  May and some analysis that you prepared in June.
6       My question is where are the written
7  communications that you had with Mr. Williamson
8  back in that time period, in other words, from
9  February 2008 up through December of 2008, which is
10  where Exhibit 2 seems to start?
11    A   Please repeat the period again.
12    Q   From February of 2008, when you were
13  retained, up until December 2008, which is where
14  Exhibit 2 seems to start.
15    A   I believe he withheld them, but -- and I
16  believe he told me he was going -- that anything
17  with the earlier period he was going to withhold.
18    Q   Okay.  So if I'm understanding that
19  answer, you provided your e-mail communications to
20  Mr. Williamson for the entire period, but he
21  indicated to you that he was only going to produce
22  to the defense in this case the e-mails beginning

3 (Pages 6 to 9)

Capital Reporting Company

Page 10

1  in December 2008?
2      A   The second part of that is correct.  I
3  think the first part is also, but I'd be more
4  comfortable if I checked on it.
5          I had somebody in the office assemble all
6  e-mails, too, and I can't remember whether I told
7  them to include them all, but I think did.
8      Q   Okay.  All right.
9          MR. ARMSTRONG:  Well, Uzo, we'll
10  follow-up on that with you all.
11          MR. OHAEBOSIM:  That's fine.
12          MR. ARMSTRONG:  I'm not quite sure what
13  the rationale would have been for excluding the
14  earlier communications, but we'll do what we can.
15          MR. OHAEBOSIM:  Okay.
16  BY MR. ARMSTRONG:
17      Q   Focusing back on your report, Deposition
18  Exhibit 1, did you provide Mr. Williamson with any
19  draft of the report for his comments prior to
20  finalizing the report?
21      A   I know I sent him drafts of the tables
22  that appear at the end.

Page 11

1      Q   Okay.
2      A   I -- when I sent the report -- when I
3  send any report in general and here, it was my
4  understanding if there's any problem or error or
5  omission, that I be told.  So in that sense I don't
6  remember getting back any -- any feedback to change
7  it.  Again, I'd have to --
8      Q   That was ultimately -- I'm sorry.
9      A   I'd have to refresh my memory as to
10  whether we got any feedback.
11          I do know -- I mean I can remember one
12  thing we found, which was, on the tables, which was
13  almost a typo, meaning the -- the programmer left a
14  word off and it got left off a lot of places so
15  that the tables had to be fixed.
16      Q   Do you remember which word that was?
17      A   Yes, it was the word "not," which is not
18  a good word to be left off.
19      Q   Probably not.  Can you turn to one of the
20  tables and identify it by page number and --
21      A   Yeah.  If you'll look at all the -- I
22  think it's all the tables, but hang on a second --

Page 12

1  and the attachments.  I'm looking at the first
2  page.
3      Q   Page five in the lower right-hand corner?
4      A   Yes.
5      Q   All right.
6      A   At the top you see the word "not" sticks
7  out from the second set of columns on the right?
8      Q   The not hired column?
9      A   Yeah.  I think we were missing that line
10  on everything.
11      Q   Okay.
12      A   And we -- because he called me and he
13  said the numbers make sense but the wording
14  doesn't.
15      Q   Okay.  So you corrected the hired column
16  to not hired on all the tables?
17      A   That's correct.  I mean the numbers were
18  correct.
19      Q   Right?
20      A   It's just that word got left off.
21      Q   Well, ultimately that was going to be my
22  question, is do you recall as you sit here today

Page 13

1  any other comments that, or any comments that
2  Mr. Williamson or anybody else representing the
3  plaintiffs gave you with regard to any draft report
4  that you submitted?
5      A   Well, I'm not sure it was with regard to
6  a draft, but the only -- we discussed whether I
7  should discuss the early work that we did, which
8  we're not using, and the answer was no.
9      Q   Okay.
10      A   So that -- that was never put in, in
11  draft form.  It formed a rule for me in writing the
12  report.
13      Q   All right.  I understand what you're
14  saying and I may ask you some more about that
15  earlier work, but I understand what you're saying.
16          So you're indicating that at some point
17  prior to finalizing the report Mr. Williamson
18  suggested that there was no need to discuss the
19  earlier work or provide tables from that earlier
20  work?
21      A   Oh, I think I actually asked that.
22      Q   You asked him and he said --

4 (Pages 10 to 13)

Capital Reporting Company

Page 14

1    A   Yes.
2    Q   -- no, we don't need to do that?
3    A   That's correct.
4    Q   Did he give you a reason why he didn't
5 want that included?
6    A   I thought he said that he had spoken to
7 counsel, meaning you, and that it was agreed that
8 we didn't have to do anything with the earlier data
9 or he would handle that.  Something along that
10 line.
11   Q   Okay.
12   A   But I had the impression that would not
13 surprise you.
14   Q   Okay.
15       MR. OHAEBOSIM:  Not to interrupt you,
16 just for the record and so that it's clear, I do
17 believe that there was data that was updated that
18 was sent to Mr. Williamson.
19       MR. ARMSTRONG:  That's correct.
20       MR. OHAEBOSIM:  And so we just want to
21 make sure that we're delineated in saying that
22 there wasn't -- that we know that there was --

Page 15

1        MR. ARMSTRONG:  No, no, we did update the
2 data and that's the data that it appears that Dr.
3 Mann is now using.
4        THE WITNESS:  I'm not sure if this is
5 germane to what you just said, but my understanding
6 is we provided you -- I thought we provided you
7 with, or maybe we provided him with complete
8 records and he decided what was to be sent to you.
9 BY MR. ARMSTRONG:
10   Q   Okay.  That actually is my next subject
11 matter area.
12       Did you provide Mr. Williamson -- we have
13 the e-mail communications that we've marked as
14 Exhibit 2.
15       Did you provide Mr. Williamson any sort
16 of work papers or anything of that nature?
17   A   No.  We provided -- well, of that nature.
18 We didn't -- we didn't have any work papers to
19 provide, but we did send e-mails containing files
20 and I'm under the impression we included early
21 files.
22       The first time we take a break today if

Page 16

1 you'd like, I'll check with my office to confirm
2 that, but there should be no mystery in that
3 regard.
4    Q   In other words, take a look at Exhibit 2,
5 which is, again, the e-mail traffic, and just as an
6 example turn to the very last page of that exhibit.
7 You will see some e-mail traffic from Will Martin
8 to you attaching various analyses; is that correct?
9    A   That's correct.
10   Q   And, again, these e-mails are in the
11 January time frame.  And then if you flip forward
12 in sequence from some of the e-mails, you'll see
13 that you sent those attachments on to
14 Mr. Williamson.
15       My question is, are you saying, as you
16 sit here today, that you think you sent him the
17 same types of analyses with that earlier data set?
18   A   Not -- I'm not saying the same types.
19 What I'm saying is whatever we did earlier I
20 thought we provided, but --
21   Q   Okay.
22   A   -- I'm not a hundred percent sure and

Page 17

1 I'll check.
2    Q   That's fine.  That's fine.
3        So it's your testimony that when I use
4 the phrase "work papers," you didn't actually
5 generate anything of that kind as a result of the
6 work in this case, you generated the various
7 analyses, but no "work papers"?
8    A   When I say "work papers," no handwritten
9 comments, notes.
10   Q   Right.
11   A   We had nothing to send.
12   Q   Okay.  Very good.
13       How many hours have you personally billed
14 on this matter?  Do you have an estimate of that?
15   A   I -- I don't know.  I'd have to look that
16 up.
17   Q   Would the answer be the same with regard
18 to anyone else on your staff?
19   A   Well, yeah, and part I -- I'm not -- in
20 my mind I'm remembering -- trying to remember bills
21 and I won't remember the detail, just the totals,
22 if any.

5 (Pages 14 to 17)

Capital Reporting Company

Page 18

1      MR. ARMSTRONG:  Uzo, we did not get any
2  of the billing statements for Dr. Mann's work and
3  we would request those.  Obviously I don't need
4  them today I don't think --
5      MR. OHAEBOSIM:  Okay.
6      MR. ARMSTRONG:  -- but I think we're
7  entitled to see them to kind of track the work that
8  was done.
9  BY MR. ARMSTRONG:
10     Q   I assume that Will Martin, whose name
11  shows up on some of these e-mails in Exhibit 2, is
12  one of your staff?
13     A   That's correct.
14     Q   Is that correct?
15        What's his background?
16     A   He has -- I forget what he has a master's
17  degree -- he has a master's degree, but I forget in
18  what.  He's worked for me for, I think it's eight
19  years, nine years, as a project manager,
20  programmer, analyst.
21     Q   Did he basically run the analysis that
22  was done with regard to the work in this case?

Page 19

1      A   When you say "run it," you mean actually
2  run the computer model?
3      Q   Yes.
4      A   Address the computer?
5      Q   Yes.
6      A   He does the programming.
7      Q   In other words, you would tell him go
8  compare under 40 and 40 and over for hired versus
9  not hired?
10     A   Correct.
11     Q   And he would go do the work?
12     A   A little more I might tell him which
13  technique to use, but, yes.
14     Q   Okay.
15     A   Having worked together for many years,
16  there's a shorthand of telling him what to do, but,
17  yes, I tell him what to do and then he runs it.
18     Q   Okay.  Very good.
19     A   And just to make sure I've answered you
20  completely, there's another person that also might
21  have been involved, but not in the -- not in the
22  data that's in front of us.

Page 20

1      Q   And who was that?
2      A   Kathryn -- what was her name when she
3  started?  When she started -- well, she's Kathryn
4  Hayer.  When she started -- I forgot her maiden
5  name.  She got married somewhere along the line and
6  I forgot her maiden name for the moment.
7      Q   Are you indicating that she --
8      A   Shaffer.
9      Q   I'm sorry?
10     A   S-H-A-F-F-E-R.
11     Q   All right.  How do you spell her married
12  name now?
13     A   H-A-Y-E-K.
14     Q   Okay.  And are you indicating that she
15  may have done some of the work on the earlier data?
16     A   I think she did, or at least there was a
17  time when one of them was on vacation and something
18  had to be done, but I -- the reason I remembered is
19  in the latter stage, when I was checking to see
20  whether we had anything to send, I remember that I
21  had to check with her to see if she had anything.
22     Q   Okay.  Very good.

Page 21

1      Take a look at Exhibit 2, which is the
2  set of e-mails, and if you could, flip down through
3  to an e-mail dated December 19.  I'm going to come
4  around and show you --
5      A   Coincidentally, I opened to one dated
6  December 19.
7      Q   Okay.  Let me see where that one is.
8  Unfortunately these are not paged.  Coming back I
9  little bit from that.
10     A   Earlier?
11     Q   Yeah, earlier.  Let's see.  That's the
12  page I'm looking for (indicating).
13     A   Is that the letter from Mr. Williamson?
14     Q   Yes, it is.
15     A   Okay.
16     Q   I think it's further back from that.  I
17  think maybe we're going the wrong way.
18     A   Going the wrong way?
19        MR. ARMSTRONG:  Let's go off the record
20  for a second.
21        (Discussion off the record.)
22  BY MR. ARMSTRONG:

6 (Pages 18 to 21)

Capital Reporting Company

Page 22

1      Q   I've placed before you an e-mail from
2  Mr. Williamson to you dated December 19, 2008, at
3  3:10 in the afternoon, and basically this is the
4  e-mail where Mr. Williamson is outlining what he
5  would like you to do with this new data; is that
6  correct?
7      A   That's correct.
8      Q   Okay.  You see in the second line of the
9  e-mail "the above file"?  I assume that means the
10 data file was attached to his e-mail, but what I'm
11 really after is "(and corresponding data
12 dictionary)."  Do you see that?
13     A   I do.
14     Q   Do you remember a written definition, if
15 you will, of the fields in the data?
16     A   I remember it exists -- something
17 existing and asking Will some questions about it or
18 he asked me some questions about it.
19     Q   Let me mark that as the next exhibit and
20 see if you recognize it.
21         (Mann Exhibit Number 3 was
22         marked for identification.)

Page 23

1  BY MR. ARMSTRONG:
2      Q   I'm handing you what's been marked as
3  Deposition Exhibit 3 and ask if you have ever seen
4  this written field description sheet that
5  identifies the various fields in the data that you
6  got and what some of the descriptions mean.
7         Have you ever seen that before?
8      A   I -- I'm not certain.  I don't recall.
9      Q   You're not saying you haven't, you just
10 don't recall as you sit here today?
11     A   I'm sorry?
12     Q   You don't recall whether you've seen it?
13     A   I don't recall, no, it just doesn't -- I
14 can't say yeah, I remember seeing this page.
15     Q   Okay.
16     A   I'm just looking to see if it has
17 anything that I said oh, yeah, I remember looking
18 at that.
19         No.  The reason I say no I don't is
20 because I don't remember -- I had to ask
21 Mr. Williamson what SSG stood for --
22     Q   Okay.

Page 24

1      A   -- and I don't remember having seen that.
2      Q   Okay.  Very good.
3         Now, back on the December 19 e-mail
4  Mr. Williamson asks you to run tests or analyses on
5  the data for outcome and for recommendation, and
6  we'll talk some more about that as we go through
7  your report, but my question preliminarily is did
8  you do any independent review or analysis to
9  determine whether you thought those were the right
10 tests to run?
11     A   Well, let me answer that in two parts.
12 What you just asked is whether those are the right
13 tests to run, and the answer is in some sense
14 that's not really up to me because he didn't give
15 me a subject and say what do I do to get this, he
16 told me run these tests.  But as a -- when I say
17 give me the test to run, I -- I mean a statistical
18 test.  In other words, if he had said -- the most
19 common request is run a regression on this from --
20 usually from someone who has no idea what a
21 regression is but saw in a court pleading.
22     Q   Right.

Page 25

1      A   That we don't -- that we don't do, we
2  don't allow.  Tell us what you want to know.  I'll
3  decide on the statistical procedure.
4         In this case when this came in, I
5  remember my reaction to it was -- was basically
6  hey, we understood our discussions.
7         In analyzing the earlier data, the wrong
8  data, we had gone through all these concepts and I
9  explained to him what we do and how and which ones
10 I wanted and he would say well, that's an issue
11 that's not at -- that's not at issue here or that
12 is in issue here.  So we had sort of gone through
13 this all before.  I expected to go through it
14 again.  Instead, I got this letter and I remember
15 talking to Will about it.  I said it's coherent and
16 it says exactly what we would run, so I don't see
17 any reason to -- I mean we just didn't see any
18 reason to go back to him.  There was nothing else
19 that I would have added that he hadn't said we
20 didn't want and there was nothing else -- there was
21 just nothing really to discuss.  It was a
22 straightforward and well written request.

