# EXHIBIT 77

1

I have been asked by plaintiffs' counsel, Lawrence Williamson, to review and offer a rebuttal to the expert report provided by Gerald Graham.  In addition, I was asked to comment on the non-technical aspects of the expert reports of Dr. Mann and Dr. Baker.  In my expert report and deposition, I opined that the process used to determine which employees would be rehired was excessively subjective.  As this process was used throughout the organization, older workers, as a group, were similarly affected by it.  In his expert report, Dr. Graham makes several comments on my assessment of the subjectivity of the process, which I will address below; nowhere, however, does his report speak to the issue of the process having a similar effect on older workers, as a class.  In furtherance of my rebuttal, I reviewed additional exhibits that were not available to me at the time I wrote my expert report.  These include exhibits marked DAP 310-810, 4178-4179, and 4272-4309, as well as the expert reports of Dr. Mann and Dr. Baker.

Overall Comments

In several places, Dr. Graham argues that I incorrectly rely on performance appraisal research in this selective rehire process.  To be clear, my reliance on the performance appraisal literature was quite deliberate.  Hiring decisions are based on information gleaned by other sources (reference checks, interviews, selection tests, etc.), whereas performance appraisal decisions are based on employees' performance in existing positions within the organization.  Likewise, in selection decisions, information that is gleaned about a prospective employee's potential comes from sources other than the managers to whom the employees will report.  In contrast, under the process referred to as "selective rehire," the Boeing managers who made the decisions are the same managers to whom the selected employees ostensibly began reporting in the new company.  Thus, despite the "rehire" nomenclature, the process was one of making decisions based on known performance information within the organization (i.e., performance appraisal), just as

many organization would do in other lay-off situations that don't involve the formation of a new company.

Responses to Professor Graham's Specific Comments

1. In paragraph 7, Dr. Graham provides a citation from a textbook by Robbins and Judge. While I don't disagree that "organizations must foster innovation and master the art of change," I don't see this quote as being relevant to whether the selective rehire criteria were subjective or whether the process had a similar effect on the putative class members. Other parts of this text which Dr. Graham failed to discuss are considerably more relevant. For example, in the same book, on page 36, the authors state, "In organizations, we frequently hear comments that represent stereotypes based on gender, age, … 'older workers can't learn new skills.' Stereotypes can be so deeply ingrained and powerful that they influence life-and-death decisions… So, we constantly have to check ourselves to make sure we're not unfairly or inaccurately applying a stereotype in our evaluations and decisions." Further, in the 2005 edition of the same text (pp 255-256), the author states that, "the weakest set of criteria… is individual traits. We say they are weaker than either task outcomes or behaviors because they are furthest removed from the actual performance of the job itself. Traits such as having 'a good attitude,' showing 'confidence,' being 'dependable' or 'cooperative,' 'looking busy,' or possessing a 'wealth of experience' may or may not be highly correlated with positive task outcomes…." Further, in the section on improving performance appraisals (pp. 259-260), Robbins states that, "evaluators can make leniency, halo, and similarity errors… They can… allow the assessment of one characteristic to unduly influence the assessment of other characteristics (the halo error)." In the following paragraph, which bears the subheading, "Emphasize Behaviors Rather Than Traits," Robbins continues, "Many traits often considered to be related to good performance may, in fact,

have little or no performance relationship… Another weakness of trait evaluation is the judgment itself. What is 'loyalty'? When is an employee 'reliable'? What you consider 'loyalty,' I may not. So traits suffer from weak interrater agreement."[1]

2. In paragraph 8, Dr. Graham aptly states that, "by carefully selecting the appropriate workforce skills and talents… the new company would also have an excellent chance of increasing labor productivity and reducing costs." However, he fails to demonstrate whether the defendants did, in fact, carefully select the appropriate workforce skills and talents. In reviewing the testimony I read prior to writing my report, I found no evidence that they did.

3. In paragraph 10, Dr. Graham notes the elements of the plan for the selective rehire process. In particular, he notes that there was "a specific requirement to avoid discriminating against protected classes of employees." However, despite the fact that EEO review was part of the process described to managers in the Post APA-Newco Hiring Management Communication exhibit, Ms. Scott indicated that that she, Mr. Patrick, and Mr. Long were aware of the adverse impact, yet did nothing. Thus, it appears that the EEO review process was so perfunctory, as to be meaningless.