7 (Pages 22 to 25)

Capital Reporting Company

Page 26

1    Q   Okay.  So if I'm understanding you
2  correctly, you're saying back in the earlier period
3  when you had the earlier set of data and did the
4  analysis that I think your report indicates was
5  done in June of 2008, you had communications with
6  Mr. Williamson at that time back and forth about
7  what kind of analysis he wanted and your discussion
8  with him about how to get there?
9    A   Back then it was more a matter of what
10 did he -- the way I approach any of this is what do
11 you want to say?  What would you like to say the
12 statistician is going to show?
13   Q   Right.
14   A   And then I'll find out if I can say it
15 or, if I can't, why not.
16   Q   Right.
17   A   What can I do close to it?  I -- if he
18 had presented me this on the first approach, I
19 would have been shocked because you just don't get
20 a request like this.
21        On the second approach I was very
22 surprised.  You usually don't get it completely

Page 27

1  absorbed so that it can be written in this kind of
2  letter --
3    Q   Okay.
4    A   -- but it was.
5    Q   Were these earlier communications with
6  Mr. Williamson oral or, to your recollection as you
7  sit here today, would they have been in e-mail
8  exchanges or some other kind of written
9  communication?
10   A   No, in the great part they were
11 telephonic -- they were telephonic.
12   Q   Okay.  So you're saying that back in the
13 earlier time frame you would have had discussions
14 by phone with Mr. Williamson about analyzing hired
15 versus not hired, which is the outcome analysis?
16   A   Right.
17   Q   And recommended versus not recommended,
18 which is the recommendation analysis?
19   A   Yeah.  In any RIF analysis we, or this
20 is -- I think of this similar, but we always want
21 to know what was the mechanism because the
22 statistician analyzes what the decision process

Page 28

1  brought about, not whether it's the right decision
2  process.  That's out of our area.  But once we know
3  what it is, the question is was it used at random
4  or was it used in a disparate -- did it produce
5  disparate results.
6        So we had a lot of discussions.  I
7  explained the statistical techniques, I explained
8  the statistical concept.  I don't mean like a
9  course, but just the concept of how we do things.
10 And this is similar to where we got on the earlier
11 set, but it had never been -- I never sent him
12 anything like this on the first set, so he digested
13 it well and came back with this.
14   Q   Did you suggest any other types of
15 analyses other than testing outcome and
16 recommendation?
17   A   Not -- certainly not on the second
18 go-around.  On the -- on the first go-around --
19   Q   Yeah, my question really was on the first
20 go-around because I know these are the ones you
21 did.
22   A   On the first go-around we looked at

Page 29

1  others.  I can't remember whether I suggested or he
2  suggested, but it was more a matter of my saying to
3  him well, tell me how the decision-making worked,
4  who was told to do what.  And that's never an easy
5  question because it's never that simple, that black
6  and white.  But he was describing it to me.
7        I think we looked -- I think we -- I know
8  we looked at another possibility other than
9  director as a possible variable that might have
10 been taken into account and we may have looked --
11 I -- I think we looked at something else on the
12 larger scale.
13        We certainly -- there is some analyses
14 that I don't consider appropriate but that I know
15 somebody is going to do, and so we want to look at
16 those also, and I -- I'm sure we generated those.
17   Q   Do you remember what those were?
18   A   In general yes, I do.  They're -- they're
19 always the overall analysis where you just look at
20 the grossest numbers, how many bodies, how many
21 survived, how many didn't with no characteristics
22 taken into account.

8 (Pages 26 to 29)

Capital Reporting Company

Page 30

1    The other one I do remember now, when
2  he -- when he first approached me, one of the
3  things he was interested in was comparing average
4  ages before and after, and I -- basically I believe
5  I dissuaded him from doing that.  I -- I think
6  that's not a relevant concept in an age
7  discrimination case.
8    Q    Why not?
9    A    Because age is a dichotomy.  It's -- the
10 way it's treated in the law.  It's at least 40
11 versus under 40.
12     If you would like, you can bring other
13 splits in, but when you talk about mean age, you
14 can get -- you can -- we regularly see adverse
15 impact against older people while the mean age goes
16 up.  And one side will argue see, we don't
17 discriminate and the other will argue yes, you do.
18 It doesn't mean anything.
19     The reason is when you get somebody who's
20 60, you've got 20 years beyond the 40 and so if you
21 keep them, you add 20 years extra to the older
22 people, whereas when you get rid of somebody 41,

Page 31

1  you only lose one year.  But you could get rid of
2  all the people on one side that are close and just
3  by keeping one on the other side that's far away
4  balance out the means.  It just doesn't lead to a
5  decent inference.
6     The loss deals with the law and -- and
7  the subject deals with proportionality, not with
8  mean age.  They don't say that you can't have the
9  mean age go up and down.  They -- they want to know
10 do you impact people over age 40.
11    Q    And so that explanation you think, or
12 that discussion I should say, you believe you had
13 something along that line with Mr. Williamson early
14 on in your work?
15    A    Yeah, and that's pretty standard in the
16 first time someone comes to me with an age case on
17 either side.  That's a common problem.  Not a
18 problem, but a common first discussion why that's
19 not really relevant.
20    Q    Did you review as a part of your work the
21 complaint in this case?
22    A    I did very early on.  I had the complaint

Page 32

1  and I read it.
2    Q    Did you review any depositions that have
3  been taken?  I'm just trying to find out kind of
4  the background.
5    A    I don't think so.
6    Q    Did you review anything about who the
7  named plaintiffs are?
8    A    Actually even if that was in the
9  complaint, I tend to skip that over.
10    Q    Okay.  I assume the same would be true
11 for anybody that's opted into the case.  You
12 haven't made any analysis of --
13    A    That's --
14    Q    -- comparators?
15    A    -- correct.
16    Q    You indicated that in these earlier
17 discussions with Mr. Williamson, which you think
18 were oral, that you asked him to describe the
19 decision-making process and that kind of thing; is
20 that right, you wanted to know how it worked?
21    A    Yes.
22    Q    What do you recall being told about how

Page 33

1  it worked?
2    A    Not -- not very much with absolutes.  I
3  don't think he -- my memory is that he would say
4  something and I'd push and well, not always.  I
5  mean it's not uncommon, but we didn't have a letter
6  that said everyone is going to do this and another
7  letter that said here's what they did.
8     My -- my memory is we had to sort of try
9  to figure it out or see what it could have been.
10 That's why I said the first time around I think
11 we -- I'm sure we analyzed something other than
12 director.
13    Q    Do you think it was below director or
14 above director?
15    A    I'm not sure it was an alternative rank.
16 I can't remember what it was.  It might have been
17 another aspect of the work or something.  But there
18 was -- when we got -- when we got to the --
19 somewhere along the line I remember saying I wanted
20 to know -- oh, this was towards -- actually after
21 we had seen some results.  I wanted to know when we
22 looked at directors, what kind of people they were

9 (Pages 30 to 33)

Capital Reporting Company

Page 34

1  looking at.  In other words, does a director look
2  at top to bottom or does it look -- does the
3  director look only at people at somewhat the same
4  rank, might one person handle both very low-level
5  people and very-high level, and the answers were
6  not solid, I didn't seem to get an absolute answer
7  to that.
8      Q    In other words, there wasn't a clean --
9      A    Right.  I was trying to actually, as
10  you'll see in the report itself -- this was the
11  part I remember because we did it more intensely,
12  was when we did the -- the report that you're
13  seeing and we started to get those results, I
14  looked -- and if you like, I think it's better if I
15  save it, assuming you're going to go look at those
16  reports, I'll go in more detail there, but I
17  will look and say tell me about so and so.
18      Q    Okay.
19      A    And --
20      Q    I understand what you're saying.
21      A    -- we didn't really get much information
22  out of that.

Page 35

1      Q    Okay.  All right.  From your discussions
2  with Mr. Williamson --
3      A    I'm sorry, excuse me a second.  So and so
4  being a director, not an employee.
5      Q    I understand.
6      A    Okay.
7      Q    That's the way I took your answer.
8          In your discussions with Mr. Williamson
9  did you understand that what you were analyzing was
10  a selection process to determine who was going to
11  be the workforce for this new company?
12      A    Yes.
13      Q    Okay.  You described it as a RIF?
14      A    Easier for me to think of it that way,
15  but I understand the difference.
16      Q    You understand the difference.
17          It's actually a selection process by a
18  new company --
19      A    That's correct.
20      Q    -- to determine its workforce?
21      A    Yeah.  In fact, the -- I think the
22  reports are labeled terminations and so on, whereas

Page 36

1  I -- I -- the modeling we're using, the statistical
2  models --
3      Q    Right.
4      A    -- are what we use for RIFs, so I think
5  of it that way.
6      Q    But did you actually change those models
7  so that it was hired versus not hired and
8  recommended versus not recommended, which is the
9  way they're now titled?
10      A    Yeah.  We use less fancy concepts.  We
11  call them the good things and the bad things just
12  to avoid that issue.
13      Q    I understand.  Okay.
14          And I take it, looking again at the
15  December 19 e-mail where Mr. Williamson is sending
16  you the new data set and asking you to run the
17  analysis, that at least from my comparison to the
18  final report it appears that you followed his
19  request in terms of the types of analysis to do; is
20  that correct?
21      A    I believe we did, yes.
22      Q    And we'll go over that in some more

Page 37

1  detail.
2      A    I do want to emphasize that this to my
3  mind when I got it, and I'm telling you this, too,
4  this was not the same as if an attorney came to me
5  with this piece of paper.  This was only possible
6  in my mind because of what we had already done with
7  him.
8      Q    I understand.  The entirety of your
9  testimony to this point indicates that this was
10  sort of the end result of a number of
11  communications that you had had with Mr. Williamson
12  over the months?
13      A    It was essentially -- yeah, it was
14  essentially look, he understood it, he wrote it
15  out, made it straightforward for us.
16      Q    I know it's difficult as you sit here
17  today because we don't have it, but do you believe,
18  looking at this e-mail on December 19, that the
19  analysis that you did of the earlier data was
20  basically the same kind of analysis, in other
21  words, hired versus nonhired, recommended versus
22  not recommended?

10 (Pages 34 to 37)

Capital Reporting Company

Page 38

1    A   Well, except for the fact that I believe
2  in the earlier analyses -- not the issue you just
3  mentioned, but in this issue we're looking at by
4  director -- essentially whether we looked at by
5  director or not.
6    Q   Okay.
7    A   Earlier we had a different criterion than
8  director.
9    Q   What --
10   A   I think -- I can't remember what it was,
11 but I know we looked -- I think we looked at
12 another criterion --
13   Q   Okay.
14   A   -- and we did not see -- in fact, we --
15 we looked -- we didn't see anything. We discussed
16 it more, what was really going on, or maybe we saw
17 something, but there were too many exceptions you
18 could point to and say why would this happen.
19       In some sense it was not satisfying. It
20 looked like there was another level of explanatory
21 variable that was necessary.
22       Ultimately when we got to director, what

Page 39

1  we were working with first not only seemed to be
2  taken -- to be not as -- to not produce as clear a
3  result, but it seemed to be taken into account by
4  the director. And so we -- we wound up in the
5  first round, although we had done other things,
6  focusing on the director.
7    Q   Okay. Let me see if I understand that
8  long answer. You're saying back in the May-June
9  time frame with the earlier set of data you think
10 you first ran analyses that did not include
11 director and then ran some that did?
12   A   I think we first ran possibly at the same
13 time multiple analyses. Let's look at director and
14 let's look at something else.
15   Q   Which you can't tell me today what it
16 was?
17   A   I can't remember what it was, but it's in
18 the materials that were -- I'm sure this is in the
19 materials provided to you.
20   Q   No. It may have been provided to
21 Mr. Williamson, but he didn't --
22   A   Oh.

Page 40

1    Q   -- give us anything about your earlier
2  work. What he produced to us is as if you started
3  in December of 2008. That's the difficulty you and
4  I are both having.
5    A   Yeah, I think we provided -- I think we
6  provided it to him. I don't know what he provided
7  to you --
8    Q   Right. Okay.
9    A   -- except what we see here. But that was
10 the concept, was we -- we got ideas from looking at
11 the early data.
12       When we got to the new data, we did not
13 go back and reexamine the ideas. We were
14 comfortable with using -- with jumping to director.
15 The others didn't seem like a good way to look at
16 it.
17   Q   In other words, in this December 19
18 e-mail, the "by director" was not a new concept to
19 you, you had already considered that in the earlier
20 work?
21   A   That was the one we were focusing on in
22 our earlier work, having eliminated some other.

Page 41

1    Q   And I think I've asked you this before,
2  but in the analysis that you ran using some other
3  variable other than director, you can't tell me
4  whether that analysis was at a higher level than
5  director or a lower level than director?
6    A   The question -- you're assuming that it's
7  a different level of leadership and I don't think
8  it was.
9    Q   Can you give me any more recollection as
10 to what it might have been?
11   A   I think it was a different
12 characteristic. Maybe it was something about the
13 nature of the jobs.
14   Q   Union versus nonunion?
15   A   No, it wouldn't have been that. It
16 wasn't a dichotomy. I don't think it was. It
17 might have been more like -- I don't think it was
18 EEO category, but let's say it would have been more
19 like that where you would put together different
20 jobs.
21   Q   Oh. A job aggregation group?
22   A   Yeah.

11 (Pages 38 to 41)

Capital Reporting Company

Page 42

1    Q    An affirmative action plan, something of
2  that nature?
3    A    Yeah, something along that line.
4    Q    Okay.
5    A    And it turned out while we were looking
6  at it that, as I said, there was -- we weren't
7  getting consistency, and in discussing it, the --
8  that we went back to how was it decided. Well, it
9  wasn't like one person decided for all electrical
10  engineers or for all whatever job you want to pick.
11  It was done by unit, by -- under -- and so -- under
12  directors, and that's where we got to then.
13    Q    Okay. Take a look at your report on the
14  top of the second page. Just to kind of close the
15  loop on this, in paragraph ten you indicate, "On
16  December 19, 2008, we received an e-mail from
17  counsel with a new data set replacing the original
18  data set, and a list of analysis requests."
19        That's the e-mail we've just been looking
20  at, correct?
21    A    That's correct.
22    Q    And you say, "At this point we abandoned

Page 43

1  all our earlier work. It is not being used for
2  this report."
3        I'm assuming that that earlier work still
4  exists somewhere?
5    A    This is a computer -- anything that was
6  run --
7    Q    Right.
8    A    -- still exists.
9    Q    Okay.
10    A    I'm sorry. Let me say that differently.
11  All the files we create -- no files were destroyed.
12    Q    Thank you.
13        And then in paragraph 11, that seems to
14  basically track the e-mail from Mr. Williamson
15  where he is asking you to run analyses on outcome,
16  which is basically hired versus not hired, and
17  recommendation, basically recommended versus not
18  recommended, correct?
19    A    That's correct.
20    Q    And you recite in paragraph 11 that
21  voluntary exits and involuntary terminations prior
22  to January 1, 2005 were to be excluded from all

Page 44

1  analyses. Those not" -- actually I think that says
2  accessed, but I think you meant to say "those not
3  assessed" in the last line. "Those not 'assessed'"
4  --
5    A    Assessed, which I don't have.
6    Q    Yeah -- "'assessed and unable to
7  determine'" were also to be excluded, correct?
8    A    Yes.
9    Q    And those are the instructions that
10  Mr. Williamson gave you in his December 19 e-mail;
11  is that right?
12    A    That's correct.
13        Wait a minute. If not -- I don't
14  remember if they were in that memo or on the phone,
15  but, yes.
16    Q    And you can look, but that basically is
17  in his e-mail. We'll come back to that in a
18  minute --
19    A    Okay.
20    Q    -- because I've got some other questions
21  about that.
22    A    Okay.