4. In point C of this section, Dr. Graham states that "very specific guidelines and training were provided." However, as I noted in great detail in my report, the guidelines were not at all specific, and were open to a great degree of interpretation by different managers.

5. In point D of this section, Dr. Graham notes that "decisions were to be made by managers who had first-hand knowledge of the employees' abilities by virtue of having personally observed their performance over time – in many cases for several years." However, he neglects

---

[1] It bears noting that several of the examples that Robbins uses in his text correspond to the very criteria or descriptions of the criteria, set forth in the Post APA – Newco Hiring Management Communication presentation.

4

to mention that the decisions also involved higher level managers, who would have had far less opportunity to observe employees' performance.

6. In point G, Dr. Graham notes that "selection recommendations were reviewed by Human Resource and legal professions." As I noted above, while Ms. Scott, Mr. Patrick, and Mr. Long may have reviewed the recommendations, they clearly saw the adverse impact, yet chose to do nothing about it.

7. Dr. Graham talks about strategic planning sessions he attended and contends that "the question, 'when do you plan to retire'?" had nothing to do with age discrimination; rather it addressed the directors' concerns with orderly succession." Dr. Graham may or may not have been in a position to know what motivated the question at this retail organization. However, this is irrelevant in determining what motivated the numerous age-related comments made to plaintiffs in this case. Moreover, several of the comments listed in the complaint had nothing to do with asking people when they were going to retire. For example, Plaintiff Kerns was asked, "Are you getting too old to do your job?" and told, "Maybe, we should put you on another shift if you're too old! Getting too old to get it done on time?" Likewise, Plaintiff Powell recounted that management said, "Boeing needs to be competitive with an aging older workforce. Younger people are stronger and faster." Thus, Dr. Graham's contention that comments about the age of the workforce were motivated by concerns regarding succession planning is without foundation. Further, even if one were to focus only on those comments that relate to retirement, the only grounds upon which Dr. Graham attempts to substantiate his claim that questions about retirement are driven by concerns about succession planning are his own personal interpretations of comments made to him regarding his age. As a parallel, the fact that some women do not find

5

use of terms such as "baby," offensive, does not imply that using this term is universally inoffensive.

8. Although he states that studies show that older workers do not suffer from poorer health or declining vigor and mental abilities, Dr. Graham does not provide any citations for the studies to which purports to be referring. His claims are not supported by the literature in the area. Having done an abundance of research on older workers, I can point to several studies that indicate that older workers do, on average, have poorer health (Rocke & Lachman, 2008), less vigor (Borgatta, 1991; Salthouse, 1987), and lower fluid intelligence (Avolio & Waldman, 1990, 1992; Botwinick, 1984) than younger workers.

9. In paragraph 21, Dr. Graham opined that the criteria were very well defined. To support his theory, he points to some examples of criterion definitions, which he claims "any manager who observed a group of employees at work could readily and objectively discern which employees more consistently meet these standards." As I elaborated in great detail in my expert report, the belief that managers would agree on what it means to be "receptive to change in support of company initiatives," "treat others with dignity and respect," etc., is untenable.

10. Although Dr. Graham stated that he thought the criteria were very well defined, he, himself, confounded two of the criteria in paragraph 24. Specifically, in attempting to demonstrate how easily a manager can discern flexibility, he states, "more flexible-good-attitude employees focus their behaviors and comments on the outcomes first while respecting the boundaries of their and other's jobs." That Dr. Graham confounded the two criteria in attempting to demonstrate how easily a manager can discern flexibility is a testament to the lack of clarity of the constructs. In reviewing the additional exhibits, it is clear that the nebulousness of the criteria were also a

problem for Boeing managers. For example, on DAP 360, Manager D. H. commented on the commitment of Brian Pontius, yet there is no mention of commitment in the criteria or criterion definitions that were presented to managers. Likewise, in evaluating Ricky Baslmann's flexibility, Manager Lieb notes that the employee is "only able to work on one project at a time." However, there is no mention of multi-tasking in the criteria or criterion definitions. In commenting on David Underwood's productivity, the same manager writes, "makes a mountain out of a mole hill," yet such a tendency is not described anywhere in the criteria. In one of the three assessments I found that contained favorable information (DAP 695), Steve Murray is described as, "very smart," a criterion which also fails to appear in the assessment information provided to managers. The fact that some managers commented on criteria that were not part of the process provides strong evidence regarding their lack of clarity.