Page 45

1    Q    What did you understand the significance
2  of the January 1, 2005 date to be?
3    A    I took it to be a legal demarcation.
4    Q    Nothing more?
5    A    That's correct.
6    Q    Did you ask him about that or do you
7  know? Do you recall?
8    A    I think I knew -- I think I thought that
9  so firmly at the time or I had heard it or --
10    Q    In the earlier work that you did back in
11  the May-June 2008 time frame were you also using
12  January 1 and June 17 as the different points?
13    A    I don't recall.
14    Q    If you used a January 1 date, does that
15  mean that you were analyzing the age of the
16  population as of January 1?
17    A    We -- I'm not sure I got the question.
18  We don't use -- you mean the age of the
19  individuals?
20    Q    Yes, the age of the individuals.
21    A    No. We had -- I'm trying to remember.
22    Q    Let me ask it another way just so you and

12 (Pages 42 to 45)

Capital Reporting Company

Page 46

1  are communicating.  As I understand the work that
2  you did, and I know the dates switched from
3  January 1 to February 22 later on, and we'll see
4  that in your report -- and actually why don't we
5  cover that now because it's going to make more
6  sense.
7         Down in paragraph 16 of your report, do
8  you see that?  I'm sorry, not --
9     A   Paragraph 16?
10    Q   Fifteen.
11    A   Fifteen?
12    Q   Basically your report says you first did
13 analysis using January 1 as the date and then you
14 were instructed or asked to switch to February 22
15 as the earlier date.
16    A   Correct.
17    Q   Do you see that?
18        What were you told as to why that switch
19 was being made?
20    A   I forget, but I remember when it happened
21 that --
22    Q   Do you recall that February 22 was the

Page 47

1  date that Boeing and Spirit signed the Asset
2  Purchase Agreement?
3     A   That's the word I couldn't think of.
4  Yeah, there was an agreement.
5     Q   Okay.  Well, did you generate analysis
6  using January 1 and June 16?  Do you recall?
7     A   I think -- well, let me just see.  I know
8  we -- we asked to start the date from -- move the
9  date from January 1 to February 22nd.
10    Q   Right.
11    A   And we abandoned the earlier -- so we had
12 generated analyses.
13    Q   Okay.  And, again, that would exist
14 somewhere?
15    A   That's correct.
16    Q   Do you think you actually sent that
17 analysis to Mr. Williamson since you switched to
18 the February date?
19    A   I can't remember.  I remember -- I
20 remember looking at it, I remember talking with him
21 about it.  I don't remember whether he had it in
22 his hands or I was telling him what I saw, but I --

Page 48

1  I think we sent it.
2     Q   Okay.  Now, take a look at paragraph 14
3  of your report, which is Exhibit 1.
4     A   Right.
5     Q   "We were asked to provide age
6  distributions of employees on January 1, 2005 and
7  June 6th, 2005.  These were provided to counsel."
8         First question is what do you mean by
9  "age distributions"?
10    A   The age of the population on -- of how
11 many people were at each age in that -- at that
12 date.
13    Q   Okay.  You mean how many people were 35
14 and how many people were 36 --
15    A   Exactly.
16    Q   -- how many people were 37, et cetera?
17    A   Number of percentage of people in each
18 age group.
19    Q   Okay.  And you provided those to counsel,
20 but I don't see those anywhere in your report.
21    A   That's correct.
22    Q   Okay.

Page 49

1     A   I did not use them.  I -- I wanted you to
2  know we did it --
3     Q   Okay.
4     A   -- but I'm not relying on it for
5  anything.
6     Q   Okay.  And you think you provided those
7  to Mr. Williamson?
8     A   Yes.
9     Q   Okay.  Now, in that paragraph you say you
10 started out using January 1, 2005 and June 6th,
11 2005.
12        Go back to the e-mail -- let me see if I
13 can find it quickly for you -- in Exhibit 2, which
14 is -- yeah, there's Mr. Williamson's e-mail to you.
15        If you look down at the bottom of that
16 e-mail of December 19, 2008, you see that
17 Mr. Williamson says, "Also, if time permits, I
18 would like to see the age distribution on
19 January 1, 2005 and on June 17, 2005 to see if that
20 tells us anything."  Do you see that?
21    A   I do.
22    Q   Do you think perhaps that your reference

13 (Pages 46 to 49)

## Capital Reporting Company

1   in paragraph 14 of your report to June 6th is a
2   typo?
3       A   It could be.
4       Q   Did you intend it to mean June 16, or let
5   me ask you this:  At any point in your work were
6   you told that the closing --
7       A   The date in the letter was June 17th.
8       Q   Yeah.  June 17 was day one of the new
9   company.
10      A   I got it.
11      Q   June 16 was the last day when the
12  operation was Boeing.  In other words, it closed on
13  June 16, and June 17 was day one for the new
14  company Spirit.
15      A   That could be a typo.
16      Q   Okay.  So you think that's likely to be
17  June 16 as being the last day --
18      A   We had no reason to choose any date.  We
19  did whatever he -- we intended to do whatever he
20  asked.
21      Q   All right.  I just wanted to clarify
22  that.

1           And then as we've seen, at some point you
2   switched from using January 1 to February 22, 2005
3   as the early date, correct?
4       A   Correct.
5       Q   Well, let me ask it this way:  Am I
6   correct that what you're trying to analyze in the
7   hired versus not hired category is you have your
8   workforce on February 22, 2005, and you're
9   comparing who in that workforce was hired and went
10  to work for the new company on day one on June 17
11  and, correspondingly, who was not hired and didn't
12  go to work?
13      A   Correct.
14      Q   So you're just using those two dates
15  to -- the first date establishes who your total
16  population is and then you're analyzing at the last
17  date who got hired and who didn't get hired?
18      A   I have one possible disclaimer and I -- I
19  think it actually happened.  I think there were
20  people who were identified as not being kept but
21  who worked for I'm going to call it a relatively
22  short period after the date, that they were

1   notified they were to -- they would not be hired by
2   the new company but they stayed on for -- for some
3   fixed period of time.  I took it to be a transition
4   issue.
5       Q   So they stayed with Boeing you mean?
6       A   They were -- I believe they were counted
7   as terminated.  They had received -- they -- they
8   were -- they were not going to be hired by the new
9   company but they continued to work -- but they
10  continued to work.
11      Q   Let's --
12      A   Wait a minute.
13      Q   Okay.
14      A   Could you -- maybe it would help me this
15  way.  The name of the old company --
16      Q   The Boeing Company?
17      A   -- was Boeing.  They stayed at Boeing and
18  worked at Boeing.
19      Q   Did you understand that Boeing,
20  basically, in Wichita had two different operations;
21  a commercial operation which was being sold to
22  Spirit and which your work looked at and a military

1   modification operation that was not sold to the new
2   company and continued to operate as Boeing in
3   Wichita?
4       A   If I had that at any point, I don't
5   remember it.  I just think of it as two companies.
6       Q   Okay.  Well, looking again at
7   Mr. Williamson's e-mail of December 19 where he
8   gives you direction -- look in the middle of the
9   page there.  He says, "In all tests,exclude
10  voluntary exits or any involuntary terminations
11  prior to January 1, 2005."  Do you see that?
12      A   I see that, and what I'm going to do --
13      Q   Hang on.
14      A   Oh, okay.
15      Q   The next sentence says, "Voluntary exits
16  include retirement, resignation, death (although
17  not voluntary per se)" -- I think he's doing that a
18  little tongue-in-cheek perhaps.
19      A   Yeah.
20      Q   -- "release, no show, transfers, and
21  stays with Boeing."  Do you see that?
22      A   Yes.

14 (Pages 50 to 53)

Capital Reporting Company

Page 54

1    Q    Now, I want you to look briefly at
2 Exhibit 3 and you will see some of those labels, if
3 you will, are reflected as being field descriptions
4 in the data set you were working with, correct?
5    A    Yes.
6    Q    Okay.  And, for example, death,
7 discharge, no show, resignation, those kinds of
8 things are in there.  In other words, just so the
9 record is clear, the data set you got related to,
10 or contained information, albeit not by name, on
11 individual employees, and the outcome category
12 contained one of those labels for each of the
13 people so that you could determine what happened to
14 them?
15    A    Yes.
16    Q    Now, one of those is "Stays with Boeing,"
17 that's about three-fourths of the way down the list
18 of outcomes, and the description is that individual
19 remained a Boeing employee, correct?
20    A    That's correct.
21    Q    And if I'm reading Mr. Williamson's
22 e-mail instructions, if you will, he's indicating,

Page 55

1 "I want you to exclude anybody that stayed with
2 Boeing"?
3    A    Yes.
4    Q    In other words, in your hired versus not
5 hired category those people would just be
6 eliminated, they'd be set off to the side and not
7 included in either category, correct?
8    A    Yes.
9    Q    Okay.
10    A    Incidentally, on that page is where I got
11 the term "RIF."
12    Q    Yes, yes, the reduction in force, yes.  I
13 understand.
14         And did you understand, again, on Exhibit
15 3, the RIF label in the field description is
16 identified the individual was not selected for hire
17 by Spirit and was laid off from Boeing?
18    A    That's why I said we referred to that as
19 the bad thing happened.
20    Q    That's right.  That individual was not
21 hired --
22    A    Right.

Page 56

1    Q    -- in your analysis?
2         Okay.  Very good.
3    A    No, but I had concern because I saw the
4 word "RIF" in my writing and I couldn't remember
5 why I was talking in terms of RIF, but this
6 reminded me.
7    Q    Very good.  Let me see that e-mail.
8    A    Which one?
9    Q    Exhibit 2.  I'll try to turn you to a
10 page quickly.  It's easier for me to do it that
11 way.
12         I'm putting before you an e-mail from you
13 to Mr. Williamson dated December 22, 2008, and it's
14 actually a response to an e-mail from
15 Mr. Williamson of the same date.  And
16 Mr. Williamson's e-mail there in the middle of the
17 page says, "I would prefer to use age as of
18 February 22, 2005, the day that the Asset Purchase
19 Agreement was signed," and that's where he first
20 requested you to switch your analysis to using
21 February 22?
22    A    That's correct.

Page 57

1    Q    And then you respond with the e-mail at
2 the top of this page and indicate that you'll
3 switch over to using February 22 as the date, and
4 in the last sentence of the first paragraph of your
5 e-mail you say, "We know that during that period,"
6 and I believe the context is the period between
7 January 1 and February 22, "we know that during
8 that period there were no additional hires but
9 there were some terminations."  Do you see that?
10    A    Yes.
11    Q    How was it that you knew that?
12    A    I asked Will to look.
13    Q    In the data?
14    A    Yes.
15    Q    And so you're saying that you concluded
16 that between January 1 and February 22 there
17 weren't any new hires but some people were
18 terminated?
19    A    That's correct.
20    Q    And so the effect of moving from
21 January 1 to February 22 is that you would exclude
22 anybody that was terminated during that period from

15 (Pages 54 to 57)

Capital Reporting Company

1   your analysis?
2       A    Yes.
3       Q    Because they wouldn't be in the
4   population at the beginning date of February 22,
5   correct?
6       A    That's right.
7       Q    In the sentence right before that you
8   say, "I have asked Will," and that's Will Martin,
9   "to revise what I already have and to finish the
10  set (Organization) using the February 22 date."
11      A    Correct.
12      Q    What does that mean, "the set"?  What's
13  by organization?
14      A    Using multiple -- we run many analyses.
15  You'll see them in the attachment.  And he had sent
16  me some and we were in the middle of it I guess, so
17  I said he's going to finish it using a new date and
18  he'll -- and he'll fix the stuff we already did.
19      Q    My question really is focused on the word
20  "organization."  Does that mean by director?
21      A    I suspect.  I'm not sure.  It could have
22  meant that I meant to say outcome because we run

1   these separately.
2       Q    Okay.
3       A    And it could have been that I meant to
4   say outcome and just chose another word.
5       Q    Okay.  If it's not that, you don't recall
6   what you were using the word "organization" to
7   refer to?
8       A    Let me see the date on this.
9   December 22nd.
10           Organization.  That could have also --
11  first set organization -- the only alternative
12  meaning I could think of is if it was -- if it was
13  some analyses when we didn't take director into
14  account.  We did some overall analyses.
15      Q    Could it refer to the fact that you're
16  analyzing overall by SSG and by non-SSG?
17      A    I don't remember.  We ran those three
18  sets and I don't remember -- I really don't
19  remember.  "Finish the set."
20      Q    Okay.  That's fine.
21           Now, turn over in the e-mail about four
22  pages.

1       A    Later?
2       Q    Yes, four pages later to an e-mail that
3   looks like that (indicating).
4       A    I think this is it.
5       Q    Do you have it?
6       A    Yes.
7       Q    It's an e-mail from you to Mr. Williamson
8   dated December 23, 2008, at 3:10 in the afternoon
9   and you're attaching, it appears, half a dozen
10  different analyses, correct?
11      A    Correct.
12      Q    And in the body of the e-mail you say,
13  "The attachments should get you started.  They seem
14  to be consistent and to identify some rather
15  specific problem areas."  Do you see that?
16      A    Yes.
17      Q    What did you mean by "they seem to be
18  consistent and identify some rather specific
19  problem areas"?
20      A    They were showing a general disparity
21  throughout and some areas were extreme -- actually
22  it's easier, again, if you look at the output.

1           There were some areas that just say well,
2   let's find more about this particular director.
3       Q    Okay.
4       A    My -- my memory is some directors, even
5   if they had less than expected, were not
6   statistically significant, but some were strongly
7   significant, and you always wonder why there'd be
8   adverse impact in one growth and not in another.
9           The obvious two answers are differences
10  in the director, which could have been
11  discrimination but need not be, and the other
12  obvious answer is they're doing different kinds of
13  workers.  And that was what I had in mind and I
14  asked him to find out more about it.
15      Q    But you believe what you were referring
16  to by specific problem areas was the results for
17  particular directors that appeared to be
18  statistically significantly --
19      A    Yeah, there were a few that --
20      Q    -- adverse to older workers?
21      A    There were a few that stood out, yes.
22      Q    Okay.  And that's what you think you were

16 (Pages 58 to 61)

Capital Reporting Company

Page 62

1   referring to in this comment?
2       A   That's correct.
3       Q   All right.  I just wanted to clarify
4   that.
5           One more e-mail.  Now, go to the back of
6   Exhibit 2 and count forward one, two, three, four,
7   five -- six pages.
8       A   You said Exhibit 2?
9       Q   Yeah, the e-mail set.  One more.
10      A   That's it, right (indicating)?
11      Q   Yeah, that's it.
12          In the middle of the page there's an
13  e-mail from Mr. Williamson to you dated January 5,
14  2009 at 4:10 p.m.  Do you see that one?
15      A   Yes.
16      Q   And he says, "Dr. Mann, I was not able to
17  determine any significance regarding the director
18  issue we discussed."  And then he says, "Thus, I
19  think we're prepared to move on to the next step."
20          What was the director issue that you
21  discussed with Mr. Williamson?
22      A   What we just talked about.  I said to him

Page 63

1   I don't know anything about these directors.  Some
2   could be very old, some could -- maybe there's a
3   difference there.  What can you tell me or do
4   you -- what do you know why some would do so much
5   worse than others.  And he just basically got back
6   and said what he said.
7           I actually asked him for the age of each
8   director and he got me that, or at least I -- I got
9   some information on that, and he sent me a
10  document, which I went through and I think I
11  couldn't get anything out of it.  I didn't see
12  anything in there to say well, here's something
13  about the -- if I remember right, there's two or
14  three or four directors that stand out, something
15  like that.
16      Q   We'll look at that when we get to those
17  paragraphs.
18      A   And I couldn't see anything that was
19  unique to them.
20      Q   You're referring in that answer to the
21  e-mail where you responded to Mr. Williams at the
22  top of this page, again on January 5, and you said

Page 64

1   "would like you to provide the age of each director
2   and a description of the area controlled," that is,
3   the jobs for which the director is making
4   decisions?
5       A   Yeah.  Actually I'm referring to the next
6   step.  He sent me some material --
7       Q   Right.
8       A   -- and it didn't help.
9       Q   So as you sit here today, you're
10  recalling that he did send you the age of the
11  directors and then he sent you something else?
12      A   I think --
13      Q   Do you think it was a description of the
14  areas that they supervised?
15      A   It was one document where I couldn't see
16  about the directors and I know we went through and
17  I picked up the ages and didn't see anything there
18  and then I picked up -- there was some other
19  information, but nothing -- there was nothing I
20  heard or saw that I could quantify to try to
21  introduce.
22      Q   Were you looking at whether a particular

Page 65

1   director was involved with engineering or, you
2   know, factory assembly or office work or that kind
3   of thing?
4       A   That's what I was looking for, although I
5   didn't know what -- I can't answer you what I would
6   have found that would tell me something, but
7   basically what I was saying is somebody dealing
8   with people for which senior people do better and
9   someone else dealing with people for whom junior
10  people do better.  If I want someone to run the
11  company, I'm going to look for senior people.  If I
12  want someone to dig in the yard, I might get rid of
13  the older people.  It all -- you know, something
14  that explains why their behavior was so different,
15  and I didn't come up with anything.
16      Q   Whatever he gave you didn't help?
17      A   That's correct.
18      Q   All right.
19      A   Well, I don't want to put it that way.  I
20  didn't come up with anything from what he gave me.
21      Q   Okay.  That's fine.
22          So you believe in this e-mail we just

17 (Pages 62 to 65)

Capital Reporting Company

1 looked at where Mr. Williamson is telling you, "I
2 was not able to determine any significance
3 regarding the director issue we discussed," that
4 that's a reference to your discussion with him that
5 we have some directors that are showing
6 statistically significant adverse results and some
7 not, can we analyze the ones that are showing
8 adverse results and see if there's a pattern?
9    A   I wouldn't call that analyze.  We looked
10 at those to see is there something that suggests
11 why they might be -- for example, if it turned out
12 that I'm -- that I am correct that there's three or
13 four of them that were showing this and they were
14 all in their early 20s, that -- and -- and
15 everybody else was older --
16    Q   Right.
17    A   -- I'd say well, maybe that's, you know,
18 that's something to put your hat on.
19    Q   Right.
20    A   We just didn't come up with anything
21 that --
22    Q   Okay.