11. In paragraph 24, Dr. Graham accuses me of being naïve. He argues that "inflexible employees interpret their jobs in the narrowest way." However, as I indicated in my expert report, union contracts often define jobs quite narrowly. As a result, the extent to which an employee could have demonstrated, "an ability or willingness to work outside of their job," even if s/he wanted to, is quite restricted. I am confident that Dr. Graham would agree that the research on reinforcement theory makes clear that employees engage in behaviors that they believe will be rewarded. In a union setting, there is little reason for an employee to believe that working outside of his/her job would result in a reward. Indeed, doing so might well result in negative repercussions, particularly when it entails stepping on a fellow union member's toes.

12. In paragraph 26, Dr. Graham notes, "a standard weighting scheme, which Dr. Goldberg does not recommend but seems to imply, poses many other issues." Dr. Graham and I are in

agreement that I did not recommend what he refers to as a "standard weighting scheme."[2] Nor did I state or suggest that weighting the criteria equally would result in a less biased process. Rather, I raised the point that absent any direction as to how to weight the criteria, a manager's perceptions of an employee's performance on one criterion are apt to influence that manager's perceptions of the employee's performance on the other criteria (e.g., halo error).

13. I concur with Dr. Graham (paragraph 28) that the halo effect may influence ratings on other criteria in either a positive or negative direction. Whether halo error may or may not result in positive overall assessments is irrelevant in the present case. At Boeing, the documentation regarding the extent to which each employee possessed each of the seven criteria, clearly indicates that employees who received a negative evaluation on one or more criteria almost never received a positive evaluation on the other criteria.

14. Related to this point, Dr. Graham later (paragraph 42) presents some very misleading information about what I stated in my report. He states that my, "assertion that 'all of the narrative about non selected employees was negative,' is incorrect." To be clear, what I said was, "in the appraisals contained on pages DAP 918- DAP 941, for *every* employee who received a "no" decision, *all* of the narrative information about him/her was negative (underline added for emphasis; italics from my original report). The exhibits he uses to counter my example (DAP000089-92 and DAP000006-7) have not been made available to me; thus, I cannot make any statements about them. However, since writing my expert report, I did receive the exhibits marked DAP 310-810, 4178-4179, and 4272-4309. In reviewing the several hundreds of pages in which assessments and decisions were made about employees, I found only three cases where any positive information was documented for employees. Two of these were marked with

---

[2] The process Dr. Graham describes is what HR experts would generally call "equal weighting."

an "x", indicating rehire; there was no mark placed next to the third case: On DAP 364, Denny Raymond was noted as "good asset for sending on the road; good knowledge of hardware," and on DAP 365, Jackie Clem was characterized as, "above average mechanic; exemplary attitude." Steve Murray was also favorably described on DAP 695 as "very smart[3], does what is asked, knows manufacturing, big mistake.[4]"

15. In paragraph 32, Dr. Graham again proffers the notion that the criteria were well defined. I think my expert report provides ample evidence of how poorly defined the criteria are. Moreover, Dr. Graham's discussion of the Woehr and Huffcutt article that I cited in my report misses the primary finding of the article, which is that a specific type of training, frame-of-reference (FOR) training, improves the accuracy of appraisals.

16. In paragraph 33, Dr. Graham states that I quote "several studies that show flaws in performance appraisal systems. One could interpret Dr. Goldberg's comments to suggest that management should have used a flawed system with incomplete data in making selection systems." The studies to which I referred show ways of improving flaws in performance appraisal systems. These include many of the issues I raised in my expert report and in this rebuttal: Clearly defining criteria; adhering to a single, consistent process in appraising behavior; providing behavioral descriptions of what constitutes good and poor performance on the criteria; clarifying the length of the appraisal period; keeping records of good and poor performance on each of the criteria; instructing managers on how to combine the information from the multiple criteria; and providing frame-of-reference training. Boeing chose not to employ any of these strategies.

---

[3] It should be noted that while favorable, "smartness" is not one of the criteria.
[4] It was unclear whether the "big mistake" referred to a mistake made by Mr. Murray or a mistake that was being made as to the decision to rehire him.