1    A   -- that looked appropriate.
2    Q   All right.
3       MR. ARMSTRONG:  Let me mark one more
4 exhibit.  That will be 4.
5       (Mann Exhibit Number 4 was
6       marked for identification.)
7 BY MR. ARMSTRONG:
8    Q   Dr. Mann, I'm handing you Exhibit 4,
9 which is the testimony list for you that was
10 provided to us?
11    A   Yes.
12    Q   I assume that's something that you
13 maintain on a regular basis and just add to it as
14 you --
15    A   Yeah.  It exists online.
16    Q   Yeah.
17    A   People can download it.
18    Q   Okay.  What I'd like to do -- in
19 paragraph six of your report you recite that your
20 work has been balanced between working for
21 plaintiffs and working for defendants?
22    A   That's correct.

1    Q   What I'd like to do is start on page 20
2 of your testimony list.
3    A   Okay.
4    Q   Turn over to page 20.  And the reason I'm
5 starting there is that's January of 2000, in other
6 words, focusing on this decade.
7    A   Okay.
8    Q   And I'd like you to start and just tell
9 me for each of those cases from there to the end of
10 the list whether you were working on behalf of the
11 plaintiff or the defendant.  And if you don't
12 remember, just --
13    A   I was going to say that's going to be the
14 most common answer.
15    Q   That's the reason I didn't go back to
16 1972, which is where this list starts.  But I
17 thought we had a better chance if we started in --
18    A   Where we had a shot.
19    Q   Start with the Beverly Enterprises case,
20 and if you don't remember, say you don't remember
21 and that will be the record.
22    A   Okay.

1    Q   How about Beverly Enterprises?
2    A   I don't remember.
3    Q   How about Forman versus Heyman?
4    A   That was plaintiff.  I worked for Forman.
5    Q   Okay.  Massachusetts Association of
6 Afro-American Police?
7    A   I believe that was plaintiff.
8    Q   Reginald Moore?
9    A   Moore, that's plaintiff.
10    Q   Brian Murry?
11    A   Plaintiff.
12    Q   Mueller, et al. versus CBS?
13    A   I think it's plaintiff, but I'm not
14 certain.
15    Q   Okay.  Maurieth --
16    A   Wait a minute.  Wait a minute.  That's
17 Missouri.  Which one are we looking at?
18    Q   Mueller versus CBS.
19    A   That's Pennsylvania.  Okay.
20    Q   That's Pennsylvania.
21    A   I can't think of who the lawyers were.  I
22 think -- I think that was plaintiff, but I'm not

18 (Pages 66 to 69)

Capital Reporting Company

Page 70

1  sure.
2      Q    Okay.  Maurieth Slader?
3      A    That was defendant.
4      Q    Okay.  Top of the next page, Honeycutt?
5      A    Consolidated Freightways.  That was
6  plaintiff.
7      Q    D'Amico versus CBS?
8      A    I think that's plaintiff.
9      Q    Monique Donaldson?
10     A    I don't remember.  We've never been
11  retained directly by Microsoft, but I remember I
12  had to turn down another case.  I -- I don't
13  remember.
14     Q    Okay.  Margaret Bunch?
15     A    Plaintiff.
16     Q    Joe Bailey?
17     A    Defense.
18     Q    Eddie Caldwell?
19     A    Defense.
20     Q    Levingston?
21     A    Plaintiff.
22     Q    Richard Drake?

Page 71

1      A    Plaintiff.
2      Q    John Kholbeck?
3      A    I -- I know what we did, but I'm not sure
4  whether it's called plaintiff or defendant.  I
5  guess it's defending.  The city had an affirmative
6  action plan.  The firefighters said get rid of it,
7  it's met its needs.  The firefighters -- I can't
8  remember whether it was the white or black
9  firefighters that got into it.
10         We got on the side that said the need was
11  gone.  I -- I can't remember how it worked out,
12  whose side we were on.
13     Q    Okay.  How about the next one, Debra
14  Barnett?
15     A    Wal-Mart.  We were plaintiffs.
16     Q    Aerostructures Corporation?
17     A    Aerostructures.  We were -- again, I'm
18  not sure of the wording, but they were objecting --
19  we worked for the company that said they were taxed
20  too much.
21     Q    That's probably Aerostructures I would
22  guess, which is the plaintiff, but the next one,

Page 72

1  American General Life?
2      A    Plaintiff.
3      Q    Jose Diaz?
4      A    The Pinnacle Group.  I'm pretty sure
5  that's plaintiff.
6      Q    Sean King?
7      A    Nebraska.  I don't remember.
8      Q    Okay.  Calvin Gaskey?
9      A    Fulton Bellows.  I don't recall.
10     Q    Shirley Williams versus Sprint?
11     A    Sprint.  Plaintiffs.
12     Q    And, finally, SCDE Corporation?
13     A    It was also a tax case and, again, I'm
14  not sure how to call it, but it was for the people
15  that owned the store that said they're being taxed
16  too much.
17     Q    Okay.  All right.  That's sufficient for
18  my purposes.
19     A    Actually, having gone through that let me
20  put something in context.  You had asked me -- you
21  said as we were going through this, because I said
22  that I keep my practice balanced, in recent years

Page 73

1  the part -- they only go in here if there's
2  testimony.  Part of my work that's very heavily
3  working for companies and defendants doesn't go
4  into court much.  A whole area of our work is
5  affirmative action work, and that doesn't go in
6  here at all, and that's a great part of our work.
7  So in recent years the court cases have been more
8  heavily plaintiffs, but the other work is
9  completely defense.
10     Q    All right.
11         MR. OHAEBOSIM:  Take a little quick
12  break?
13         MR. ARMSTRONG:  Yeah.
14         (Brief recess.)
15  BY MR. ARMSTRONG:
16     Q    We've talked generally about this, but
17  when you received the new data set in December and
18  did the analysis on it that eventually became, you
19  know, your final report, was that data set the same
20  kind of data that you had back in May?
21     A    I don't know what you mean by "kind of
22  data."  It relates, of course, to the same issue,

19 (Pages 70 to 73)

Capital Reporting Company

Page 74

1  but I -- I don't know the fields.  I -- I don't
2  know whether we just got data corrections or
3  additional fields, I -- I don't know.
4      Q   So you don't remember what, if any,
5  differences there were between the data set in May
6  and the one in December?
7      A   That's correct.
8      Q   Did anybody in your organization analyze
9  that or did you just take the new set and said this
10  is what we're going to work with?
11      A   I think something in between.  It was
12  probably looked at and -- and probably discussed,
13  but unless there were new variables that might have
14  shed light on things, it was probably just dropped.
15      Q   And you don't recall that there were?
16      A   That's correct.
17      Q   Did Mr. Williamson provide you with
18  transactional employment histories of individuals,
19  in other words, things like when they were hired,
20  the different jobs they were in, anything like
21  that?
22      A   Well, let me answer the question as you

Page 75

1  first stated it.  We did not get a transaction file
2  that I know of.  I don't remember seeing one.
3      Q   Okay.  That actually has a meaning to you
4  when I say --
5      A   Yes.
6      Q   I didn't know that it did and that's the
7  reason I elaborated.
8      A   Yeah, we didn't get a transactional file.
9      Q   But you did not get a transactional file.
10  Okay.  That was basically my question.
11          Did you ever request one?
12      A   I think at the beginning we always ask
13  for anything we can think of and we're told this is
14  what -- I mean we're told this is what you're
15  getting, this is what I can get, this is what we
16  have, they're not going to give us anything else.
17  So the -- I always ask, just because of this kind
18  of question, for more and was told this is what you
19  got.
20      Q   Okay.  Have you used transaction files in
21  the past in other work?
22      A   I have.  I'm not sure we've used them in,

Page 76

1  I'm going to say this type of analysis, meaning a
2  RIF and also meaning -- we've done one or two
3  others that -- I don't know what to call it, but
4  they're similar to this where there was a takeover
5  company and there was continuation.  I don't
6  remember that we used transaction analyses in any
7  of them and I'm -- as I'm sitting here, I'm trying
8  to think of what use I would make of transaction
9  data.  I -- I usually would use it to construct the
10  kind of files we were given unless they had some
11  sort of detailed annotation.
12      Q   Okay.  And since you were given a
13  detailed data set, you didn't think you needed the
14  transaction file?
15      A   Yes.  I mean I can -- I could -- in my
16  mind I could conceive of something I could get out
17  of a -- out of a transaction file, but I -- I
18  suspect that it would be more along the lines of
19  eliminating particular individuals that are not
20  worth the trouble, particularly for, frankly,
21  particularly for a plaintiff.
22      Q   Okay.  You mentioned a moment ago that

Page 77

1  you had worked on a couple of other cases similar
2  to this where there was a takeover company and a
3  continuing workforce; is that right?
4      A   I said I think I've worked on one or two
5  others.  I don't remember whether they went to --
6  to the point of my giving testimony, sworn
7  testimony.
8      Q   Did they go to the point of submitting a
9  written report?
10      A   I don't know that they were relevant to
11  what we were doing, but I seem to remember in there
12  some of the cases we looked at had to do with
13  Rent-A-Center.
14      Q   Yes.
15      A   I think it came up in a Rent-A-Center
16  case.  They had -- there were other rent -- similar
17  rental companies and I think that that came up
18  somewhere along the line, that there were different
19  companies involved --
20      Q   That --
21      A   -- over time.
22      Q   That was Brian Murray versus

20 (Pages 74 to 77)

Capital Reporting Company

Page 78

1  Rent-A-Center, which was pending in the Western
2  District of Missouri?
3      A   There's a -- there's two Rent-A-Center
4  cases nearby -- near each other there and I --
5      Q   Margaret Bunch versus Rent-A-Center?
6      A   -- I believe there can -- I believe we
7  did one and we did the other one a little bit
8  later. I'm not sure -- where it says pending --
9  did you say it said pending?
10     Q   No, it does not say pending.
11     A   Oh.
12     Q   You mean currently pending?
13     A   No.
14     Q   No.
15     A   Because we don't usually -- if something
16 is pending, I'm never told what happens.
17     Q   Yeah. No, these were both in the Western
18 District of Missouri.
19     A   Yeah.
20     Q   One in 2000 and one in 2002. You think
21 both of those may have --
22     A   I think --

Page 79

1      Q   -- involved a similar situation with a
2  continuing company?
3      A   I'm not sure both, but I -- I know -- I
4  think Rent-A-Center involved that. We did -- we
5  did work on at least two, if not maybe a third
6  issue on Rent-A-Center, and I think somewhere in
7  there was the issue -- I can't remember the other
8  name of the company, but it was like another rental
9  company, and somehow we had to work with that.
10     Q   Was it a continuation company after
11 Rent-A-Center sold?
12     A   I think it was the other way around. I
13 think Rent-A-Center took over another company.
14     Q   Okay. Okay.
15     A   And it might not be relevant to this, it
16 might simply be that there were different
17 workforces combined, but the concept of taking
18 over -- of a company taking over another company
19 and having to deal with its workforces.
20     Q   And you were working for the plaintiffs
21 in those cases, not Rent-A-Center?
22     A   That's -- that's correct.

Page 80

1      Q   All right. Did you ever suggest to
2  Mr. Williamson that analyses should be run on a
3  level of organization below the director, for
4  example, at the second-level manager?
5      A   I can't remember whether that's one of
6  the things we did.
7          Well, first of all, I don't remember that
8  I suggested it. When we first started, we were
9  trying to figure where is the control, who's
10 telling whom what to do. We may have worked with
11 different levels, I just don't remember.
12     Q   And if you did do analysis at a lower
13 level, at a manager level of some sort, you would
14 still have that analysis?
15     A   That's correct.
16     Q   The output of it?
17     A   That's correct.
18     Q   Okay.
19     A   The only caveat I have to put on, and I
20 don't think it's relevant to that, we don't -- we
21 don't get rid of it because we're not going to use
22 it here. What I don't -- what I have to be a

Page 81

1  little careful of is if I ask for something and the
2  programmer grabs the program, he might write over a
3  program that we use for something else and if he
4  didn't keep the output of the early runs, then we
5  have no record, but not done --
6      Q   Right.
7      A   -- intentionally.
8      Q   But from your earlier testimony my recall
9  is, and correct me if I'm wrong, that when you did
10 this analysis in May and June on the earlier data
11 set, you would sent the results of that to
12 Mr. Williamson?
13     A   That's correct. We sent several, I
14 believe, several sets of results to him, which
15 means that -- but that doesn't mean everything we
16 saw was sent to him.
17     Q   I understand.
18     A   And I'm saying there may be something we
19 saw that if we -- for example, remember that --
20 where you pointed out to me we might have the date
21 wrong on the age distributions?
22     Q   Right.