17. I concur with Dr. Graham's assertion in paragraph 34, that past behavior is the best predictor of future performance. However, there is an important distinction between the examples he gives of work sample tests and observing performance for temporary assignments and observing years or decades of performance without keeping any record-keeping. Human memory is very fallible. As a result of these limitations, people over-estimate the occurrence behaviors that occur very early (what we call, "primacy effects"[5]) and very late (what we call, "recency effects") in the recall period. I did not state or suggest in my expert report that past performance should not have been used. On the contrary, on page 12, I opined quite clearly that performance records should have been used: "Yet, even for the 40% of the workforce for whom prior performance assessments were available, both Ms. Scott (p. 64) and Ms. Caster (p. 179) note that these evaluations were not considered." However, asking a manager to provide a snapshot judgment about an employee's performance over the course of decades is not likely to yield reliable information. Returning to the Robbins textbook (8th edition), on page 260, under the heading, "Suggestions for Improving Performance Appraisal," the author notes, "the evidence indicates that by keeping a diary of specific critical incidents for each employee, appraisals tend to be more accurate and less prone to rating errors. Diaries, for instance, tend to reduce leniency and halo errors because they encourage the evaluator to focus on performance-related behaviors rather than traits."

18. Dr. Graham put some words in my mouth regarding the section of my report that focused on changing the rules of the game in the midst of the rehire process. Nowhere did I suggest "that there were some skilled employees that management did not want to hire, and that management invoked the remaining six standards so they could 'cover themselves'." The only issues I raised

---

[5] This phenomenon is also sometimes referred to as "first impression bias."

about changing the process had to do with the fact that different processes yield different results and the fact that the way in which the initial seven-criterion process was carried out (e.g., inadequate documentation regarding strengths and weaknesses on each of the criteria) left managers without the information they needed (e.g., documentation regarding performance solely on the skills criterion) to make skills-only assessments.[6]

19. In paragraph 36, Dr. Graham provides a plausible theory as to why the focus shifted to only Skills, when Boeing was adding the extra 500 employees to the selective rehire list. However, in my expert report, I made no mention of whether Skills was or was not a reasonable criterion (though I did indicate that I do not consider the definition of this criterion to be reasonable). It is possible, that with a better definition of the criterion, that Skills may, indeed, be an appropriate criterions for making the rehire decisions. However, if, as Dr. Graham suggests, it is important to "ensure, as a minimum, that the 'additional 500 recommendations for hire' have the required skills," then why would Boeing not have made the same requirement during the initial round of decisions?

20. In paragraph 38 of his report, Dr. Graham correctly notes, "correlation does not prove causation. There may be many reasons, other than age discrimination, why a greater proportion of older employees were not selected for employment in the new company." However, my report did not suggest that correlation proves causation. Rather, given the statistical evidence of discrimination noted in Ms. Scott's testimony (later corroborated by the reports of Dr. Mann and Dr. Baker), my report was focused on some of the potential explanations for the statistical disparity. The subjectivity of the criteria, the likelihood of disagreement about the interpretation

---

[6] In preparing this rebuttal, I noticed there is an extra "not" in the last sentence of the first paragraph on page 15 of my report. The sentence should read as follows: "Had Boeing utilized the ranking system that was considered in DAP 18937 – 18971, they would have been able to determine which 500 of the employees who were initially 'no' decisions should be changed to 'yes' decisions, without having changed the rules of the game."

of the criteria, the instructions to rely heavily on judgment, and the halo error that is evidenced in the narrative assessments[7] suggest that actual performance-related differences between older and younger workers is not a reasonable interpretation. In contrast, the ageist statements reported in the complaint, which I cited on page 5 of my report, are indicative of a climate that tolerates age discrimination.[8]

21. In paragraph 40, Dr. Graham correctly states that "the mere fact of attendance does not ensure that employees are adaptable and willing to learn." I agree with this statement; however, it is not relevant. In my expert report, I stated, "despite the known availability of more objective assessments of employees' willingness to learn new skills, the defendants chose to rely on a more subjective, bias-prone process." I never stated or implied that training records were a perfect measure of willingness to learn new skills; rather, I suggested that they are a more objective assessment (and indeed, Mr. Tuner indicated that this would be a tangible, observable means of assessing employees' desire to learn) than the process Boeing ultimately used. Given that Mr. Turner felt that this was an objective measure and it was available, then why muddy the waters with judgments?