21 (Pages 78 to 81)

Capital Reporting Company

Page 82

1    A   That's one where if we had it on one date
2   and we know it should have been run on another
3   date, I doubt that we would go out of our way to
4   preserve the two programs, we would have just
5   written over it.
6    Q   Right, I understand.
7       Look at your report, Exhibit 1, paragraph
8   11.  It's on the second page.  We looked at that
9   briefly before.  It's basically your lead-in
10  paragraph to the kind of analysis that you did.
11   A   Yes.
12   Q   And you're describing the outcome
13  analysis is dichotomous with values hired and not
14  hired, correct?
15   A   Yes.
16   Q   Now, it's correct, isn't it, that the
17  data set that you've got doesn't have a field
18  labeled hired versus not hired, you had to do some
19  interpretation of the labels?
20   A   Yeah, I think we had to construct it from
21  the -- the words.
22   Q   Okay.  And we covered before in

Page 83

1   Mr. Williamson's first e-mail to you on December 19
2   where he sent you this new data set and he
3   instructed you that voluntary exits were to be
4   excluded and that voluntary exits included the
5   label "stays with Boeing."  Do you recall that?
6    A   Yes.
7    Q   Okay.  And I take it, I think you
8   testified earlier, that you believe your analysis
9   followed that instruction and treated stays with
10  Boeing -- or not treated -- excluded stays with
11  Boeing from the analysis?
12   A   Except remember I said to you that I was
13  concerned that we might have somebody who was --
14  was not indicated was going to stay with Boeing, in
15  fact, was marked for a RIF, marked to not be --
16   Q   Hired by the new company?
17   A   -- hired by the new entity but who had
18  worked whose termination date was later.  It's as
19  though they said you're going to go but not right
20  away.  And I'm trying to remember exactly what we
21  did them.  I'm not sure they're covered in the idea
22  of they were kept by Boeing if they were kept by

Page 84

1   Boeing only for a short time.
2    Q   Did you attempt to make any analysis of
3   the people in the data set that were labeled "stays
4   with Boeing," as to how many of them stayed with
5   Boeing for only a short time versus stayed much
6   longer?
7    A   No.  I think, and when we get to the
8   analyses themselves, I'm going to look for this
9   under labeling, there were times when this occurs
10  and we're able to make what I call conservative
11  decisions, meaning we'll put them in one place
12  because if we're wrong, it's only going to be
13  better for our client, and we may have done that,
14  may have -- depending on -- depending -- again,
15  depending on their age group what's better for the
16  client differs.  But we may have followed that rule
17  somewhere.
18      And in terms of an uncertainty, we
19  would -- we would act as though the bad thing
20  happened if they were old -- if they were young and
21  the good thing happened if they were old.  But I --
22  I can't remember if that actually occurred here,

Page 85

1   and when we get to the end of the report and
2   looking at the pages, it'll --
3    Q   All right.
4    A   -- it should say, or in the text of the
5   report it should say so.
6    Q   Well, let's turn to page five of your
7   report, which is the first table, and this is the
8   table where you analyze hired versus not hired for
9   the overall population, correct?
10   A   Yes.
11   Q   And this table, just so we understand the
12  organization of the report, this table --
13   A   Well, wait a minute.  I'm saying yes to
14  that.  This one looks at each director -- the one
15  we're looking at -- page five --
16   Q   Right.
17   A   -- looks at each director separately.
18   Q   No, I understand that.  What you've
19  attached as six tables to your report is you have
20  three tables that are hired versus not hired and
21  three tables that are recommended versus not
22  recommended, correct, and those three tables both

22 (Pages 82 to 85)

Capital Reporting Company

Page 86

1  cover --
2    A   Well, there are more than --
3    Q   No, no, I understand that.  On the
4  Fisher's Test I'm focusing on now.
5    A   Okay.  Then, yes.  Then, yes.
6    Q   I'm focusing first on the Fisher's Exact
7  Test.  You ran a hired versus nonhired on the
8  entire population?
9    A   Right.
10   Q   That's the table on page five.
11       You ran a hired versus not hired on the
12  only SSG population, that's the table on page six?
13   A   Right.
14   Q   You ran hired versus not hired on the
15  non-SSG population?
16   A   That's correct.
17   Q   And then you did the same three analyses
18  but used recommended versus not recommended?
19   A   That's correct.
20   Q   All right.  So now back to page five.  So
21  page five corresponds, does it not, to paragraph 18
22  of the written report, it's the hired versus not

Page 87

1  hired or outcome analysis for all employees?
2    A   Correct.
3    Q   Okay.  Now, using that, using page five
4  and that analysis as our focal point, we've added
5  up the number of not hired in your column not
6  hired -- it's actually a dual column, under 40 and
7  over 40 -- do you see that?  And I'm --
8    A   Actually I don't.  I'm not sure I'm with
9  you.  I'm don't see where you added that up.
10   Q   No, I'm saying that --
11   A   Oh.
12   Q   -- having reviewed your report we've
13  added that up.
14   A   Okay.
15   Q   And the total number not hired is 1,988
16  of --
17   A   In the table?
18   Q   Yeah, in the table.
19   A   One thousand?
20   Q   1,988.
21   A   Okay.
22   Q   And I'm going to ask you to assume with

Page 88

1  me first that that's correct.  I don't want to
2  spend the time with you and a calculator adding
3  that up.
4    A   Okay.
5    Q   We've also analyzed, and I want you to
6  assume with me, that there are only approximately
7  1200 of those individuals who had an outcome of
8  either discharge or RIF.
9    A   Approximately 1200?
10   Q   Approximately 1200.  So that leaves --
11   A   Discharged?
12   Q   Either discharged or riffed.
13   A   Or riffed?
14   Q   Right.  In other words, we've taken your
15  analysis and tried to replicate it, if you will,
16  and that shows that 1200 of that not hired group
17  are characterized in the data as either being
18  discharged or riffed.
19   A   Okay.
20   Q   Now, that leaves, obviously, almost 800
21  or -- I'm sorry -- almost 700 people unaccounted
22  for.

Page 89

1    A   Go for the 800.
2    Q   Okay.  I'm sorry.  Eight hundred, you're
3  right.  You're right.  I had it right the first
4  time.  It's almost 2,000, so, yeah, almost 800
5  people that are in this analysis that were not
6  labeled in the data as either discharged or riffed
7  and our analysis says those are all stays with
8  Boeing.  And so I'm putting it to you that if our
9  analysis is correct, did you really follow the
10  instruction to exclude stays with Boeing because we
11  don't think you did?
12   A   Well, there's no response to that except
13  to check it.  We gave you the programs to show you
14  who we put -- you can actually see who we
15  instructed to be kept or not.  If there was an
16  error, we'd fix it.  If there's not an error --
17  there could be an error somehow in what -- how
18  you're counting or when things were entered or -- I
19  don't know.  There could be a lot of reasons.
20   Q   Yeah.
21   A   The main thing -- the easiest thing to
22  do, which I -- I mean either of us, or maybe

23 (Pages 86 to 89)

Capital Reporting Company

Page 90

1  together we can do it faster, but if you can point
2  to any particular director where the number is
3  known to be wrong so that we -- preferably a small
4  one.
5      Q   I can't. I don't know that in detail.
6      A   So we're looking for a -- well, actually
7  we gave you the file that shows how they were
8  counted. As long as we can say here's a person
9  that we count one way, you count the other.
10     Q   When you say you gave us the file, what
11 do you mean by that?
12     A   I think you have the file on which we ran
13 our programs.
14     Q   The electronic file you mean?
15     A   Yes.
16     Q   I don't believe we do. You gave that to
17 Mr. Williamson --
18     A   I think we gave that --
19     Q   -- to give it to us?
20     A   Yes. Well, the instructions were to give
21 you all the programs, so -- I'm -- I'm sorry -- to
22 give him all the programs.

Page 91

1      Q   Right.
2      A   Which I thought we did and I thought he
3  was going to give them to you.
4      Q   All right. Well, I'll follow-up with
5  Mr. Williamson on that, but the questions --
6      A   Let me make something clear.
7      Q   Sure.
8      A   We use commercial software.
9      Q   I know that.
10     A   We can't give you the commercial
11 software, but -- but we give you the instructions
12 that we give to the commercial software. The
13 Fisher's Test is run using SAS, which is a standard
14 system, and you can tell anyone who -- anyone who
15 you would ask to look, meaning people that do
16 this --
17     Q   Right.
18     A   -- can look at our instructions and see
19 what we told the machine to do.
20     Q   We've seen Mr. Williamson's instructions
21 to you to exclude from the analysis the stays with
22 Boeing category. We saw that in his e-mail.

Page 92

1      A   Yes.
2      Q   And you agreed with me that with the
3  possible exception of people that stayed with
4  Boeing for only a short period of time, you agreed
5  with me that stays with Boeing on a long-term basis
6  should not be treated as not hired or an adverse
7  outcome?
8      A   I think they were to be omitted.
9      Q   Yeah. They certainly shouldn't have been
10 included in the not hired category?
11     A   That's correct.
12     Q   Because they still had a job with Boeing
13 on a long-term basis?
14     A   That's correct.
15     Q   All right. So you would agree with me
16 that if our analysis is right and that you included
17 in the not hired category all people who stayed
18 with Boeing, that would be an error?
19     A   Yeah. I mean basically what I agree is
20 you get different answers. Someone has got an
21 error -- at least one of us has at least one error
22 somewhere --

Page 93

1      Q   Okay.
2      A   -- or a disagreement in definition, but
3  --
4      Q   Well, in the testimony you gave earlier
5  about there may have been some individuals that
6  were labeled stayed with Boeing, but when you look
7  at their date of termination, it's only a month or
8  two, do you have any recall that there might have
9  been as many as 800 people in that category?
10     A   My impression is no.
11     Q   Okay.
12     A   I have no reason to think it was a big
13 number.
14     Q   All right. Paragraph 11 of your report
15 says, and I think we've referenced this earlier, it
16 says that you were instructed to exclude those not
17 assessed and unable to determine, correct?
18     A   Yes.
19     Q   Did you do that in your outcome analysis?
20     A   We intended to. I mean we said we're
21 following these rules.
22     Q   Okay. Did you attempt to analyze the

24 (Pages 90 to 93)

Capital Reporting Company

Page 94

1    number of people -- strike that.  I need to lay a
2    foundation.
3            You were also instructed to exclude
4    voluntary exits, which could include things like
5    retirement, correct?
6        A    Yes.
7        Q    Did you make any attempt to analyze how
8    many people actually chose to retire prior to day
9    one?
10       A    I don't think so.
11       Q    Okay.  So you didn't attempt to analyze
12   whether those people tended to be older and decided
13   to just retire rather than even attempt to go to
14   work for the new company?
15       A    I don't think we ran any analysis to look
16   at differences between them and the remaining
17   people.
18       Q    Okay.  And so if there is a group of
19   people that were retirement eligible at the time,
20   obviously that means they're older relatively?
21       A    Uh-huh.
22       Q    They may have taken themselves out of the

Page 95

1    process and your analysis simply excluded them,
2    didn't treat them one way or the other?
3        A    That's my understanding.
4        Q    Okay.  Now, in paragraphs 18, 19, 20, 21
5    and 22 and 23 you're using the Fisher's Exact Test,
6    and you describe in paragraph 17 that you used a
7    one-tail Fisher's Exact Test, correct?
8        A    Yes.
9        Q    And indeed the tables themselves on pages
10   five, six, seven, eight, nine and ten, the
11   right-hand column is labeled "One-Tail Level of
12   Significance," correct?
13       A    That's correct.  It's actually labeled, I
14   think, one sided.  Oh, let me see.  Maybe it's --
15       Q    No, it says one-tail.
16       A    -- on the other part of the output.
17       Q    Yeah, it says one-tail.
18       A    Let me just make sure I'm looking at the
19   right -- same one.  StatXact is one sided.
20   Yours -- Fisher's --
21       Q    Uses one tail.
22       A    -- used one tail.

Page 96

1        Q    Okay.
2        A    Actually the Fisher is not -- I don't
3    think we gave you a Fisher in here.  We just said
4    that.  We did not.  We didn't give you the actual
5    computer run in here.
6        Q    Well, take a look at the table on page
7    five.  It's labeled up at the top Fisher's Exact
8    Test.
9        A    No, no, but I'm saying we didn't give you
10   the actual computer printout where the results
11   appeared.
12       Q    Oh.  I'm sorry.
13            Well, does the table on page five, is
14   that something that is generated by the computer
15   program?
16       A    Yes, but we don't give you everything
17   that's generated.  We have it, but it would have
18   two pages for each line.  So we wrote this report
19   program to just pick up the important components of
20   it so you don't see everything that was generated.
21       Q    All right.  In choosing to use the
22   Fisher's Exact Test for these six analyses on

Page 97

1    outcome doing it three ways and recommendation
2    doing it three ways, does using that test assume
3    that there are a fixed number of positions
4    available for which people will be hired or, stated
5    conversely, a fixed number of positions that are
6    going to be eliminated?
7        A    Effectively, yes.
8        Q    Okay.  It assumes a fixed number?
9        A    That's correct.
10       Q    Were you told that by Mr. Williamson,
11   that there were a fixed number of positions
12   available, or how did you conclude that that was
13   the right test to use?
14       A    Early on when we discussed how the RIF
15   worked, they were -- the concept, I think, we had
16   was that they figured out how many they would
17   want -- if not how many, how much money they had or
18   how many they could afford or how many they would
19   keep.  So, yeah, we had -- I at least had the idea
20   that there was a fixed number to be kept.
21       Q    Were you told that there was some sort of
22   a target of 85 percent?  Does that ring any bells?

25 (Pages 94 to 97)

Capital Reporting Company

Page 98

1    A   No.
2    Q   Did you do any analysis as to director by
3  director whether or not the percentage of not hired
4  was the same or did it vary all over the place?
5    A   Percentage not hired.  Let me make sure I
6  understand you.  Remember I said under -- well,
7  maybe it's on here.  Let me see if we copied that
8  out.  I don't see it here.
9         In each of the tables we could see -- not
10  this table -- the ones that underlie this, we could
11  see the percentage of people that were riffed or
12  nonriffed regardless of age group.
13         You're asking did we look at the
14  percentage riffed and see if that was consistently
15  somewhere around 85 percent.  No, we did not.
16    Q   Okay.  So based upon some understanding
17  you had from Mr. Williamson, you assumed and,
18  therefore, chose the Fisher's Exact Test, that
19  there were a fixed number of positions available?
20    A   Yes, unless I -- rather than possibly
21  mislead you, the alternative, if you -- well, if
22  you wanted to specify 85 percent, we could do

Page 99

1  something.  If you wanted to say it's fixed but we
2  don't know the percent or it's, you know, don't
3  assume the number is fixed, but -- I'm sorry --
4  don't assume the number is fixed, just assume that
5  they were getting rid of people, some stayed, some
6  didn't, and whether or not there was a fixed
7  percent, we would use a different model resulting
8  in different analyses.
9         For the most part where the numbers are
10  large the two are going to be pretty close
11  together, and we use a binomial analysis for that.
12    Q   In other words, you're saying you might
13  have one hypothetical situation in which the
14  selectors are told we want you to keep 85 percent
15  of the people that work for you and under that
16  circumstance you would choose the Fisher's Test
17  versus selectors being told we want you to select
18  the best people and we're not going to give you any
19  guideline on how many to pick, just don't pick all
20  of them because we know we need to reduce our
21  workforce?  Under that circumstance you'd --
22    A   No, I'm not sure --

Page 100

1    Q   All right.  Where am I going wrong?
2    A   I'm not sure the dichotomy you said is
3  the dichotomy I have in mind.
4    Q   Okay.
5    A   Basically, whether the -- the idea could
6  be this model says we know how many people are
7  going to be riffed.  You're saying what if you
8  don't know how many people are going to be riffed.
9  So one possibility is -- you -- you articulated
10  this -- maybe we don't know the number, but we know
11  the concept is generally 85 percent throughout.
12         Well, that's the same as the first one.
13  That -- that would still be a hypergeometric.
14    Q   I understand that.
15    A   The next possibility, which I don't think
16  you've articulated but I think you maybe have in
17  mind is someone says look, just go through, pick
18  out the dead wood, tell me who to get rid of and
19  let's see how it shakes out.
20         The difference is, and maybe it becomes
21  clear if I tell you another name for these things,
22  the Fisher Exact Test is used and sometimes

Page 101

1  referred to as a distribution for sampling without
2  replacement, meaning you look, you make a decision,
3  you're out, you go back, you look again and now
4  you've got fewer people, you're out.
5         The binomial, which is the one I'm saying
6  is the alternative, is used when you sample with
7  replacement, and that would come into play if
8  instead of that I simply had the employees parade
9  in front of the directors one at a time, yes, no --
10  the director simply says yes or no, no restriction
11  as to how many yeses and how many nos he gives.
12         Now, notice that's not your 85 percent
13  because that would --
14    Q   Right.
15    A   -- be a restriction.
16    Q   Right.
17    A   In that one you would use the binomial to
18  compare the two proportions.
19    Q   And you assumed that the selection
20  process used in this case was closer to --
21    A   We presented the results on that basis.
22  I would be -- we have the numbers in our -- in our

26 (Pages 98 to 101)