22. I disagree with Dr. Graham's contention (paragraph 43) that, "it is simply much more practical to record the reasons for rejection than it is to fully record and describe all of the reasons why candidates were judged to have met the criteria." While it may have been faster for the defendants to do that, the result was that they did not have information on the Skills criterion, upon which to base their decisions for adding back the additional 500 employees, a result which is highly impractical. Moreover, as I discussed in my expert report, exhibit pages marked DAP

---

[7] Having reviewed the additional exhibits marked DAP 310-810, 4178-4179, and 4272-4309, I found positive comments regarding only three of the employees who were not selected, suggesting strong evidence of halo error.
[8] Dr. Graham suggests that I took these quotes out of context. However, these were quoted directly from the complaint.

12

18937 – 18971 show that a very practical appraisal system in which employees would have been rated on each criterion in a less biased manner was considered (sufficiently so, that it had been approved by the legal department), but abandoned.

23. Dr. Graham asks (paragraph 45), "how could you possibly take judgment out of the process?" I don't believe one can completely remove judgment from the appraisal process. However, this is not to say that organizations shouldn't strive to minimize the extent of judgment that is allowed to enter into the process. In the case of Boeing, managers were explicitly instructed to rely heavily on their judgment, a practice which invites bias. Ostensibly Ms. Scott realized that this was a bad idea, as she clearly went out of her way in her deposition (pp. 78-79, 99-101) to avoid using the word "judgment."

24. Dr. Graham's definition of stereotypes as, "judging an individual on the basis of one's perception of images of a group to which the individual belongs" is reasonably close to the definition I would use. However, his assertion that by referencing other studies in formulating my opinions about the present case suggests that I "have fallen prey to the very stereotypical biases that <I> posit to the managers who made the selections," is nonsensical: 1.) What he refers to as my "perception drawn from studies" is knowledge about whether or not a relationship exists between variables; and 2.) I did not make judgments about the managers at Boeing. If relying on prior knowledge in assessing a novel case is stereotyping, then Dr. Graham's logic suggests that doctors are stereotyping when they diagnose a patient who comes into the office with the same symptoms as the doctor has seen in the past, and that judges are stereotyping when they rely on legal precedents.

Relying on the findings of other researchers is the primary means of creating new knowledge. Indeed, one of criteria used in evaluating empirical research is external validity (Campbell & Stanley, 1963). External validity refers to the extent to which the findings of a study are generalizable to other situations. If a study lacks external validity, it is of limited value to the academic community, because other researchers cannot rely on the study's findings.

25. In his concluding paragraph, Dr. Graham asserts, "it is just not credible to conclude that managers would purposefully, or unintentionally, exclude employees who were better suited to make the new company successful simply because they were older, while at the same time, selecting less capable employees simply because they were younger." If this were, indeed, true, then courts would never find in favor of plaintiffs. However, Miller, Kaspin, and Schuster (1990) reported that 32% of the ADEA performance appraisal cases between 1968 and 1986 had verdicts that favored the employee-plaintiff, suggesting that Dr. Graham's assertion is incorrect.

## Comments on the Statisticians' Reports

26. In referencing a statement I made on page 6 of my report indicating that the absolute number of older versus younger workers is irrelevant, Dr. Baker correctly notes that the probability of a chance occurrence is influenced by the number of individuals in each group. However, I was not opining on whether the number of individuals in each group was relevant to finding a statistically significant difference; I was opining on the fact that even after finding evidence of a statistically significant difference, Ms. Scott testified that she did not follow-up on this finding, because "there was no reason to question this." My point about relevance had to do with the relevance of following-up on the finding of adverse impact; not on the relevance of proportions to finding statistically significant effects.