Capital Reporting Company

1 underlying -- in our underlying report -- no -- in
2 our computer output.
3     Q    You have what numbers?
4     A    To do it either way.
5     Q    But you chose to use the hypergeometric?
6     A    I chose to use the Fisher or the
7 hypergeometric.
8     Q    Okay.
9     A    And I'm saying I don't -- I'm agreeing
10 with you in concept that there are two possible
11 ways we just talked about.  I thought at first you
12 were saying that the two were fixed number and
13 fixed percent.  Those are the same.
14     Q    No, I understand that.
15     A    Okay.  So, no.  But the other two --
16     Q    If I said that, I did not mean it.
17     A    Yeah, the other two are different.  But
18 I'm going to say to you that as a statistician, and
19 not with regard to your data because I didn't look
20 at it this way, I'd be surprised particularly in
21 the big groups, which is where you're going to get
22 statistical significance, if it makes any

1 difference.
2     Q    But in making that decision in which test
3 to use, you wouldn't have made that on your own
4 without asking questions about the basic underlying
5 selection process, would you?
6     A    No.  The -- the point there was well, who
7 was told to do what and they would say well, you've
8 got to rid of some number of people.  Okay.  Well,
9 you've given a number, you've given an idea of what
10 you've got to do, yes.  That's different from just
11 pick out the good and the bad.
12     Q    Okay.
13     A    Oh.  And I also should throw in if you're
14 going to do a true binomial analysis, meaning
15 someone says well, pick out the good and the bad,
16 you have to have -- to do it in its -- in the form
17 that's in the output that I said we have.  You have
18 to assume that the percentage good and bad is
19 fixed, otherwise it gets into a much more
20 complicated procedure.
21         In other words, let's say that there's
22 one -- well, let's make this assumption.  The

1 director looks at all the people under him and says
2 I'm going to spin a random generator and I'm going
3 to get rid of the people that are bad and assuming,
4 when I look at the overall result, if I get rid of
5 30 percent of the people, whatever that is, I'm
6 going to say well, that 30 percent should have
7 evenly be old and young, should be same, and we're
8 testing the hypothesis that it is the same.  And at
9 that point you would have a binomial for him.  That
10 would be here.  Then you go to the next person,
11 next director, and he might have a different
12 number.  He might say well, I thought I had
13 80 percent good and only 20 percent bad.  The next
14 director might say I thought I had 1 percent good
15 and the rest were terrible.
16         They -- they're all going to have
17 different numbers to work with, so they would all
18 be -- the binomial results would be okay for them,
19 but in the StatXacts that are coming up we would
20 have a problem.
21     Q    Okay.  I think I understand what you're
22 saying.  I think we've covered this, but you chose

1 to do your analysis by director based upon the
2 conversations and the back and forth that you had
3 with Mr. Williamson?
4     A    That's correct.
5     Q    Okay.  Did he give you any understanding
6 as to how the directors were involved in the
7 selection process?
8     A    I vaguely recommend the directors picked
9 out who they thought should go and then it went up
10 higher to be approved.
11     Q    Okay.  Anything else?  I'm just trying to
12 make sure I understand.
13     A    No.  I mean I'm just sort of figuring
14 that out.  That's why we have recommended and --
15     Q    Okay.  Do you remember any discussion
16 with Mr. Williamson about the organizational
17 structure at Boeing including first-level managers,
18 second-level managers and directors?
19     A    I think we may have tried doing things on
20 that -- on that basis.  In that first -- very first
21 set I think we may have worked in different level
22 managers.  I just don't remember.  But I think the

27 (Pages 102 to 105)

Capital Reporting Company

1  decision -- well, but I think the decision point
2  came out to be the director.
3      Q   All right.  Paragraph 14 of your report
4  -- I think we covered this, but I don't want to
5  rely on my memory -- that's the one where you say
6  we were also asked to provide age distributions on
7  the various dates.
8          Did you also provide age distributions on
9  February 22 and June 16, when we switched to that
10  February 22 date or do you remember?
11     A   I don't remember.
12     Q   And the age distribution, as I recall
13  your answer, was either how many or what percentage
14  of the population were 35, 36, 37, 38?
15     A   Yeah, that's what an age distribution is.
16     Q   Okay.
17     A   I don't remember.  That -- when we were
18  told to switch dates, I -- I don't remember knowing
19  that we did that.  I really didn't care if we did
20  it or not, it just was requested.
21     Q   And I think you said you didn't think it
22  needed to be -- that that analysis or that

1  breakdown needed to be in the report?
2      A   It didn't -- it didn't affect what I did.
3      Q   Were you instructed not to attach a
4  table?
5      A   No, just the opposite.  I said I don't
6  intend to include that.
7      Q   Okay.  Very good.  Thank you.
8          In paragraph 17 you say, "The statistical
9  procedure used for the six analyses is the one-tail
10  Fisher's Exact Test," and then we've asked them
11  that the tables are actually labeled one-tail test.
12         Can you briefly describe what a one-tail
13  test is versus a two-tail test?
14     A   It's easier to tell you how the terms
15  come about.  If you want to know -- we're talking
16  about -- in shorthand, we're talking about old
17  versus young.
18         If we want to know is there a difference
19  between young and old, we use the two-tail test.
20  If we want to know is old doing worse than young,
21  we use a one-tail test.  If we want to know is old
22  doing better than young, we use a one-tail test in

1  the -- in the other direction.
2      Q   Okay.
3      A   It depends on what you want the -- on
4  what your final statement of interest is, and in
5  this case I take it to be there's a difference in
6  this direction.
7      Q   In other words, what you were trying to
8  test was are older workers doing worse than younger
9  workers?
10     A   That's -- is there reason to believe that
11  older workers are doing worse.
12     Q   And that in your view is a one-tail test
13  or you should use a one-tail test?
14     A   Yes.  I would say that's not an opinion,
15  but I -- I know other people somehow manage to say
16  different.  I do not understand how.
17     Q   Okay.
18     A   They're not -- to my mind statistics
19  clearly says you have to do it this way, or what
20  happens, and people have finally managed to say it,
21  sometimes say well, we're going to run a two-tail
22  test and then we're going to reject if it's in the

1  direction we want, which is, effectively, a
2  one-tail test at half the level of significance.
3      Q   Using a one-tail test, does that mean
4  that you're only looking for outcomes that are
5  adverse to older workers?
6      A   I'm only looking for -- no, it -- it
7  means is there reason to believe -- it means what
8  we said; is there reason to believe they're doing
9  worse.
10         Let me -- let me just -- maybe this will
11  help a little bit because I didn't put a big
12  statistical discussion in here.  I believe that
13  there's pretty much one decision that led people to
14  start using two-tailed tests because a particular
15  appellate court said to do it, and it's just wrong.
16  It's the court doing statistics.
17         The court doesn't care about my legal
18  decisions and I don't care when the court thinks it
19  understands statistics.
20     Q   All right.
21     A   But others have adapted to this
22  procedure, so they say court said use a two-tailed

28 (Pages 106 to 109)

Capital Reporting Company

Page 110

1 test, so I will use this two-tailed test. But when
2 they get done describing it, they change the
3 result, and what they changed it to was the result
4 of a one-tailed test at the level of significance
5 half the one stated. So at that point it's
6 semantics.
7    Q   Well, let's talk a little bit about level
8 of significance. If I understand your, and I'm
9 looking to see whether you articulate it or not --
10 on page five, the first of your tables on the
11 Fisher's Exact Test, when the last column is
12 labeled, "One-Tail Level of Significance" -- do you
13 see that in the far right-hand column, one tail?
14    A   Yes.
15    Q   What level of significance are you using?
16    A   Well, I'm presenting -- there is a level
17 of significance obtained in every table and I put
18 an asterisk next to those that were less than .05.
19    Q   Okay. That's what I was after, is you're
20 using a level of significance of .05 or below?
21    A   By definition level of significance means
22 or below, yes.

Page 111

1    Q   I understand. All right.
2       If we were to convert that .05 level of
3 statistical significance to an equivalent number of
4 standard deviations, which you see in a lot of the
5 cases, what would that level of standard deviation
6 be?
7    A   Do you really want to catch your plane?
8 I need to figure out how long an answer to give
9 you.
10       The answer, of course, is it depends on
11 what you mean and here's -- here's what's going on.
12 The concept of numbers of standard deviations came
13 about in the Hazelwood case.
14       It -- the clerk of the court presented to
15 the court some simple statistical calculations
16 using a binomial -- a normal approximation to the
17 binomial distribution.
18       In order to get that -- in order to be
19 able to do that, the binomial had to be appropriate
20 and the normal -- the sample size had to be large
21 enough to use the normal approximation.
22       At that point when you can say I will

Page 112

1 approximate the results using a normal
2 distribution -- normal distribution is the
3 bell-shaped curve.
4    Q   I understand that.
5    A   And the difference -- big difference is
6 this: The normal distribution is a continuous
7 curve, it has no jumps in it, whereas the binomial
8 and the hypergeometric have jumps. Only the
9 integers get probability, whereas the normal,
10 everything gets probability, every individual
11 result has probability zero and you can only
12 approximate what each individual unit would get.
13       When they were speaking in terms of a
14 normal distribution, there is a characteristic of a
15 normal distribution that's very useful. If you go
16 in any normal distribution the same number of
17 standard deviations from the mean, you capture the
18 same amount of probability. That is actually a
19 characterization of the normal distribution.
20       It's another way -- if I tell another
21 statistician that's the case, he's going to say oh,
22 you mean you used the normal distribution.

Page 113

1       When you use the normal, standard
2 deviations can be equated to probabilities. If
3 you're not using a normal, you don't have that
4 result.
5       When we use Fisher Exact Test, if you
6 look at the standard deviation of the test
7 statistic and you look at the distribution, you
8 will not find that what you're expecting is .05
9 corresponds to two standard deviations. In fact,
10 back in Hazelwood, it's not .05 that corresponds to
11 two standard deviations, .05 actually corresponds
12 to 1.96 standard deviations, and that's only for a
13 two-tailed test. For a one-tailed test, .05
14 corresponds to 1.645 standard deviations.
15    Q   That's what I was looking for.
16    A   Yeah. But -- but you can only use that
17 where standard deviations equate to probability.
18       I mean you can only use that under the
19 normal distribution. We're not using the normal
20 distribution.
21       Now, if you were to take the results, and
22 I'm just picking this out as an example. On page

29 (Pages 110 to 113)

Capital Reporting Company

Page 114

1 five the asterisks are all in what I would consider
2 large samples.
3       So even though I used a Fisher Exact
4 Test, you could go ahead and compute a normal
5 approximation to -- it would be to the Fisher Exact
6 Test, it could be said to the hypergeometric -- you
7 could create a normal approximation. If you do,
8 that thing will be approximately the same.
9       What this means is with large numbers we
10 should wind up with about the same answer whether
11 we think of it as a normal approximation or an
12 exact probabilty. The exception, if there is --
13 well, to the extent that there is one, is when the
14 probabilty is -- when the number's relatively rare.
15 In other words, what I just said works pretty well
16 if you've got 50 percent the dichotomy one way,
17 50 percent the other way. It works pretty well
18 30/70, 20/80, even 10/90. If you get down to a
19 rare disease, .001 versus one minus that, that
20 normal approximation is not going to be
21 particularly good. In fact, very commonly the
22 results you see are more due to the approximation

Page 115

1 to the distribution than they are to the random
2 event of interest.
3       So to go back to your question was, is
4 this the two-standard deviation result. Not in
5 this case. I wanted to answer you, but I wanted to
6 give you all that explanation to go along with it.
7    Q   But you do agree that the.05 level in a
8 one-tailed test, if you're going to equate it to a
9 standard deviation, it's 1.64?
10   A   Only if you assume a normal distribution.
11   Q   I understand.
12   A   This doesn't use a normal distribution.
13   Q   I understand.
14   A   There was -- let me just think. There
15 was something the way you said that. The -- the
16 concept -- the use of the number .05 and the use of
17 the number 2, referring to standard deviations
18 and -- referring to probability and number of
19 standard deviations, causes a problem because --
20 I'm saying the same thing in a slightly different
21 way -- probability is universal. You're going to
22 see it in all statistical analyses. The numbers of

Page 116

1 standards deviations is not universal, it's not
2 generally relevant. It's only of interest in that
3 one case of a normal distribution where that is
4 equivalent to the number of standard deviations.
5       What the court was trying to do, and this
6 is not a statistical issue, this is a judgment
7 issue, is determine what will we consider
8 sufficiently unusual to say that there's --
9 reasonably there's a difference.
10      The court was trying to, in that case,
11 was trying to determine are these two different,
12 not is one less than the other or greater than the
13 other. Are these two different? Therefore, that
14 court in that case was using, in the eyes of the
15 clerk that did it, a two-tailed test.
16      For the two-tailed test normal
17 approximation, when the court said I'm going to
18 draw a limit and I think, and this is the important
19 part of the decision to make, the court determined
20 the universal number is .05. That's what means
21 unusual; 1 in 20. That's what the court said. And
22 I could tell you where that comes from, which is

Page 117

1 another sad story, but the court does that.
2       Having decided that, under certain
3 circumstances it corresponds to .05 -- yeah, to two
4 standard deviations --
5    Q   Right.
6    A   -- which is the normal approximation
7 approximated again by saying 2 instead of 1.96 --
8    Q   Right.
9    A   -- or it corresponds to 1.645 in the
10 one-tailed test depending on what you're doing.
11 But whatever you're doing, what's always present is
12 .05.
13      Now, when you run a Fisher Test or any
14 other statistical test, you may not have the
15 benefit of using a normal approximation, but you
16 can use the .05.
17      So we take the level that the court
18 considered unusual and state it in terms of
19 standard deviations, treated it what the court, we
20 say, I say meant by unusual, which was .05, 1
21 chance in 20, and apply it in this case, which is a
22 one-tailed test, and say we're still looking for

30 (Pages 114 to 117)

Capital Reporting Company

Page 118

1   that level of unusualness.
2      Q   Have you read court cases where the court
3   opines that if you're using a one-tailed test, the
4   level of significance should be half of the .05,
5   should be .025?
6      A   Not where the judge appeared to
7   understand what he was doing.
8      Q   So the answer was yes, you've seen court
9   opinions that say that?
10     A   I think I've seen them.  I know I've had
11  them -- been told -- been told about them.  As I
12  said, that's -- that's the court putting on its
13  statistical hat.  With only one or two
14  exceptions --
15     Q   All right.  Let's move on --
16     A   -- we don't worry about that.
17     Q   Let's move on because I'm not going to be
18  able to debate with you on this exhibit.
19     A   No, but I'm just trying to explain where
20  I'm coming from.
21     Q   I understand.
22     A   I do not agree -- I strongly disagree as

Page 119

1   a statistician --
2      Q   I understand that.
3      A   -- and I don't think it's arguable as a
4   statistician.
5      Q   Looking at page five --
6      A   I'm sorry.  Let me just finish one last
7   thought on that.
8      Q   Sure.
9      A   To me, and this is where there's room for
10  debate, to me the court should say I'm trying to
11  find out if something unusual happened and I'm
12  going to tell you, the lay public and the
13  statisticians, what I mean by unusual.
14        Now, what you just asked me is do you
15  think -- have you seen opinions where a court said
16  what's unusual is different depending whether
17  you're in a one-tailed test or a two-tailed test,
18  and the answer is, to me -- this is opinion, not
19  statistical fact -- that's absurd.  What's unusual
20  is unusual, period.
21     Q   All right.  Looking at page five, the
22  first Fisher's table, am I correct that you