27. The analyses provided in the reports of Dr. Baker and Dr. Mann differ with regard to an assumption as to whether or not the number of selections is fixed. Dr. Baker relies on the binomial method, which assumes that the number of selections is not fixed. This assumption is untenable in the Boeing case. Dr. Baker's assumption suggests that decisions made about one employee are completely independent of decisions made about other employees.[9] However, evidence from Ms. Caster's deposition transcript and exhibit DAP 744 make clear that adherence to the 85% rule was required. The number of selections was fixed by the 85% rule. Ms. Caster's deposition confirms this in several places. For example, on page 66, she characterizes the target as a "'ye shall' directive." On page 67, in response to Mr. Williamson's question as to whether the percentage was required, she concedes that the document she was examining[10] "states, 'must'." On page 93, she states that, "they were directed to go to the 85/15 target." Further, DAP 744 shows that the HR department calculated exactly how many employees would be needed to achieve the 85/15 target.

The assumptions of the binomial method used by Dr. Baker also do not allow for the adjustments that were made as a result of the different Statements of Work (SOWs). In particular, even if we could assume that the initial number of selections was fixed, her analyses provide no means of explaining the adjustments to the numbers that were made based on the SOWs. If an SOW requires more people in a particular job type, then the random selection of people in that job receiving a "yes" decision is going to be very different from the random selection of someone in a different job group receiving a "yes" decision. Likewise, the assumption that the number of

---

[9] As an analogy, her assumption suggests that each employee represents the toss of an 85/15 coin. Over many tosses, one would expect 85% of Boeing employees to land on "yes." However, this approach does not account for the possibility, that for any given manager, the result may not be anywhere near 85/15.
[10] I do not reference the exhibit here, as the deposition transcript was somewhat unclear as to what document she had in front of her at the time. However, this verbiage appears in the Post-APA-Newco Hiring Management Communication.

15

selections is not fixed is completely at odds with the requirement that 500 employees be changed from "no" to "yes."

28. Dr. Baker stated on page 41, that "characteristics such as skills, productivity and quality, as well as the other selective hire process criteria outlined in Section IV… are not contemplated by any statistical analyses produced to date in this case because these factors, in general, are not readily quantifiable." I suspect that she meant to say that they were not quantified; not that they are not quantifiable. Every entry-level HR text book with which I am familiar (and certainly every advanced level performance appraisal book I've encountered) discusses the idea performance can be measured and that traits can be broken down into observable, measurable behaviors. Indeed, the evidence clearly indicates that a system in which the seven criteria would be quantified was proposed and later abandoned (see DAP 18949-18950).

29. Dr. Baker states (p. 41 of her report) that "the record in this case and published professional literature on statistical analyses in age discrimination cases suggest that older employees are less likely than their younger counterparts to possess the characteristics that enhance the probability of selection and are more likely to have the characteristics that diminish the likelihood of selection." However, in the HR literature, there have been two published meta-analyses on the relationship between age and performance (McEvoy & Cascio, 1989; Waldman & Avolio, 1986). In a meta-analysis, the researcher calculates the average of the correlations reported in prior studies and weights these by the size of the study sample. In both meta-analytic studies, the average correlation between age and performance (.06) was not significantly different from 0. Thus, the generally accepted view in the HR literature is that age and performance are unrelated.

30.   Dr. Baker indicates on page 43, that the *Peter Principle* has been well studied and documented in the labor economics and human resource management professional literature; however, she does not provide any references to support this assertion.  From my own recent search of ABII and PsychInfo, the two major academic search engines in the HR field, I did not find support for her assertion that the Peter Principle has been well studied and documented in the HR literature.[11]

Conclusion

Although Dr. Graham disagreed with much of what I stated in my expert report, he does not provide any support for his opinions that are based on the research in Human Resource Management.  Although he does reference an Organizational Behavior text book in his report, the reference was irrelevant to the issue of whether the selective rehire process was unduly subjective and/or whether older workers, as a class, were similarly affected by the process.  Moreover, the same text (and an earlier edition of it) addresses many of the points I raised in my report (e.g., the power and frequency of reliance on stereotypes, examples of age-related stereotypes, the weaknesses of trait-based appraisals, the pervasiveness of errors and biases in judgment, and the importance of keeping diaries of performance, rather than relying on memory).

In sum, I continue to opine that the selective rehire process was unduly subjective and that this process had a similar effect on older workers, as a class.

*Caren Goldberg, Ph.D.*

---

[11] On May 4, 2009, I used, "Peter Principle" as a search term in ABII and PsychInfo.  From these searches, I found only one peer-reviewed HR journal article.