Page 120

1   indicated that you crafted, or not -- crafted is
2   not the right word, but that you displayed your
3   results from the program in this fashion and chose
4   these columns to use, correct?
5      A   And -- yes, and the order.
6      Q   And the order.
7         Is it correct that the Fisher's Test,
8   when you run the program, will also generate a
9   two-tailed result?
10     A   Fisher's -- yes, it does.
11     Q   Okay.  And so you chose not to display
12  that result, you were using a one tail and so you
13  displayed only the one-tailed results?
14     A   Further, I -- I generated only the
15  appropriate one-tailed result.  There are -- there
16  are two.  There are at least two, and there may be
17  more than two, but I generated only the one of
18  interest.
19     Q   Okay.  That's fine.
20     A   I'm sorry, but you do have the others.
21  Well, no.  We did -- we did turn over output to
22  counsel that contained all of the -- all of the

Page 121

1   output -- all of the underlying numbers including
2   the ones you just asked about.
3      Q   All right.  And you did that here
4   recently as a result of this recent work?
5      A   As a result of?
6      Q   Of the new data work beginning in
7   December.  You turned --
8      A   Well, we did it as part of -- we asked
9   him what he wanted to provide with the report and
10  he said --
11     Q   Right.
12     A   -- everything you've got or give me
13  everything you've got and we did.
14     Q   Okay.  Now, I think we established this,
15  but the table on page five corresponds with
16  paragraph 18 of the written report, does it not?
17     A   Let me see.  This is director.  Yes.
18     Q   Okay.  And in paragraph 18 you recite
19  that the outcome analysis for all employees
20  considered 34 directors.  Eleven of those were
21  uninformative, which you define in the footnote as
22  being all the employees were either of the same

31 (Pages 118 to 121)

Capital Reporting Company

1 type or the same outcome, so you couldn't compare.
2     A    Right.
3     Q    And of the remaining 23 directors, four
4 had statistically significant differences adverse
5 to older workers at the .05 level, correct?
6     A    Right.
7     Q    And those four were Harms, Waner,
8 Carlisle and Jackson.  And if you turn to the table
9 on page five, those are the four directors that you
10 have placed asterisks next to, correct?
11    A    That's correct.
12    Q    And just so we understand how the table
13 works, for example, Carlisle's output or result is
14 .046.  So that's just slightly below the .05 level?
15    A    That's correct.
16    Q    And the rest of them are lower than that,
17 correct?
18    A    That's correct.
19    Q    Okay.  Looking at the column "Not Hired
20 Number (%)," do you see that?
21    A    Yes.
22    Q    And, again, you've got that column

1 actually broken down into subcolumns under 40 and
2 40 plus.
3        Are those percentage numbers the percent
4 of -- well, tell me what those are.  Maybe that's
5 the easier way to do it.
6     A    Let's -- let's just pick one out.  Let's
7 pick the first, the Jackson Brian Patrick.
8     Q    Okay.
9     A    Seventeen were under 40.  Now, if you
10 look over to the far left --
11    Q    That's -- yeah.
12    A    -- you will see there are 200.
13    Q    So in the pool you were looking at for
14 Brian Jackson there were 200 people under 40 and 17
15 of them were not hired?
16    A    Yeah, so 17 out of 200 is 8 and-a-half
17 percent.
18    Q    Okay.  And the over --
19    A    And I picked that because we could do the
20 arithmetic in our heads.
21    Q    Right.  And the over 40 there were a
22 total of 968 in Jackson's group and 182 of them

1 weren't hired, and that generates the 18.8 percent?
2     A    That's correct.
3     Q    All right.  I just wanted to make sure we
4 understood how the math worked.
5        Would you agree that for a particular
6 director if the percentage not hired for younger
7 workers is higher than the percentage not hired for
8 older workers, that older workers were favored in
9 that particular direction?
10    A    I've got to go very slow on this just
11 because of the way the wording goes.
12    Q    Okay.  Let's use an example.
13    A    Okay.
14    Q    Let's use an example.  Take a look about
15 five from the bottom, Ron Brunton.
16    A    Okay.
17    Q    Do you see that?
18    A    Right.
19    Q    And in the under 40 column, 50 percent of
20 the younger workers were not hired in Brunton's
21 group, correct?
22    A    Right.

1     Q    And 25.6 percent of the older workers
2 were not hired in Brunton's group?
3     A    Right.
4     Q    So that reflects, does it not, that in
5 that particular director older people faired better
6 than younger people in the selection process?
7     A    That's true, but not the same way as the
8 first four more like the ones above it, meaning I
9 don't have statistical significance in that
10 direction.
11    Q    Well, that was going to be my next
12 question, but just basically separate and apart
13 from statistical significance --
14    A    The direction is as you say.
15    Q    -- the direction is favorable to older
16 workers if the percentage is higher?
17    A    That's correct.
18    Q    Okay.  And did you attempt to calculate
19 whether any of -- you would agree with me that
20 there are several directors on page five where
21 older workers directionally are favored in that
22 particular director?

32 (Pages 122 to 125)

Capital Reporting Company

1    A   Yes, but I don't know whether I'm
2  anticipating or just trying to keep this easy for
3  us because you seem to be not being antagonistic
4  about it so I can just explain it.
5    Q   I'm trying not to be.
6    A   When I got this table and looked through
7  it, I dismissed pretty much everything below Urso,
8  Crisp and down just the way I dismissed everything
9  above Jackson Brian Patrick, as the groups were
10 just too small.
11   Q   Wait a minute.  Let's look at White.
12 That's not a small group, is it?
13   A   Which one?
14   Q   White, the third one from the bottom.
15   A   Oh.  I'm sorry.  No, they're -- they're
16 not.  I guess I was looking for a lot of people in
17 both groups, and White would fit into this category
18 and White looks fine.  White could turn out to be
19 significant in the other direction.
20   Q   That was going to be my next question.
21 Did you think --
22   A   Oh, yeah, I think it is.

1    Q   Okay.  You think, for example, White's
2  results would be statistically significant
3  favorable to older workers?
4    A   Yeah.  I think I'd actually have to -- I
5  don't think that I can -- I can't simply subtract
6  it from one because you run into the exact
7  probability of its happening.
8    Q   I understand that.
9    A   But it's close and it indicates the other
10 direction, yeah.
11   Q   And for the other directors where the
12 percentage not hired under 40 is higher than the
13 percentage not hired over 40, at least
14 directionally older workers were favored in those
15 director groups even if it's not statistically
16 significant?
17   A   Right.
18   Q   All right.  That's all I'm trying to get
19 at.
20       Okay.  Now let's move on to the next
21 table I think.  Let's see.
22       Oh.  Did you make any attempt in the four

1  directors on page five that you identified as
2  having statistically significant results adverse to
3  older workers, did you make any attempt to
4  determine what percentage of the total number of
5  people were in those four groups?
6    A   No.
7    Q   Okay.  Now let's look at paragraph 19 of
8  your report.  I just want to track through the
9  various tables.  Paragraph 19 corresponds to page
10 six, the table on page six, which is the hired
11 versus not hired only SSG, correct?
12   A   Correct.
13   Q   And there, according to paragraph 19,
14 none of the directors had statistically significant
15 differences adverse to older employees, correct?
16   A   That's correct.
17   Q   And on page six we don't see any
18 asterisks, so that corresponds to that, right?
19   A   That's correct.
20   Q   Now, paragraph 20 is the same analysis
21 but excluding the SSG people, and in paragraph 20
22 you say again you eliminated 11 directors as

1  uninformative and 4 of the remaining 20 had
2  statistically significant differences adverse to
3  older workers, and, again, you identify the names
4  of those people and that corresponds to asterisks
5  on page 7, correct?
6    A   That's correct.
7    Q   Now, moving then to the recommendation
8  analysis and, again, just so we're clear, this is
9  the analysis where you looked at whether the person
10 was recommended or not recommended regardless of
11 what their ultimate outcome was, correct?
12   A   Yes.
13   Q   And in paragraph 21 is your
14 recommendation analysis for all employees, and you
15 say that you had 29 total directors, 8 of those
16 were uninformative and 4 of the remaining 21 had
17 statistically significant differences adverse to
18 older workers at the .05 level, and you identify
19 Harms, Waner, Carlisle and Jackson, correct?
20   A   Jackson, Waner and -- yes.
21   Q   I'm actually looking --
22   A   Actually I think it's -- well, let me

33 (Pages 126 to 129)

Capital Reporting Company

1   just make sure.
2       Q   Well --
3       A   It's Jackson, Waner, Harms and it looks
4   like Urso.
5       Q   It does indeed.
6       A   I'm sorry?
7       Q   It does indeed.
8       A   Oh.
9       Q   But keeping your finger there on that
10  page, flip back to the written portion of your
11  report if you would, please, and paragraph 21 is
12  the paragraph that corresponds to that table.
13      A   Which paragraph?
14      Q   Twenty-one.  I am simply trying to point
15  out what I think is a typographical error --
16      A   Yeah, there is.
17      Q   -- in your report.
18      A   I did this by copying paragraphs
19  incorrectly.
20      Q   I had a feeling it was cut and pasted.
21  You would agree with me that the chart on page 8,
22  which corresponds to paragraph 21, the 4 directors

1   that you've identified as having statistical
2   significance --
3       A   Wait a minute.  Wait a minute.  Let me
4   just make sure I'm lining this -- yeah, that's what
5   I'm getting.
6       Q   Yeah, it clearly is.  Carlisle is way --
7       A   And the funny thing is I think I knew
8   that it was four different and I had this checked
9   by two different people and we all let it go.
10      Q   All right.  Just so I have a clear
11  record, you would agree that the four directors on
12  the chart on page eight are Jackson, Waner, Harms
13  and Urso?
14      A   Right.
15      Q   Okay.  What I want you to do then is go
16  to paragraph 21 of your report.
17      A   Twenty-one of my report.
18      Q   Yeah, what we were just looking at where
19  the typo appears.  I'm going to have you hand
20  correct your report.
21      A   On this copy?
22      Q   Yes, on that copy, on the original.

1       A   Okay.  Let me -- paragraph?
2       Q   Twenty-one.  It's the bottom of page two.
3   And you'll see that --
4       A   Twenty-one, bottom of page two?
5       Q   Yeah.
6       A   Okay.  And it's --
7       Q   And Carlisle should be crossed out and
8   Urso should be written in for that result.
9       A   Actually I don't want to screw this up.
10  Let me make sure I'm on the -- recommended, and
11  it's Jackson, Waner, Harms and Urso.
12      Q   Right.
13      A   And it's --
14      Q   You have Jackson, Harms, Waner --
15      A   Yeah.  It's even in the same -- it was
16  even in a different order.
17      Q   Yeah.  Carlisle was the one that's
18  incorrect, so I'd like you to line through that --
19      A   Line through this (indicating).
20      Q   -- and put Urso underneath so that we
21  have a clean report that --
22      A   Do you want this initialed or anything?

1       Q   That would be good, yes.  Okay.  That way
2   the original exhibit will be correct and we can all
3   work off that.
4       A   Okay.  That's funny.
5       Q   Okay.  I'm just making sure I've covered
6   everything to this point.  Give me a second.  By
7   the way, we're moving along again.
8           On that chart on page eight, which is the
9   first recommended versus nonrecommended analysis,
10  did you make any attempt to determine the number of
11  employees that were in those four directors'
12  groups?
13      A   No.
14      Q   All right.  Now let's go on to paragraph
15  22, which corresponds with the table on page 9.
16  Twenty-two appears at the top of page 3 of your
17  report.
18      A   Okay.
19      Q   Please go to paragraph 22 first because I
20  think we have another error.
21      A   Oh, come on.
22      Q   And that's what I want to call your

34 (Pages 130 to 133)

Capital Reporting Company

Page 134

1  attention to and get it corrected if I'm right.
2      Paragraph 22 is the SSG employee only
3  analysis and you say, "Two of the remaining five
4  directors had statistically significant differences
5  adverse to older workers."
6      A   Yeah.  It's White.
7      Q   Yeah, it's White instead of Jackson, is
8  it not?
9      A   Do you want me to do the same thing in
10  there?
11     Q   I would like you to do that.
12     A   What paragraph is that again?
13     Q   Twenty-two.
14     A   Twenty-two replaces --
15     Q   Jackson.
16     A   -- Jackson with --
17     Q   With White.
18     A   -- with White.
19     Q   That's the way I read the table.
20     A   Yeah, that's what it says.
21     Q   Okay.
22     A   Urso and -- okay.

Page 135

1      Q   And, again, if you would initial that.  I
2  assume you've already done that.
3      A   Okay.
4      Q   Very good.  Thank you.
5          And just so we don't take the time to do
6  this on every table, but if we looked at those
7  percentage columns that we did on the very first
8  table --
9      A   Yes.
10     Q   -- and analyzed the percentage of younger
11  workers not hired versus the percentage of older
12  workers not hired, at least directionally if the
13  percentage of younger not hired is higher, it means
14  directionally that older workers were favored in
15  that particular director group?
16     A   I hesitated to say favored, meaning --
17     Q   Fair and better?
18     A   -- they did better.
19     Q   They did better.  And you've made no
20  attempt to calculate whether any of those did
21  better results is statistically significant or not?
22     A   We did.  I mean we -- I'm sorry.  We did.

Page 136

1  We have the probabilities here and in no case were
2  they -- I mean we show whether they're significant
3  or not -- oh.  You mean whether they're significant
4  in the other direction?
5      Q   Yes.
6      A   That's correct.
7      Q   Okay.
8      A   But that's what the -- the next set of --
9  the StatXact analyses will address the overall
10  issues.  I have no problem with -- with indicating
11  on any of these that we find pockets of statistical
12  significance with other groups that are large
13  enough -- large, but we still didn't find anything.
14     Q   And you understand, for example, that the
15  workers in Wawzysko's group in the table on page
16  five --
17     A   I'm sorry, I'm missing a word.  On whose
18  group?
19     Q   Wawzysko.
20     A   Oh, yes.
21     Q   It's the fourth director on the bottom on
22  page five.

Page 137

1      A   Yes.
2      Q   Are you on page five?
3      A   No, page eight, but I saw him down at the
4  bottom.  Yeah.
5      Q   Wawzysko has 484 over 40 workers in his
6  group, correct?
7      A   Yes.
8      Q   Sixty-six of whom were not hired,
9  correct?
10     A   Yes.
11     Q   And you understand that some of those 66
12  are in the class in this case?
13     A   Yes.
14     Q   All right.  Now, we've talked about your
15  outcome analysis, hired versus not hired, and your
16  recommendation analysis, recommended versus not
17  recommended.
18         In any of the work that you've done to
19  date in this case have you formed any opinion as to
20  which of those analyses is the more preferable?
21     A   No.  Let me -- let me step on that.  I
22  haven't really given it any thought.  I was just

35 (Pages 134 to 137)

Capital Reporting Company

Page 138

1  presenting both of them.  But just the question
2  provokes me to think about it and I would focus
3  on -- well, no, I guess because of Teal I would say
4  they're both relevant.
5      Q   Because of what?
6      A   The Teal decision.
7      Q   Okay.
8      A   That they would both be relevant.
9      Q   And what is it about the Teal decision
10  that in your view would make it --
11      A   Well, that you can't correct it one step
12  for problems in another step.  That's me
13  paraphrasing.
14          Teal v. Connecticut was -- you can't,
15  let's say, have a test.  Let's say you have --
16  20 percent of the applicants are of the protected
17  class and only 5 percent of the people that passed
18  the test are of the protective class.  You can't
19  then select from among the people that have passed
20  the test in such a way as to bring it back down to
21  the 10 percent and say see, we're okay.  You have
22  to be okay at each step or different people would

Page 139

1  be affected.
2      Q   So to analogize that to our situation,
3  you're saying you couldn't have bad results at the
4  recommendation stage and then correct for it at the
5  actual hiring stage?
6      A   That's under the assumption that the
7  person going to correct it is looking at the
8  recommendation -- recommend people and saying I'm
9  going to choose so it comes out a different way.
10  If, instead, he says thank you for your
11  recommendations, throws them out and goes back to
12  the beginning, that would be okay.
13      Q   Well, what if you have the recommendation
14  process and a person is recommended to receive an
15  offer with a new company but then after that
16  process takes place and before day one for the new
17  company that person takes themselves out by
18  deciding to transfer over to a different job at
19  Boeing and stays with Boeing?
20      A   Well, in that case that person should be
21  considered -- oh, and transferred to another thing
22  in Boeing?

Page 140

1      Q   Yeah.
2      A   Then they should be removed.
3      Q   Okay.  All right.  Let's --
4      A   Wait a minute.  I'm trying to think.  I
5  may go stronger than that.
6          No, I think I would go stronger than
7  that.  The action you're being judged on -- the
8  company is being judged on is what they wanted to
9  do with that person.
10      Q   The recommendation?
11      A   They wanted -- they wanted to -- they
12  wanted to keep that person.  I would -- and
13  that's -- that's against my client, and I would say
14  it stays in, certainly for the recommended, for the
15  purposes of the decision I would say that stays in
16  if you can document -- I'm not -- I'm not worrying
17  about whether they're staying at Boeing.  I'm
18  accepting it at face value, he chose to do it.
19      Q   Uh-huh.
20      A   But even though he chose to do it, the --
21  the actions of the company said you can --
22      Q   He was recommended to get an offer --

Page 141

1      A   Yes, you can go.
2      Q   -- with the new company?
3      A   That's not what I had in mind by the
4  difference between recommended and --
5      Q   An outcome?
6      A   -- an outcome, but the example you give
7  I -- I would have to count that as favorable to the
8  company.
9      Q   All right.  Now let's switch to the
10  StatXact Test, which I think you begin discussing
11  it in paragraph 24 of your report.
12          Do you see that?
13      A   Yes.
14      Q   Can you just, and, again, keeping in mind
15  the weather outside, can you briefly explain to me
16  what the test is --
17      A   Yes, I can.
18      Q   -- and why you performed it?
19      A   Yes, I can.  I'm going to use the magic
20  of big words.
21      Q   I had a feeling you would.
22      A   Actually it's not that bad.  You seem to

36 (Pages 138 to 141)

Capital Reporting Company

Page 142

1  know and understand that what they -- we called it
2  the hypergeometric.  We could have called it the
3  Fisher, we could have called it the sampling
4  without replacement.
5          What that test does, it says hey, look,
6  I've got a bunch of people, I'm going to do
7  something bad to some of them, did I do it to too
8  many of the protected class, and it focuses on
9  what's the probabilty that I would do it to this
10  many or more if chance was the operating factor.
11         All the StatXact does is it switches the
12  question.  It says look, I have a whole bunch of
13  the things I just described.  The net outcome of
14  all of these is a certain number of people are --
15  have the bad thing happen to them from the
16  protected class.  Given all the variations possible
17  to me except I can't change the number of people
18  that leave from each group, what's the probability
19  I have as many or more bad things happen to the
20  protected class in this set.  That means you're --
21  you're controlling for the number of actions in
22  each class.  That's called -- can be called a

Page 143

1  multivariate hypergeometric, meaning it's just a
2  combination of hypergeometrics.
3          It has a lot of other names because it
4  comes up in a variety of circumstances that sound
5  like they should be separate, but they all come to
6  the same answer.  But that's, in brief, that's all
7  it does, is switch from how many in this group to
8  how many overall.
9      Q   And would a layman's way of saying that
10  be it's a roll-up to a higher level?
11     A   Only if you add in respecting the number
12  of actions at each of the lower levels.
13     Q   How about if I describe it as a roll-up
14  controlling for a director?
15     A   Yes.
16     Q   I just wanted to --
17     A   Controlling for -- yeah.
18     Q   Taking --
19     A   Taking it into account.
20     Q   Your paragraph says "to consider the
21  employees as an entirety while respecting the
22  existence of directors."

Page 144

1      A   Yeah.  I -- it's funny because you put in
2  a technical word and I tend to use the nontechnical
3  word, but -- but, yes, it's the same thing.
4      Q   Okay.  And in paragraph 25 you present
5  the results of that StatXact analysis and I think
6  those are self-explanatory.
7          You have one where older workers, the SSG
8  employees in the outcome test are actually doing
9  better than younger workers, correct?
10     A   Yes.
11     Q   Okay.  And the recommendation analysis
12  for SSG employees, would that actually be a
13  statistically significant result?
14     A   Which one was that?
15     Q   The recommendation analysis for SSG.  It
16  says .0052.  That's slightly above the .05 level of
17  significance.
18     A   Only SSG recommendation.  I don't think
19  it reversed the output format, .0052.
20     Q   I mean using the .05 level of cutoff,
21  that would be slightly --
22     A   Yeah, but you've got -- you have to

Page 145

1  correct for the equality, which means you have to
2  add back.  But it's small, the 003, so, yeah, that
3  would be significant.
4      Q   I guess I'm not understanding that.  If
5  the output generated is .0052, that is greater than
6  .05, not less than?
7      A   Well, you've got to be -- let me point
8  something out to you.  I -- I know I saw this in
9  one of them.
10         Take a look at page 12.  Let's start --
11  let's start with 11.  I think that's the first one.
12  And you seem to -- you knew to go to the one-sided
13  line.
14     Q   Yes.
15     A   And you see it says S greater than or
16  equal to 1.783?
17     Q   Right.
18     A   And then you pick up the probability.
19     Q   Right.
20     A   Now, I want you to -- I'm emphasizing S
21  greater than or equal.
22         Go to the next page.  That's less than or

37 (Pages 142 to 145)

1  equal.
2      Q   Right.
3      A   Oh.  Actually wait a minute.  You want to
4  make the distinction in the other direction.  I'm
5  sorry.  I was trying to figure out what I was
6  trying to say and I didn't do it properly.
7          On the first page, 0001 --
8      Q   Yes.
9      A   -- it does not correspond to -- to 3243
10 on the second page.
11     Q   Oh, I understand that.
12     A   You understood that?
13     Q   And you footnote that --
14     A   Okay.
15     Q   -- in the body of your report.
16     A   Okay.
17     Q   I understand that.  I was focusing on the
18 recommendation one, which is, I believe --
19     A   So the chance of being less than or equal
20 is 3243 on that page and the -- the number that I
21 think you're focusing -- well, am I right?  I'm not
22 sure what you're --

1      Q   No, we're not -- I'm on the
2  recommendation, not the outcome.
3      A   Oh, I'm sorry.
4      Q   Yeah.
5      A   I've got to go to the other page.
6      Q   Yeah, which is on page 15.
7      A   Recommended on page 15.
8          Yeah, this stayed with greater than or
9  equal.
10     Q   Right.
11     A   So the probability of seeing at least as
12 many is -- is very small, but you want -- at least
13 as many --
14     Q   Okay.  So the .0052 is less than your
15 .05?
16     A   But I'm not sure that it's -- but it's
17 for my one-tailed test, not for your one-tailed
18 test.
19     Q   All right.
20     A   But I -- it didn't reverse -- it didn't
21 reverse the GE and the LE.
22     Q   All right.  I think I've got it.

1          Did you make any --
2      A   But I still think it's going to be
3  significant.
4      Q   Did you attempt to make any analysis on
5  your StatXact Test as to whether certain directors
6  were driving those overall results?
7      A   No.  I think I have that from the
8  Fisher's.
9      Q   In other words, you didn't attempt to,
10 for example, take out one of the directors that
11 indicated a statistically significant adverse
12 result and see what that did to the overall?
13     A   No.  No, I treated -- this was to
14 consider the totality of the results and --
15     Q   I understand.
16     A   -- that's what it did.
17     Q   Okay.  Have you made any analysis of the
18 individual number of decisions, either hire versus
19 nonhire or recommended versus nonrecommended, have
20 you made any analysis of the number of individual
21 decisions that would have to change to result in
22 equality between --

1      A   No.
2      Q   -- older and younger workers?
3      A   No.
4      Q   Would it surprise you to know that that's
5  a relatively small number of individual decisions?
6      A   I'm not sure I know what it would mean
7  by -- what you would consider a relatively small
8  number, what my client would mean.
9      Q   Well, would it surprise you that that
10 number is less than a hundred people out of 9,000
11 selection decisions?
12     A   I don't -- I'm not sure -- I'm not sure
13 that that's quite relevant -- I'm just
14 listening to what you said.  One hundred out of
15 9,000.  I think --
16     Q   I said less than a hundred.
17     A   What I'd like to know is 100 out of how
18 many older workers.
19     Q   Well --
20     A   In other words, there's a shortfall
21 associated with this process.
22     Q   Right.

38 (Pages 146 to 149)

Capital Reporting Company

Page 150

1    A   I haven't figured out what the shortfall
2  is.  To me that goes more to a damage question, but
3  that's what you're saying to me.
4    Q   Yeah.  Assume the shortfall is something
5  in the neighborhood of 1200 older workers didn't
6  get --
7    A   1200?
8    Q   1200 -- didn't get job offers.
9    A   And that seems like a -- I guess I'm not
10 understanding.  That seems like a lot to me.  Wait.
11 A total of 1200 didn't get --
12   Q   Didn't get offers.
13   A   Regardless of age?
14   Q   No.  Older workers.
15   A   Older.  And now you're saying it would
16 have been maybe 11.  You're saying change a hundred
17 of them?
18   Q   Yeah.  Change less than a hundred of
19 those 1200.
20   A   Well, that doesn't -- I'm not sure I
21 would say that's -- however you characterize it,
22 it's a hundred.  It is what it is.  It's a hundred.

Page 151

1       If you take a hundred people and you're
2  paying them, I don't know, even $10,000 a year, it
3  starts mounting up.
4    Q   Take a look at paragraph 26 of your
5  report.  Do you have it?
6    A   I'm sorry?
7    Q   Paragraph 26.
8    A   Paragraph 26, yes.
9    Q   And basically without reading it all into
10 the record, you indicate that the results of the
11 test you ran indicate that chance and director do
12 not explain the observed disparities and that,
13 therefore, there are other variables used in the
14 decision-making.  Do you see that sentence?
15   A   No, it doesn't quite say that.
16   Q   I thought I read it.  It begins on the
17 fourth line --
18   A   Yeah, I got it.
19   Q   -- in paragraph 26.
20   A   Wait a minute.  I got it, but read it
21 again.
22   Q   "These results indicate that chance and

Page 152

1  director do not explain the observed disparities
2  and that, therefore, there are other variables used
3  in the decision-making."
4    A   I think in the next line I saw there
5  appear to be other -- yeah --
6    Q   Yeah.  Okay.
7    A   -- there were other variables.  Now --
8    Q   Okay.  You don't opine that the other
9  variable is age discrimination, do you?
10   A   No, that's correct.
11   Q   You're not offering any opinion on that?
12   A   That's correct.
13   Q   That's for somebody else to argue?
14   A   That's correct.  And, of course, all
15 these results are limited to the data that I have.
16   Q   And you made no attempt to identify what
17 other variables there might be other than --
18   A   I did at the very beginning.  I was just
19 told it doesn't matter what you come up with, we're
20 not going to get more data, so -- and I don't know
21 that I know what they'd be, but it seems to me
22 there's other reasons if you -- the company

Page 153

1  probably could find that out or may know that more
2  easily than the plaintiffs by actually looking at
3  the individual decisions and talking to the
4  decision makers.
5    Q   Did you ask for any information about how
6  the Boeing workforce as of February 22, 2005, the
7  early date in your analysis, how that workforce
8  came to be what it was?
9    A   I'm not -- the answer is no, but I'm not
10 sure what you mean.
11   Q   Well --
12   A   I didn't ask, but I don't know exactly
13 what I would have asked.
14   Q   Were you told anything about what the
15 workforce was like, say, in mid 2001 versus what it
16 was in February 2005 either in total number of
17 employees or anything else?
18   A   I'm trying remember whether I had the
19 ability to generate it, but we didn't -- I
20 didn't -- I didn't make that comparison.
21   Q   Were you told anything about large
22 layoffs that occurred at Boeing Wichita after

39 (Pages 150 to 153)

Capital Reporting Company

---

Page 154

1   September 11, 2001?
2       A   No, certainly not told.  Not put to my
3   attention, no.
4       Q   Okay.  So you weren't told anything about
5   how those layoffs were accomplished, whether they
6   were done on a seniority basis or some other basis?
7       A   That's correct.
8           MR. ARMSTRONG:  Let's take a short break.
9   I think I'm done, but I want to check.
10          THE WITNESS:  Can't be.
11          (Brief recess.)
12          MR. ARMSTRONG:  I have no further
13  questions.  Thank you.
14          MR. OHAEBOSIM:  No questions from the
15  plaintiff.
16          (Whereupon, at 12:58 p.m., the
17          deposition of CHARLES R. MANN, PH.D.
18          was concluded.)
19              * * * * *
20
21
22

---

Page 156

1   A C K N O W L E D G E M E N T   O F   D E P O N E N T
2
3
4   I, CHARLES R. MANN, PH.D., do hereby acknowledge I
5   have read and examined the foregoing pages of
6   testimony, and the same is a true, correct and
7   complete transcription of the testimony given by me,
8   and any changes or corrections, if any, appear
9   in the attached errata sheet signed by me.
10
11
12
13
14
15
16
17
18
19   _____   _____
     Date                    CHARLES R. MANN, PH.D.
20
21
22

---

Page 155

1          CERTIFICATE OF NOTARY PUBLIC
2       I, SHARI R. BROUSSARD, the officer before whom
3   the foregoing deposition was taken, do hereby
4   certify that the witness whose testimony appears in
5   the foregoing deposition was duly sworn by me; that
6   the testimony of said witness was taken by me in
7   stenotypy and thereafter reduced to typewriting
8   under my direction; that said deposition is a true
9   record of the testimony given by said witness; that
10  I am neither counsel for, related to, nor employed
11  by any of the parties to the action in which this
12  deposition was taken; and, further, that I am not a
13  relative or employee of any counsel or attorney
14  employed by the parties hereto, nor financially or
15  otherwise interested in the outcome of this action.
16
17
18
19          SHARI R. BROUSSARD
            Notary Public in and for the
20            District of Columbia
21
    My commission expires:
22  July 14, 2010

---

Page 157

1   Lawrence W. Williamson, Jr., Esquire
2   Williamson Law Firm, LLC
3   218 Delaware, Suite 207
    Wichita, Kansas 67206
4
5   IN RE:  Apsley, et al. vs.
            The Boeing Company and Spirit Aerosystems
6
7   Dear Mr. Williamson:
8       This letter is to advise you that the original
9   transcript of  CHARLES R. MANN, PH.D. taken in the
10  above matter will be available for the witness to view.
11  Please have the witness contact Capital Reporting
12  Company directly at (202) 857-3376 to view this
13  transcript for signature.
14      Pursuant to the rules, the transcript will be
15  available for 30 days beginning Monday, February 9,
16  2009.
17      If you have any questions, please do not
18  hesitate to call.  Thank you.
19  Yours,
20
21  Shari R. Broussard, RPR, CSR
    Reporter/Notary
22  cc:  James M. Armstrong, Esq.

---

40 (Pages 154 to 157)

Capital Reporting Company

Page 158

1   Capital Reporting Company
2   1821 Jefferson Place, Northwest
3   Third Floor
4   Washington, D.C. 20036
5   (202) 857-DEPO
6           E R R A T A   S H E E T
7   Case Name:   Apsley, et al. vs. The Boeing Company
8               and Spirit Aerosystems
9   Witness Name:  CHARLES R. MANN, PH.D.
10  Deposition Date:  Tuesday, January 27, 2009
11  Page No.   Line No.       Change/Reason for Change
12
13
14
15
16
17
18
19
20
21  _____      _____
22  Signature                Date