## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

PERRY APSLEY, et al.

               *Plaintiffs,*

vs.

                               Case No. 05-1368-EFM

THE BOEING COMPANY and SPIRIT
AEROSYSTEMS, INC.,

               *Defendants.*

## MEMORANDUM AND ORDER

This case arises out of Boeing's sale of the assets of its commercial facilities in Wichita, Kansas and Tulsa and McAlester, Oklahoma (the "BCA Wichita Division"), to Spirit AeroSystems, Inc. ("Spirit"), in June 2005. Plaintiffs are former Boeing employees who were not hired by Spirit when it purchased Boeing's BCA Wichita Division assets. Plaintiffs bring this lawsuit alleging that Defendants violated the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140; § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185; and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623. On November 11, 2006, this Court conditionally certified a collective action under the ADEA. Now before the Court are the following motions: (1) Plaintiffs' motion to certify a class under the LMRA and ERISA (Doc. 287); (2) Defendants' motion for summary judgment on Plaintiffs' ERISA and LMRA claims (Doc. 298); and (3) Defendants' motion for summary judgment or, in the alternative, to decertify Plaintiffs' ADEA

-1-

claims (Doc. 307).  For the reasons stated below, the Court grants Defendants' motions for summary

judgment.  In light of this holding, Plaintiffs' motion to certify a class under the LMRA and ERISA

and Defendants' motion to decertify Plaintiffs' ADEA claims are rendered moot and are therefore

denied.

**I.  Facts**[1]

**Years Leading up to the Divestiture of the BCA Wichita Division**

In hopes of remaining competitive in the aerospace industry, Boeing Commercial

Airplanes ("BCA"), headquartered in Seattle, Washington, began changing its business strategy

in the late 1990s.  BCA decided to increasingly focus on the initial engineering and design of its

aircrafts, sales and marketing to the end user, and final assembly of the finished product.  This

shift in focus meant moving toward purchasing more piece parts and component assemblies from

non-Boeing outside suppliers.

Pursuant to this change in strategy, BCA began exploring opportunities to divest itself of

several of its manufacturing operations that had been internal suppliers of piece parts and

component assemblies, but were not involved in final assembly of the aircraft.  When it reviewed

each of its facilities, BCA compared the performance of that Boeing facility as an internal

supplier against acquiring the parts and assemblies from an external supplier.  The comparisons

were based upon a wide variety of factors.  Over a number of years, several Boeing facilities

were divested.

Boeing's commercial facilities in Wichita, Kansas and Tulsa and McAlestor, Oklahoma

(the "BCA Wichita Division") were a BCA supplier.  In light of the fact that Boeing was

---

[1]Additional facts will be set forth in the Analysis section that warrant further discussion.

increasingly outsourcing work to non-Boeing external suppliers, management at the BCA Wichita Division grew increasingly concerned that the BCA Wichita Division would win fewer contracts on new Boeing programs unless a different cost structure could be established. Due to this concern, management at the BCA Wichita Division began to analyze how they could structure the BCA Wichita Division to be more competitive with external suppliers.

In early 2002, Jeff Turner, the leader of the management team in Wichita, spoke with Jim Morris, BCA V.P., Engineering & Manufacturing in Seattle, and suggested that BCA consider bundling the facilities in Wichita, Tulsa, and McAlester and either sell the facilities, create a wholly-owned subsidiary, or spin-off the facilities. Mr. Turner learned that a team of individuals in Seattle was already evaluating whether a different structure for the BCA Wichita Division would allow BCA to purchase the assemblies manufactured at the BCA Wichita Division at a more of a market-based price. BCA management was also evaluating whether restructuring the BCA Wichita Division created less risk than purchasing the assemblies from an external supplier. At the time of these discussions, there were many other suppliers with the ability to meet Boeing's needs.

In the fall of 2003, the decision to offer the assets of the BCA Wichita Division for sale was made. At that point in time, the potential sale was referred to as "Project Lloyd." A team of people in Seattle prepared for the potential sale, working closely with the management team for the BCA Wichita Division. Between September 2003 and March 2004, an Offering Memorandum was prepared for and given to potential buyers. This memorandum provided business, product, operational, and financial data, highlighted market outlook, presented current and projected revenue, as well as new growth opportunities, and included internally developed

cost saving opportunities for the stand alone entity.  One of the key assumptions was that Boeing would enter into a long-term supply agreement with the buyer.

BCA believed that the Wichita Division would be attractive due to the potential cost saving opportunities.  Unlike Boeing, the purchaser of the Wichita Division would not be constrained by labor contracts that were tied to those in Seattle.  These contracts had resulted in the Wichita Division paying higher wages than those in the rest of the Wichita market and had created a number of job codes that were too rigid, as they defined each employee's job responsibilities too narrowly.  In addition to the savings that would occur from offering base pay and benefits that were more in-line with the local market and combining job codes, BCA believed that the purchaser could also reduce costs by reducing the number of people working at the Wichita Division.  Management for the Wichita Division believed that the purchaser could still meet the Division's statement of work by hiring only 80 to 90% of the current workforce.

Onex Partners LP ("Onex") was one the companies interested in purchasing the BCA Wichita Division.  Onex believed that the opportunity to acquire the Wichita Division was attractive because: (1) the commercial aircraft market was at a low point in its production cycle; (2) the Wichita Division would be able to reduce its costs and increase its competitive position by virtue of being separated from Boeing; and (3) the distinct competencies of the Wichita Division, when combined with the long-term supply agreement to be entered into between it and Boeing, would give it a sustainable revenue outlook.

In October 2004, Boeing and Onex entered into exclusive negotiations for the divestiture of the BCA Wichita Division.  Boeing agreed that Onex could have access to a select group of leaders in Wichita to allow it to evaluate the supply contracts being offered by Boeing and

potential cost savings identified by the Wichita management and other consultants.[2]  From the
outset of negotiations, Boeing made it clear that a requirement of any sale was that Boeing's
existing pension obligations would be transferred to Onex for those employees hired by them.
Initially, Onex did not want to assume these obligations and preferred to pay a higher purchase
price rather than assume the pension obligations.  Onex's position was based on its desire to
offer a defined contribution 401(k) retirement plan instead of a defined benefit pension plan.
However, in the end, Onex agreed to assume Boeing's pension liabilities as of the close of the
sale, so long as Boeing transferred sufficient funds for the pension obligations being transferred.

Sometime during the negotiations, Onex formed Mid-Western Aircraft Systems, Inc.
("Mid-Western").  Mid-Western served as the vehicle to purchase the assets of the BCA Wichita
Division from Boeing.[3]  On February 22, 2005, Boeing and Mid-Western signed the Asset
Purchase Agreement.  The closing of the transaction took place on June 16, 2005.  At the time of
the closing, Boeing terminated all employees at the BCA Wichita Division.  All employees
stopped accruing benefits under the Boeing pension plan on that day.[4]  Spirit's Day One
workforce began work on June 17, 2005.

**Selection Process Used to Pick Spirit's Day One Workforce**

The process used by Spirit to select its Day One workforce was developed by the BCA
Wichita Division Human Resources personnel.  This process involved Boeing managers
evaluating employees on seven defined criteria: skills, productivity, quality, teamwork/attitude,

---

[2]At the time, Onex was an equity manager that had no previous experience in the aerospace industry.

[3]Mid-Western changed its name to Spirit after the divestiture was complete.  Throughout this Order, Mid-
Western and Spirit will be referred to collectively as Spirit.

[4]This was true regardless of whether any particular employee was offered a job by Spirit.

safe work practices, lean, and corrective action.  Each of the criterion included details and examples of what the criterion meant.  Although managers were not told how to weigh the criteria, they were told that they were only to consider these criteria.  Managers were further told that age was not to be considered.  According to Defendants, these hiring criteria were designed to identify a workforce that would be flexible and possess the skills and attitude necessary to give Spirit the best chance of success.

### Selection Process for the Wichita Site

In Wichita, the selection process was conducted by organization, with the director of each organization ultimately being responsible for signing off on the hiring recommendations.  Within those director groups, the make-up of the selection meetings varied, depending on the make-up or organization of the group.  For example, in large organizations, the selection groups may have been organized by second-level manager, that is, a review of all employees reporting to all first-level managers who reported to a particular second-level manager.  In other organizations, the selection groups may have been organized by multiple second-level managers.

The selection process began in February 2005, and continued through May-June 2005.  During this time, there were hundreds of meetings (at least between 300 and 400) in which the managers, accompanied by their HR team, went through their employees and made recommend/not recommend decisions.  These meetings included anywhere between one and upwards of fifteen managers.  At the first set of these meetings, managers were directed to recommend only 85% of the current workforce.

In every meeting where managers made recommendation decisions, Human Resources representatives were present to facilitate the meeting.  Typically, the meeting would start off

with the first-level manager of record for each employee giving his recommendation on the employee.  This initial recommendation, though, was not necessarily the resulting recommendation.  Other managers also gave recommendations for employees who they had previously managed or observed.  After each manager had had an opportunity to share their opinion, the group of managers would then reach an agreement as to whether to recommend a particular employee for hire.

As noted previously, the directors were ultimately responsible for reviewing the decisions that were made within their organizations and signing off on them.  The director met with the Human Resources person who had facilitated the meetings and approved or disapproved the recommendation decisions that had been made by the lower-level managers.  After the directors signed off on the selection decisions, the decisions were then reviewed by a panel.

During the selection process, Spirit performed several statistical analyses that compared the selection rate for various protected categories of employees (gender, race, and age) to the overall selection rate for employees in various broad job groups.  Spirit conducted these analyses at several stages of the selection process between March and June 2005.  The analyses were not conducted by segregating employees who were considered in one selection meeting or even all employees under one director.  Instead, the employees were grouped together by facility or by a broad Affirmative Action Plan ("AAP") job group which included many job codes.  As a consequence, the results were not reflective of the decision-making groups or the way in which the selection process was conducted.

These analyses revealed that women, workers over the age of 40, and minorities were being adversely affected by the selective rehiring process.  Following review of these analyses,

changes were made to the recommendation statuses for minorities and women.  According to Defendants, these changes were not based solely on the impact analyses.  Additional factors such as increased work statements and an opportunity to improve the utilization of their workforce also affected their decision to make the changes.  No changes were made to the recommendation statuses for workers over the age of 40, though, because Spirit did not believe that the results were indicative of discrimination, particularly where multiple decision makers had been involved in the process and the selection process was properly conducted, with several levels of oversight.

### Selection Process for the Oklahoma Sites

The same seven criteria that were used at the Wichita site were also used in Oklahoma. Pat Winn, an employee of the Hutchison Group, a Human Resources consultant hired by Spirit, conducted the training on the process to be used to determine which Boeing employees Spirit would hire.  All of the Boeing Oklahoma Human Resources personnel and managers involved in the selection process were required to attend the training.  At the training session, a copy of the selection criteria to be used was distributed.  Mr. Winn also instructed the managers not to consider such factors as an employee's race, sex, age, disability, or retirement eligibility in making their decisions.

Mr. Winn and at least one Human Resources employee attended each of the selection meetings to evaluate the employees in the Tulsa Business Unit.  Because of the smaller size of the facilities in Oklahoma, second level managers and directors, who had worked with the employees being considered for years and were knowledgeable about whether the employees met the seven criteria, made the selection decisions.

**Spirit's Negotiations with the International Association of Machinists and Aerospace Workers ("IAM")**

While the selection process was going on, Spirit was negotiating with the IAM over what type of benefits Spirit would offer the union's members.  During these negotiations, the union suggested that Spirit make a contribution to the IAM National Pension Fund ("IAM NPF"), a multi-employer plan that the IAM NPF manages and numerous employers contribute to, in lieu of contributing to a 401(k) plan, which is what Spirit planned to offer to some of its employees who were not represented by the IAM.  Spirit agreed to do so.

The IAM NPF uses a schedule for determining how much an employer must contribute to the plan.  According to this schedule, an employer that entered the plan around the time that Spirit did should have to contribute $1.35 per hour.  However, because the IAM NPF's actuaries determined that the Wichita Division's employee population was older and closer to retirement, the IAM NPF demanded that Spirit contribute $1.65 per hour.  Believing that the demographics at the Wichita Division were going to change over time, Spirit did not think that it should be locked in at this higher rate.  To resolve this dispute, Spirit agreed to deposit a conditional contribution of $.30 per hour into an escrow account for each hour worked by covered employees until June 30, 2010.[5]  Management for the Wichita Division, i.e., those participating in the selective hiring process, were not involved with these negotiations.

---

[5] In January 2006, the Board of Trustees of the IAM NPF determined that Spirit was no longer required to make the additional $.30 per hour payments into escrow, and returned the escrow monies that had been paid on behalf of the IAM workers.

**Results**

During the selective hiring process, Boeing managers reviewed 10,671 Boeing employees.  Of these employees, 9,203 (86%) were recommended for hire.  Of the 10,671 Boeing employees who were considered for hire, 9,332 (87%) were 40 or older.  Boeing recommended 7,968 (85%) of these older employees for hire.  Spirit actually hired 8,354 Boeing employees for its Day One workforce.  Of these, 7,237 (86%) were age 40 or older.  The average age of all BCA Wichita Division employees on its last day of operations, June 16, 2005, was 48.6 years.  The average age of all Spirit employees on its first day of operations, June 17, 2005, the next day, was 48.2 years.

On or about May 21, 2005, Spirit notified Wichita Division IAM-represented employees as to whether or not they had received a job offer from Spirit.  This was prior to the membership vote on the proposed collective bargaining agreement between Spirit and the IAM.  Employees who did not receive offers from Spirit were not allowed to vote on the proposed agreement.  All of the executive directors up to the CEO at the BCA Wichita Division were offered positions with Spirit.

In the five and a half months following the divestiture, Spirit hired 1,125 more workers.

## II.  Summary Judgment Standard

The Court is familiar with the standards governing the consideration of summary judgment.  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."[6]  An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8]  In considering a motion for summary judgment, the Court must examine all of the evidence in a light most favorable to the nonmoving party.[9]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment.[10]  The moving party is not required to disprove the nonmoving party's claim or defense, but must only establish that the factual allegations have no legal significance.[11]  If this initial burden is met, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial.[12]  In doing so, the opposing party may not rely on mere allegations or denials in its pleadings, but must present significant admissible probative evidence supporting its allegations.[13]  The Court is also cognizant that it may not make credibility determinations or weigh the evidence when examining the underlying facts of the case.[14]

---

[6]Fed. R. Civ. P. 56(c).

[7]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

[8]*Id.*

[9]*Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[10]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[11]*Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

[12]*Celotex*, 477 U.S. at 323.

[13]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[14]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."

In their response, Plaintiffs assert that Defendants' motions for summary judgment are premature because they have not yet had the opportunity to conduct merit discovery.  In an affidavit attached to their response, Plaintiffs claim that additional time for discovery would enable them to depose the union representatives who were responsible for processing grievances, the managers who made certain recommendations about Plaintiffs, and expert witnesses who would discuss technical aspects of pensions and the amount of money that Defendants have saved from Boeing's sale of the Wichita division.  Plaintiffs make their request pursuant to Fed. R. Civ. P. 56(f), which provides:

> [i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or (3) issue any other just order.

The Court denies Plaintiffs' request.  As recently stated by the Tenth Circuit, a party must do more than simply claim that discovery is incomplete; rather, they must "state with specificity how the additional material will rebut the summary judgment motion."[15]  Here, Plaintiffs have merely stated what they intend to do with additional discovery time; they have not stated how any additional facts discovered during that time would create a genuine issue of material fact.  As a result, the Court will review the merits of Defendants' motions.

---

[15] *Libertarian Party v. Herrera*, 506 F.3d 1303, 1308 (10th Cir. 2007).

### IV. Discussion

Plaintiffs bring this lawsuit alleging that Defendants violated § 510 of ERISA, § 301 of LMRA, and the ADEA.  Defendants have asked the Court to grant summary judgment on each of these claims.  The Court will address the claims in turn.

**ERISA § 510 Interference Claim**

Plaintiffs contend that Defendants violated § 510 of ERISA by "design[ing] and implement[ing] [the] sale [of the BCA Wichita Division] with the intention of interfering with [their] attainment and receipt of benefits under the Plans."[16]  According to Plaintiffs' theory, both Defendants wanted to avoid the economic burden caused by pension and healthcare benefits for Boeing's older workers so they developed a complex scheme to eliminate these workers, and, thus, prevent them from accruing any more costly benefits.

Before turning to the merits of Plaintiffs' claim, the Court deems it necessary to properly frame Plaintiffs' claim.  Based on Plaintiffs' submissions, it appears that Plaintiffs believe that Defendants may be held liable under § 510 if they intended to prevent Plaintiffs from accruing benefits under either the Boeing or Spirit benefit plan.  This belief is erroneous.  As stated in 29 U.S.C. § 1132, a party may only bring a § 510 claim under a plan that they were a participant of. Therefore, because Plaintiffs, being former Boeing employees who were not hired by Spirit, were only participants of the Boeing pension plan, their § 510 claim must be construed as relating only to the accrual of benefits under that plan.

---

[16]Doc. 241, p. 49.

Section 510 provides in relevant part:

> [i]t shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan.[17]

To prevail on a § 510 interference claim, the plaintiff must show that the defendant had the specific intent to interfere with their protected ERISA rights.[18]  The plaintiff can satisfy this burden by relying on either direct or circumstantial proof.[19]  Here, Plaintiffs have not presented direct evidence that Defendants had the specific intent to interfere with their protected ERISA rights.  Therefore, Plaintiffs must prove their case through circumstantial evidence.

In cases where a plaintiff relies on circumstantial evidence, courts have applied the familiar *McDonnell Douglas Corp. v. Green*[20] burden shifting framework, regardless of whether the plaintiff is asserting a § 510 claim individually or on behalf of a class.[21]  Under this framework, the plaintiff must first demonstrate a *prima facie* case of discrimination.  If the plaintiff succeeds in making this showing, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason

---

[17]29 U.S.C. § 1140.

[18]*See Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir. 1993).

[19]*See Garratt v. Walker*, 164 F.3d 1249, 1256 (10th Cir. 1998) (en banc).

[20]411 U.S. 792, 802-04 (1973).

[21]*See, e.g., Pendleton v. QuickTrip Corp.*, 567 F.3d 988, 992 (8th Cir. 2009); *Crawford v. TRW Auto. U.S. LLC*, 560 F.3d 607, 613 (6th Cir. 2009); *Giordano v. Thomson*, 564 F.3d 163, 169 (2d Cir. 2009); *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 67 (1st Cir. 2008); *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 785 (3d Cir. 2007); *Godwin v. Sw. Research Inst.*, 237 Fed. Appx. 306, 308 (10th Cir. 2007); *Tisdale v. Woman's Hosp.*, 191 Fed. Appx. 255, 257 (5th Cir. 2006); *Lessard v. Applied Risk Mgmt.*, 307 F.3d 1020, 1025 (9th Cir. 2002); *Salus v. GTE Directories Serv. Corp.*, 104 F.3d 131, 135 (7th Cir. 1997); *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir. 1993); *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 239 (4th Cir. 1991).

for its conduct.  If the defendant articulates a legitimate, nondiscriminatory reason, the presumption is destroyed and the burden shifts back to the plaintiff to show that the defendant's proffered reason is pretextual.[22]

In their response, Plaintiffs argue that the application of the *McDonnell Douglas* test in this case would constitute reversible error.  More specifically, Plaintiffs contend that because they allege that Defendants have engaged in a pattern or practice of pension-based discrimination, the Court must apply the pattern-or-practice framework adopted by the Supreme Court in *International Brotherhood of Teamsters v. United States*[23], a Title VII case where the United States brought a pattern-or-practice claim against an employer.[24]  In support of their contention, Plaintiffs cite to a number of courts that have applied the *Teamsters'* pattern-or-practice method of proof to discrimination claims arising under statutory provisions other than Title VII, namely the Americans with Disabilities Act and the Age Discrimination in Employment Act.[25]  Plaintiffs also cite to *Vaszlavik v. Storage Technology Corp.*[26], a District Court of Colorado case where the court appears to have implicitly approved the application of

---

[22]*See Goodwin*, 237 Fed. Appx. at 308.

[23]431 U.S. 324 (1977).  "Pattern and practice cases are typically tried in two or more stages."  *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1106 (10th Cir. 2001).

[24]Unlike other anti-discrimination statutes, Title VII explicitly provides the Attorney General with the authority to bring a civil action when they have reasonable cause to believe that an employer is engaging in a pattern or practice of intentional discrimination.  *See* 42 U.S.C. § 2000e-6(a).

[25]*See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557 (10th Cir. 1996) (ADEA); *White v. York Int'l Corp.*, 45 F.3d 357, 361 (10th Cir. 1995) (ADA).

[26]183 F.R.D. 264 (D. Colo. 1998).

the pattern-or-practice method of proof to § 510 claims.[27]  In their briefing, Defendants claim

that Plaintiffs' contention is erroneous.[28]

The Court is not persuaded by Plaintiffs' argument.  First, Plaintiffs have not cited to one

case where the presiding court applied the pattern-or-practice framework to a § 510 claim, which

is particularly telling in light of the fact that the pattern-or-practice methodology was developed

by the Supreme Court more than thirty years ago and that courts have applied the framework in

other contexts.  Second, the lone case that Plaintiffs cited to where the pattern-or-practice

framework was even discussed in the § 510 context, *Vazlavik*, is of little persuasive value

because the court in that case merely stated that the plaintiffs were proceeding under a pattern-

or-practice theory; it did not provide a reasoned explanation for why the framework was

appropriate in the § 510 context.[29]  Third, Plaintiffs have failed to advance any argument for why

this Court should expand the pattern-or-practice framework into the § 510 context.  Accordingly,

the Court is unwilling to find that the pattern-or-practice framework applies to § 510 claims.

---

[27]*See id.* at 266 ("Plaintiffs seek to represent the proposed class only to the extent their [ERISA claim] is based on a pattern and practice of discrimination, which is subject to the bifurcated approach of *International Brotherhood of Teamsters v. United States* . . . . If the representative plaintiffs show a pattern and practice of discrimination in phase one of the trial, the class members are entitled to a presumption that they were individually discriminated against.").

[28]In their response, Plaintiffs state that the Court cannot grant Defendants' motion for summary judgment on Plaintiffs' § 510 claim because Defendants did not address Plaintiffs' pattern-or-practice argument in their initial motion.  Plaintiffs' contention is erroneous for two reasons.  First, Defendants did argue in their initial motion, albeit in a footnote, that the pattern-or-practice method of proof does not apply in this case, and, even if it does, Plaintiffs' claim would fail because their evidence does not show that it is Defendants' regular practice to discriminate against plan participants based on their pension status.  Second, and irrespective of the first, Defendants could argue in their reply that the pattern-or-practice method of proof does not apply here because Plaintiffs made the argument in their response that it did.  *See, e.g., Beaudry v. Corr. Corp. of Am.*, 331 F.3d 1164, 1166 n.3 (10th Cir. 2003); *United States v. Campbell*, 279 F.3d 392, 401 (6th Cir. 2002); *Harris Trust & Sav. Bank v. Edelson (In re Wildman)*, 859 F.2d 553, 555-56 n.4 (7th Cir. 1988).

[29]*See Gross v. FBL Financial Servs., Inc.*, 129 S. Ct. 2343, 2349 (2009) (admonishing courts not to blindly import proof frameworks that were developed under Title VII).

Even if the framework did apply to § 510 claims, though, Plaintiffs' § 510 claim would fail. In order to survive a summary judgment motion made at the first stage of a pattern-or-practice case, the plaintiff must produce evidence that shows two things: first, that the defendant has engaged in unlawful conduct; second, that it is the defendant's standard operating procedure – the regular rather than the unusual practice – to engage in such conduct.[30] To determine whether the alleged conduct is indeed unlawful, courts must necessarily look to the statutory basis of the plaintiff's claim. Here, because Plaintiffs claim that Defendants violated § 510, the Court must look to § 510.

Section 510 makes it unlawful for "any person to discharge, fine, suspend, expel, discipline, or discriminate against a [plan's] participant for the purpose of interfering with the attainment of any right to which such participant may become entitled to under the plan." As is evident from the preceding quote, § 510, by its terms, does not cover all forms of pension-based discrimination. Recently, in *Becker v. Mack Trucks*[31], the Third Circuit addressed the question of whether, despite its failure to include the word hire in the string of denominated employment practices, Congress intended to cover discrimination that occurs during an employer's hiring decisions.[32] There, to ascertain Congress' intent, the court first compared § 510's language to the language found in other employment discrimination statutes. It then reviewed § 510's legislative history and the judicial opinions interpreting it. After performing these exercises, the court concluded that Congress did not intend for § 510 to regulate such decisions.[33] This Court is

---

[30] *Thiessen*, 267 F.3d at 1109.

[31] 281 F.3d 372 (3d Cir. 2002).

[32] *Id.* at 379-83.

[33] *Id.* at 383.

persuaded by the Third Circuit's reasoning, and thus agrees that § 510 does not usually apply to an employer's hiring decisions.

In addition to not usually applying to an employer's hiring decisions, § 510 also typically does not apply to an employer's basic operational decisions (such as the decision to sell one of its divisions), even when such decisions are based, at least in part, on labor costs.[34]  The reason for this is that § 510 was primarily designed to cover only actions aimed directly at individuals, and basic operational decisions are usually based on impersonal factors.[35]  As pointed out by the D.C. Circuit, if Congress had intended to cover such decisions, it would have included the terms layoff and termination in the statute.[36]

Although hiring decisions and basic operational decisions do not generally, by themself, violate § 510, they may if they are made pursuant to a scheme that is specifically designed to interfere with an employee's protected ERISA rights.  As noted by the Court previously, in such cases, the parties' decisions will be viewed as one, and thus taken together amount to a discharge or discriminatory act.[37]

Here, Plaintiffs allege that a scheme existed between Defendants and that Defendants based their respective decisions on that scheme.  In support of this allegation, Plaintiffs rely principally upon the following factual allegations: (1) Boeing believed that the wages at the Wichita Division were higher than the local market; (2) Jeff Turner, Spirit's Chief Executive

---

[34]*See Andes v. Ford Motor Co.*, 70 F.3d 1332, 1338 (D.C. Cir. 1998).

[35]*Id.* at 1337-38.

[36]*Id.* at 1338.

[37]Doc. 139, p. 17-18.  The Court's holding was premised on the principle that two actors cannot do what one could not do on their own.  *See Lessard*, 307 F.3d at 1026.

Officer, stated that older workers tend to be more expensive in regards to pay and benefits; (3) Boeing saved millions of dollars in future pension benefits by divesting the Wichita Division; (4) Boeing was tracking during the rehiring process the number of people who were retirement eligible; (5) Boeing workers over the age of 40 were not hired by Spirit at the level expected by Plaintiffs' expert and that the difference between the expected and actual number is statistically significant; (6) Spirit realized an immediate cost savings by not rehiring all of the Boeing employees; and (7) Spirit considered employees in the age range of 45-54 the most expensive in terms of pension expenses.  In their reply, Defendants contend that Plaintiffs' allegations do not establish the necessary connection between Defendants' actions to meld them into one.

There is little case authority on the issue of what type of evidence a plaintiff must produce at the summary judgment stage in order to substantiate their contention that actions taken by two separate actors should be treated as one.[38]  Recently, however, in *Nauman v. Abbott Laboratories*[39], the Northern District of Illinois addressed the related question of whether it should analyze an employer's decision to spin off a subdivision separately from its decision to adopt a policy not to hire back the spun off workers for a period of time into the future when determining whether the former employer had the requisite unlawful intent.  The court concluded that it should not.  The court stated that because the adoption of the no-hiring policy affected the

---

[38]It appears that there has been only one case where both the seller and buyer in a divestiture were held liable under § 510, *Lessard*, 307 F.3d 1020.  That case is of little help here, though, because the plaintiff there did not have to rely upon circumstantial evidence to prove their claim, as the sales agreement between the parties facially discriminated against employees exercising rights to which they were to entitled to under the plan.  *See id.* at 1025-26.

[39]2008 WL 4773135 (N.D. Ill. July 10, 2008).

plaintiffs' ability to accrue future pension benefits under the former employer's plan, the actions should be considered together.[40]

The Court finds the *Nauman* opinion instructive on the issue now before it, and concludes that, at a minimum, the party seeking to have two or more actions treated as one must show that each action affected their ability to accrue additional benefits under the plan that they participated in.  The reason such a showing is necessary is that without it there is simply no reasonable basis to believe that the parties' actions were taken pursuant to an unlawful agreement designed to keep employees from accruing benefits that are protected by ERISA.

Here, it is an uncontroverted fact that *all* Boeing employees stopped accruing Boeing pension plan benefits on the day that they were terminated.  This was true without regard to whether or not Spirit later hired an employee.  Spirit's hiring decisions had absolutely no impact on Plaintiffs' ability to accrue additional benefits under the Boeing pension plan.  As a consequence, the Court sees no reason to treat Boeing's decision to terminate all of its employees in conjunction with the asset sale and Spirit's decision not to hire them all back as one.

Because Defendants' actions must be viewed separately, Plaintiffs' § 510 claim can survive summary judgment only if Plaintiffs' evidence shows that either of these actions, by themself, constitute unlawful conduct under § 510.  Plaintiffs' evidence is insufficient to make this showing.  To begin with, an employer's decision to sell one of its divisions can only violate § 510 if the division sold had some special ERISA characteristic, such as having a clearly above-average proportion of employees with pension rights about to vest or being the most expensive

---

[40]*Id.* at *9.

division in terms of pension costs.[41]  Here, Plaintiffs have not argued, much less put forward any

evidence, that the Wichita Division had any special ERISA characteristics.  Rather, they have

merely alleged that Boeing sold the Wichita Division in order to avoid incurring another year of

pension costs.  Selling an ongoing business in order to avoid such costs, though, is not prohibited

by ERISA.[42]  As a consequence, Boeing's decision to sell the Wichita Division does not violate §

510.  Furthermore, Spirit's hiring decisions do not violate § 510 because hiring decisions, at least

those not part of a scheme to violate ERISA, are not covered by this provision.  As a result,

Plaintiffs' claim could not succeed under the pattern-or-practice framework even if it applied.

Plaintiffs' claim also fails under the *McDonnell Douglas* test because, for the reasons just

stated, Plaintiffs cannot establish a *prima facie* case of unlawful pension discrimination.  To

establish a *prima facie* case, the plaintiff must first show that the defendant has engaged in

prohibited conduct.[43]  Plaintiffs cannot satisfy this requirement.  As established above, neither

Spirit's hiring decisions nor Boeing's decision to sell violate § 510. Therefore, in light of the fact

that Plaintiffs' § 510 claim cannot succeed under either the *McDonnell Douglas* test or the

pattern-or-practice framework, summary judgment is warranted on Plaintiff's § 510 claim.

---

[41]*See, e.g., Deich-Keibler v. Bank One*, 243 Fed. Appx. 164, 170 (7th Cir. 2007); *Andes*, 70 F.3d at 1338.
The cases relied upon by Plaintiffs are consistent with this rule.  *See Millsap v. McDonnell Douglas Corp.*, 162 F.
Supp. 2d 1262, 1271 (N.D. Okla. 2001) (closing a plant that had a disproportionate number of employees about to
qualify for an early or normal retirement); *Pickering v. USX Corp.*, 809 F. Supp. 1501, 1549 (D. Utah 1992)
(deciding to accelerate the closure of a plant in order to prevent a large number of employees from obtaining vested
pension rights).

[42]*See Andes*, 70 F.3d at 1338 (stating, that despite the fact that a business owner's decision to sell is
"virtually always based, at least in part, on labor costs," ERISA does not routinely cover such decisions").

[43]*See Maez v. Mountain State Tel. & Tel.*, 54 F.3d 1488, 1504 (10th Cir. 1995).

-21-

**ADEA Claims**

The ADEA makes it "unlawful for an employer (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age;" as well as "(2) to limit segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age."[44]  Plaintiffs have raised two claims under the ADEA: disparate treatment and disparate impact.  The Court will review these claims in turn.

### *Disparate Treatment*

Plaintiffs' disparate-treatment claim alleges that during the Wichita Division divestiture Defendants engaged in a pattern or practice of discriminatory treatment of employees over the age of 40.[45]  To establish a *prima facie* case of pattern-or-practice discrimination, Plaintiffs must show that Defendants' regularly and purposefully treated members of the protected group less favorably and that unlawful discrimination was Defendants' regular procedure or policy.[46] Plaintiffs can make this showing solely by producing evidence of gross statistical disparities.[47]  If

---

[44]29 U.S.C. § 623(a)(1)-(2).

[45]The Court questions the appropriateness of applying the pattern-or-practice method in a case where the plaintiffs' claims arise out of one employment action, *see Oinonen v. TRX, Inc.*, 2010 WL 396112, at *4 (N.D. Tex. Feb. 3, 2010) (citing *Sperling v. Hoffman-La Roche,Inc.*, 924 F. Supp. 1346, 1364 (D.N.J. 1996); *see also* 110 Cong. Rec. 14270 (1964) (statement by Sen. Humphrey) ("[A] pattern or practice would be present only where the denial of rights consists of something more than an isolated, sporadic incident, but is repeated, routine, or of a generalized nature."), which is what Plaintiffs claim the Wichita Division divestiture was, *see, e.g.,* Doc. 341, p. 77 ("The class includes individuals who were subject to *one combined employment action*: involuntarily terminated by Boeing and not hired by Spirit." (emphasis added)); however, because Defendants do not raise the issue, the Court will not decide it.

[46]*E.E.O.C. v. McDonnell Douglas Corp.*, 191 F.3d 948, 951 (8th Cir. 1999).

[47]*Hazelwood School Dist. v. United States*, 433 U.S. 299, 307-08 (1977).

such statistics do not exist, Plaintiffs may still establish a pattern or practice by "combining statistics with historical, individual, or circumstantial evidence."[48]  If Plaintiffs make their showing, the burden of production shifts to Defendants to show that the challenged decisions were made for legitimate, nondiscriminatory reasons, or that Plaintiffs' proof is inaccurate or insignificant.[49]  In the present case, Plaintiffs have put forth statistical, circumstantial, and anecdotal evidence.

***Plaintiffs' Statistical Evidence***

Plaintiffs have submitted one expert report relating to statistics.  This report was prepared by Dr. Charles Mann.  For his report, Dr. Mann reviewed two sets of data: (1) Recommendation data for three groups of Boeing employees (all employees, Shared Services Group (SSG) employees, and non-SSG employees) who were recommended or not recommended for hire and (2) Outcome data for three groups of Boeing employees (all employees, SSG employees, and non-SSG employees) who were hired or not hired by Spirit.[50]  Dr. Mann chose to analyze this data both in the aggregate and broken down by each individual director group.

Dr. Mann's recommendation analysis considered the recommendation decisions of twenty-nine director groups that had at least one hire or non-hire.  The recommendation decisions of eight of these director groups were uninformative and, thus, were not studied.  Of the remaining twenty-one director groups, Dr. Mann found that only four had statistically

---

[48]*Pitre v. W. Elec. Co., Inc.*, 843 F.2d 1262, 1267 (10th Cir. 1988).

[49]*Teamsters*, 431 U.S. at 360.

[50]Dr. Mann's statistical analysis of the data sets for each of the three groups of Boeing employees is not materially different.  Therefore, for the sake of brevity, the Court will discuss only Dr. Mann's analysis of the data for the all employees group.

significant differences adverse to older employees.[51]  Dr. Mann's report showed, though, that in all but five of the director groups, workers over the age of 40 were not recommended at a rate higher than workers under the age of 40.

Viewing the recommendation decisions of the director groups as a whole, Dr. Mann found that workers over the age of 40 were adversely affected at a statistically significant level. According to Dr. Mann, the difference between the number of people over the age of 40 that his model predicted would be recommended (8,028) and the number that was actually recommended (7,968) was greater than five standard deviations.  This number of standard deviation correlates with a 1 in 50,000 chance that the results observed were the product of random occurrence.  Dr. Mann did not offer an opinion as to what caused this difference.

With respect to his outcome analysis, Dr. Mann considered the outcome decisions of twenty-eight director groups that had at least one hire or non-hire.  The outcome decisions of nine of these directors were uninformative and, thus, were not studied.  Of the remaining nineteen director groups, Dr. Mann found that only three had statistically significant differences adverse to older employees.[52]  Dr. Mann's report showed, though, that in all but one of the director groups, workers over the age of 40 were not recommended at a rate higher than workers under the age of 40.

Viewing the outcome decisions of the director groups as a whole, Dr. Mann found that workers over the age of 40 were adversely affected at a statistically significant level.  According to Dr. Mann, the difference between the number of people over the age of 40 that his model

---

[51]These four director groups contained only 35% of the older employees who were not recommended for hire.

[52]These three director groups contained only 20% of the older workers that were not hired by Spirit.

predicted would be hired (7,285) and the number that was actually hired (7,237) was over four and a half standard deviations.  This number of standard deviations also correlates with a 1 in 50,000 chance that the results observed were the product of random occurrence.  Dr. Mann did not offer an opinion as to what caused this difference.

In response, Defendants contend that Plaintiffs' statistical evidence is insufficient to establish a pattern or practice of age discrimination.[53]  Specifically, Defendants point out that in neither analysis did Dr. Mann report statistically significant disparities adverse to workers over the age of 40 in more than four of the twenty-plus director groups he studied.  They also direct the Court's attention to the fact that, out of the thousands of employees recommended for hire or actually hired, if Defendants would have recommended sixty more workers over the age of 40 or hired forty-eight more workers over the age of 40, workers over the age of 40, in the aggregate, would not have been adversely affected at a statistically significant level.

The Court agrees with Defendants that Plaintiffs' statistical evidence is insufficient to establish a *prima facie* case of pattern-or-practice age discrimination.  First of all, Dr. Mann's analyses relating to the individual director groups do not prove a pattern or practice, despite the fact that in a number of director groups workers over the age of 40 were not hired or not recommended at a rate higher than workers under the age of 40.  The reason for this is that a majority of the director groups analyzed did not have statistically significant disparities.  As a general rule, statistics must be statistically significant in order to give rise to an inference of

---

[53]Defendants have also submitted a report prepared by their statistical expert.  However, because Defendants did not rely on this report for their motion, the Court did not rely on the opinions expressed in it when deciding Defendants' motion.

discrimination.[54]  This rule does not necessarily apply, though, when the sample size is small.[55]

Here, a majority of the director groups studied did have meaningful populations.[56]  Therefore, in

order for Dr. Mann's director group statistics to establish a pattern or practice of discrimination,

they would, at a minimum, have to show that in a significant number of director groups older

workers were adversely affected at a statistically significant level.  Because Dr. Mann's

statistics, do not do this, they fail to prove a pattern or practice of discrimination.

In addition, Dr. Mann's aggregate results do not make out a *prima facie* case.  To be sure,

some courts have held that when the plaintiff's statistics show a disparity between the expected

value and the actual value greater than four or five standard deviations, the plaintiff has

established a *prima facie* case of disparate treatment.[57]  However, these cases must be read in

light of the Supreme Court's admonition that courts must consider the statistical evidence in the

context of the surrounding facts and circumstances.[58]  In certain instances, a large number of

standard deviations simply will not be enough.  This case presents one of those instances.  It is

important to recognize that here the Court is looking at thousands of hiring decisions, not

---

[54]*See, e.g., Bennett v. Total Minatome Corp.*, 138 F.3d 1053, 1062 (5th Cir. 1998); *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989).

[55]*See Pitre*, 843 F.2d at 1269.

[56]*See U.S. v. San Diego County*, 1979 WL 269, at *7 (S.D. Cal. July 6, 1979) (stating that a sample size of eighty-one is large enough to be probative of discrimination).  Here, fifteen out of the nineteen director groups studied in the outcome analysis had over a hundred workers.  Similarly, fifteen out of the twenty-one director groups studied in the recommendation analysis had over a hundred workers.

[57]*See, e.g., Chisholm v. U.S. Postal Serv.*, 665 F.2d 482, 496 n.17 (4th Cir. 1981); *N.A.A.C.P. v. Town of East Haven*, 892 F. Supp. 46, 50 (D. Conn. 1995).

[58]*Teamsters*, 431 U.S. at 340.  In the disparate impact context, the Supreme Court has stated that "we have not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination."  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 995 n.3 (1988).

hundreds.  Due to this large sample, *de minimus* disparities may become statistically

significant.[59]  Here, Dr. Mann's model predicted that out of over 9,000 recommendations

decisions, sixty more Boeing workers over the age of forty should have been recommended.

Similarly, Dr. Mann's model predicted that out of over 8,000 hires, forty-eight more workers

over the age of 40 should have been hired.  Stated another way, Boeing recommended and Spirit

hired over 99% of the workers that Dr. Mann's model predicted.  The Court finds this disparity

to be practically insignificant, and, as a consequence, that Plaintiffs' aggregate results also do not

establish a *prima facie* case of age discrimination.[60]

　　　The Court's finding that Plaintiffs' statistical evidence is insufficient to establish that age

discrimination occurred on a company-wide level is further buttressed by the fact that the

percentage of Spirit's Day One workforce that was over the age of 40 (86.6%) is nearly identical

to the percentage of workers who were considered for hire that were over the age of 40 (87.4%).

As noted by other courts in the reduction-in-force context, an insignificant drop like this does not

support a finding of age discrimination.[61]

---

　　　[59]*See* Ramona L. Paetzold & Steven L. Williborn, THE STATISTICS OF DISCRIMINATION 12.03 (2002) ("Statistical significance is affected by the number of observations, so that for large samples, spurious significance can result."); Daniel L. Rubinfeld, *Reference Guide on Multiple Regression*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 191-92 (Federal Judicial Center 2d ed. 2000) (stating that the reason that small disparities can be statistically significant is that "statistical significance is determined, in part, by the number of observations in the data set").

　　　[60]*See* David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 124 (Federal Judicial Center 2d ed. 2000) ("When practical significance is lacking – when the size of the disparity or correlation is negligible – there is no reason to worry about statistical significance."); *see generally* Allan G. King, *"Gross Statistical Disparities" as Evidence of a Pattern and Practice of Discrimination: Statistical versus Legal Significance*, 22 LAB. LAW 271 (2007) (highlighting some of the problems of using statistical significance as the measuring rod for determining whether a plaintiff has established a *prima facie* case).

　　　[61]*See, e.g., McDonnell Douglas Corp.*, 191 F.3d at 952.  Plaintiffs' argument that the Court must look beyond the demographics of the Day One workforce in ascertaining whether discrimination occurred is unpersuasive.  While the Tenth Circuit has recognized actions taken by an employer after an employee's termination may be probative of discrimination, *see Bingman v. Natkin & Co.*, 937 F.2d 553, 556-57 (10th Cir. 1991), it has done so only when there is a logical connection between the action taken against the plaintiff and the one that occurs later.

*Plaintiffs' Circumstantial and Anecdotal Evidence*

Plaintiffs also present what they contend to be a wealth of circumstantial and anecdotal evidence. Plaintiffs first cite to statements made by managers and executives and internal documents that they believe demonstrate that Defendants had an age biased corporate culture and that this culture permeated the divestiture. The first statement that they cite to is one made by Jeff Turner, CEO of Spirit. According to a declaration submitted by Plaintiffs, some time within one year of the divestiture, Mr. Turner told a manager that "Boeing's workforce was getting older and that the managers needed to find ways to do something about it." Next, Plaintiffs cite to comments made by other upper-level management noting the fact that Boeing had an older workforce. Plaintiffs then cite to multiple derogatory statements made by low-level managers to older workers. Lastly, Plaintiffs cite to emails sent between Spirit and its consultants during the negotiations with the IAM NPF discussing how much the average age of the workforce would have to drop in order for Spirit to avoid having to pay a higher rate into the pension fund.

In further support of their claim that Defendants had an age bias culture and that this culture affected the hiring process, Plaintiffs put forth an expert report prepared by Dr. Caren Goldberg. In her report, Dr. Goldberg states that the statistical disparities identified by Dr. Mann occurred in a climate of age-based animus and were the result of an intentional plan to reduce the age of the workforce. She also states that the subjectivity of the selective rehiring process

---

Here, Plaintiffs have failed to establish this connection between their after-the-fact evidence and the divestiture. Without such a connection, the fact that workers over 40 make up a smaller percentage of workers at the Wichita Division now than they did in 2005 is not probative on the issue of whether intentional discrimination occurred during the divestiture.

provided fertile ground for bias, that the process was incapable of yielding accurate results, and

that negative decisions regarding older workers is more likely in an age bias climate.[62]

    After reviewing this evidence, the Court finds that a reasonable jury could not conclude

that there was a pervasive age bias that affected hiring decisions during the Wichita Division

divestiture.  Although some of Plaintiffs' culture evidence indicates that some managers may

have been biased against older workers, this evidence, viewed as a whole, is insufficient to create

an inference that such a bias was held companywide.  Unlike the cases cited by Plaintiffs,[63] there

is no evidence that upper-level management viewed older workers less capable or younger

workers more favorably or believed that older workers needed to be replaced by younger ones,[64]

which is significant because without such evidence it is hard to believe that there was an age bias

emanating from the upper-echelons of corporate management that infected the managers and

supervisors below.  The only evidence that Plaintiffs have offered that could even conceivably

be construed as showing that upper-level management viewed older workers disfavorably is Jeff

---

[62]The essence of Dr. Goldberg's expert report is simply that, in her opinion, there was a better way to make the hiring decisions and the fact that Defendants did not use her preferred method indicates animus.  The Court gives no credence to these opinions regarding the motivation of Defendants' actions, as they are lay matters which a jury is capable of understanding and deciding without the expert's help.  *See, e.g., Getter v. Wal-Mart Stores*, 66 F.3d 1119, 1124 (10th Cir. 1995); *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

[63]*See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 93 (2d Cir. 2001); *Ryder v. Westinghouse Elec.*, 128 F.3d 128, 130-32 (3d Cir. 1997); *Grayson v. Kmart Corp.*, 79 F.3d 1086, 1097-98; (11th Cir. 1996); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 333-34 (3d Cir. 1995); *Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 55 (3d Cir. 1989).  Plaintiffs' cases are further distinguishable on the ground that none of them involved a patter-or-practice claim being decided at the summary judgment stage.

[64]Plaintiffs no doubt believe that the emails sent between Spirit and its consultants during Spirit's negotiations with the IAM show that Defendants believed that older workers needed to be replaced by younger ones and this belief tainted the selective rehiring process.  They do not.  As noted above, the management at the Wichita Division was not involved with these negotiations.  As a result, the staffing scenarios discussed by Spirit and its consultants during these negotiations are not probative on the issue of whether age discrimination occurred while the hiring decisions were being made.  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (stating that there must be a nexus between the alleged comments and the adverse employment actions in order for them to be probative of discrimination).

Turner's comment to a manager that "Boeing's workforce was getting older and that the managers needed to find ways to do something about it."  However, when this comment is viewed in the correct context, it is clear that it is benign.  The submitted evidence unambiguously demonstrates that Jeff Turner and other upper-level management officials were concerned about their workforce's age because they were afraid that a large percentage of their workforce would retire within a few years of each other, and, thus, leave Boeing with an inexperienced workforce.  Such a concern belies the claim that Defendants disfavored older workers and that this sentiment created an environment that led to these workers not being recommended for hire.  As a consequence, the Court concludes that Plaintiffs have failed to create a triable issue as to whether Defendants had a corporate culture of age bias and that this culture resulted in a widespread pattern of older workers not being recommended for hire because of their age.

Next, Plaintiffs allege that Defendants were tracking the age of employees during the selective rehiring process and that this fact supports their claim that Defendants engaged in a pattern or practice of age discrimination.  In support of this charge, Plaintiffs cite to a 2004 Investment Memorandum prepared by Onex that listed the average age of employees belonging to the eight unions that operated at Boeing, a list prepared by Boeing stating how many people over the age of 55 had been recommended for hire, and notes taken by someone during the Tulsa selection process that listed the age of certain employees.

The Court finds that this evidence is insufficient to raise an inference that it was Defendants' standard operating procedure to engage in unlawful discrimination during the Wichita Division divestiture.  To begin with, Plaintiffs' first two pieces of evidence are not probative on the issue of discrimination.  These documents, unlike the ones in the cases cited by

Plaintiffs,[65] do not list individual ages.[66]  Furthermore, there is no evidence that the decision

makers had this information when they were making their hiring decisions.[67]  As for the last

piece of evidence, it too is insufficient to show a pattern or practice because it only relates to the

selection process at the Tulsa site.  Thus, at best, it supports an inference that isolated

discriminatory acts occurred.

Plaintiffs further assert that Defendants' desire to reduce labor costs supports their

pattern or practice claim.  According to Plaintiffs' theory, Defendants believed older workers

were more expensive, and, because of this belief, decided not to hire them.  Plaintiffs' argument

is deficient for two reasons.  First, there is no evidence to support a finding that those making the

hiring decisions based their decisions on how much a particular worker would cost Spirit in

terms of either wages or benefits.  As established by Defendants, the meaningful cost savings

highlighted by Boeing were tied to Spirit hiring fewer workers, changing various work rules, and

offering lower wages.  Second, even if some workers were not selected because they were

perceived by those making the hiring decisions as being more expensive, this would not violate

the ADEA.  As noted by several circuit courts following the Supreme Court's decision in *Hazen*

---

[65]*See Armbruster v. Unisys Corp.*, 32 F.3d 768, 781 (3d Cir. 1994); *Sheerin v. N.Y. State Div. of Substance Abuse Servs.*, 844 F. Supp. 909, 915-17 (N.D.N.Y. 1994).

[66]*See Edwards v. Baptist Health*, 2005 WL 1331262, at *7 (M.D. Ala. June 3, 2005) ("[T]he fact that [the defendant] requested and received merely the average age of the workforce in general, months in advance of the RIF at issue here, is so attenuated and weak that no fact finder could reasonably conclude from this evidence that [the defendant] intended to discriminate against [the plaintiff] on the basis of her age.") (internal quotation marks omitted).

[67]*See Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 514 (6th Cir. 1991) (stating that the maintenance of age information, "absent direct evidence that it was used in making adverse employment decisions, cannot create even a circumstantial inference of discrimination").

*Paper Co. v. Biggins*[68] "employment decisions motivated by factors other than age (such as

retirement eligibility, salary, or seniority), even when such factors correlate with age, do not

constitute age discrimination."[69]

Additionally, Plaintiffs contend that Defendants' decision to utilize a subjective selection

process supports their pattern or practice claim. Specifically, Plaintiffs allege that Defendants'

adopted this process to "conceal [a] systematic and discriminatory policy." While the use of

subjective considerations by an employer may create an inference of discrimination in certain

cases, the use is "not unlawful per se."[70] To determine if in fact the use does give rise to an

inference unlawful intent, the Court must look at the evidence presented.[71] Here, while the

evidence may support an inference of discrimination, it fails to create an inference of company-

wide discrimination. First, as discussed above, the statistics do not show a practically significant

disparity in the aggregate nor do they show statistically significant disparities across the

divisions. Second, outside of Dr. Goldberg's improper expert testimony that Defendants'

decision to utilize a subjective process was deliberate, to which, as noted earlier, the Court gives

---

[68]507 U.S. 604 (1993). In *Hazen*, the Court stated that an employer's decision that is wholly motivated by factors other than age does not violate the ADEA. It went on to say that "[t]his is true even if the motivating factor is correlated with age." *Id*. at 611.

[69]*McDonnell Douglas Corp.*, 191 F.3d at 951; *accord James v. N.Y. Racing Ass'n*, 233 F.3d 149, 153 (2d Cir. 2000); *Broaddus v. Fla. Power Corp.*, 145 F.3d 1283, 1287 (11th Cir. 1998); *Denio v. Asplundh Tree Expert Co.*, 1996 WL 423125, at *3 (4th Cir. July 30, 1996); *Anderson v. Baxter Healthcare Corp.*, 13 F.3d 1120, 1125-26 (7th Cir. 1994). The cases cited by Plaintiffs do not suggest a contrary result. To begin with, the majority of cases cited by Plaintiffs were decided before *Hazen* and are contrary to the Court's holding therein. As for the lone case that Plaintiffs cite to that is post-*Hazen* and involved an ADEA claim at the summary judgment stage, *Babich v. Unisys Corp.*, 842 F. Supp. 1343 (D. Kan. 1994), it is readily distinguishable. There, the plaintiff did more than merely allege that the defendant terminated him because they viewed him as being more expensive; rather, he presented evidence that the cost the defendants were seeking to avoid was directly tied to his age. *See id.* at 1351-52 (terminating the plaintiff shortly before he turned 54 prevented the plaintiff from attaining the right to receive early retirement and medical benefits).

[70]*See Bauer v. Bailar*, 647 F.2d 1037, 1045-46 (10th Cir. 1981).

[71]*Id.* at 1046.

no credence,[72] there is no evidence that Defendants chose this process for the purpose of

covering up a discriminatory policy.  As a result, Defendants' use of subjective criteria does not

raise an inference that discrimination was Defendants' ordinary practice during the divestiture.

Plaintiffs further claim that Spirits' failure to act after an internal report showed that

workers over the age of 40 were adversely impacted by the selective rehiring process is evidence

of discrimination.  The Court disagrees.  First, it is an uncontroverted fact that Spirit did not

believe the results were indicative of discrimination because there were multiple decision makers

that were involved in the process and the selection process was conducted with several levels of

oversight.  Furthermore, unlike the cases cited by Plaintiffs,[73] Spirit did not have a policy in

place that mandated that it alter its hiring decisions if a report showed a disparity.  Without such

a policy, Spirit's failure to act simply is not probative of discrimination.[74]  As for the fact that

Spirit chose to alter its hiring decisions with regard to women and minorities, it too does not

raise an inference of discrimination.  This decision simply tells us nothing about whether

Defendants did not choose to hire a class of workers because of their age.

Lastly, Plaintiffs point the Court to the forty-plus declarations that they have submitted in

support of their claim.  The overwhelming majority of these declarations merely state each

declarant's own opinion that the he or she was qualified for the job that they previously held;

---

[72]*See, e.g., In re Fosemax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009); *Andrews*, 882 F.2d at 708.

[73]*See Russell v. TG Mo. Corp.*, 340 F.3d 735, 746 (8th Cir. 2003); *Bass v. Bd. of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1108 (11th Cir. 2001); *Mozee v. Am. Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991); *Antol v. Perry*, 82 F.3d 1291, 1301 (3d Cir. 1996); *Milburn v. West*, 854 F. Supp. 1, 8, 13 (D.D.C. 1994).

[74]*Cf. McFadden v. State Univ. of N.Y., College of Brockport*, 195 F. Supp. 2d 436, 456 (W.D.N.Y. 2002) (finding that the defendant's failure to write the plaintiff a letter of recommendation after she complained of sex discrimination was not evidence of retaliation because, among other things, there was no policy in place of providing such letters).

only one states that the declarant was not chosen for hire because of their age.  Thus, while these declarations may be relevant to Plaintiffs' claim,[75] they are insufficient, in themself, to establish a pattern of age discrimination during the Wichita Division divestiture.[76]

Although none of Plaintiffs' evidence viewed individually is sufficient to establish a pattern or practice of age discrimination, it may, when viewed in the aggregate, raise a triable issue as to whether Defendants engaged in a pattern or practice of age discrimination during the Wichita Division divestiture.[77]  Plaintiffs argue that the Tenth Circuit has found that the combination of their allegations is sufficient to establish a pattern or practice of age discrimination.  According to Plaintiffs, this case is directly analogous to *E.E.O.C. v. Sandia Corp*[78].  Plaintiffs contend that like *Sandia*, there is evidence that the procedure for determining who was to be terminated during the reduction in force ("RIF") relied on highly subjective factors, that management was concerned about the increasing age of the corporation's employees, that qualification for benefits under the retirement plan was a factor considered by the decision makers while making employment decisions, and that older workers were adversely impacted by Defendants' actions.

---

[75]*See Chisholm*, 665 F.2d at 494-95.  Contrary to Plaintiffs' implication, the plaintiffs in *Chisholm* did more than simply state that they were qualified for the position that they sought.  Rather, they provided numerous examples of instances when they were treated differently than their white counterparts.  *See Chisholm v. U.S. Postal Serv.*, 516 F. Supp. 810, 852-67 (D.N.C. 1980).

[76]*See Chiang v. Schafer*, 2008 WL 3925260, at *35 (D.V.I. Aug. 20, 2008) (stating that witnesses must testify to specific instances of when they were adversely affected because of their membership in a protected class in order for their testimony to show that the defendant had the intent to discriminate); *E.E.O.C. v. Consol. Servs.*, 777 F. Supp. 599, 609 (N.D. Ill. 1991) (same).

[77]*See Pitre*, 843 F.2d at 1268 ("[A]ll of the evidence, statistical and nonstatistical, tending to establish a prima facie case should [be] assessed on a cumulative basis." (quoting *E.E.O.C. v. Am. Nat'l Bank*, 652 F.2d 1176, 1189 (4th Cir. 1981))).

[78]639 F.2d 600 (10th Cir. 1980).

-34-

While there are certainly similarities between this case and *Sandia*, there are significant differences that the Court finds distinguishes *Sandia* from the matter now before it.  First, in *Sandia*, the disparities highlighted by Plaintiffs' statistics were stark and were uniform across the board.  Although older workers made up a small percentage of the workforce, they consistently made up a sizeable portion of the number of people terminated.[79]  Furthermore, and more importantly, there was evidence in *Sandia* that the defendant had adopted policies to remedy the problems it associated with having an older workforce.  For example, in that case, the plaintiff presented evidence that the defendant had implemented a hiring scheme that discriminated against older workers.[80]  In light of these differences, the Court concludes that *Sandia* does not control here.

A case that appears to be more similar to the one at hand is *E.E.O.C. v. McDonnell Douglas Corp*.[81]  There, due to adverse business circumstances, the defendant had to undertake major RIFs of its nonunion employees.  First-line supervisors were responsible for preparing the RIF lists.  In deciding who to keep, supervisors were to consider the following subjective factors: experience, versatility of skills, and work quality.  Supervisors were not told how much weight to give to each factor; however, they were told that age was not to be considered.  Once the supervisor had completed their list, they submitted it to their division head for review.[82]

---

[79]*Id.* at 605-08.

[80]*Id.* at 610-11.

[81]17 F. Supp. 2d 1048 (E.D. Mo. 1998), *aff'd*, 191 F.3d 948.

[82]*Id.* at 1051.

The RIFs resulted in 13.7% of the workers over the age of 55 being terminated, as opposed to only 5.4% of the workers under the age of 55.[83]  Believing that the defendant had engaged in a pattern or practice of age discrimination during the RIF process, the E.E.O.C. filed an ADEA claim.  In support of its claim, the E.E.O.C. presented statistically significant statistics showing an adverse impact against workers older than 55, an expert report prepared by a human resource expert, which stated, among other things, that there was a cultural focus of youth which permeated the RIF decisions, anecdotal evidence that some managers had selected employees over the age of 55 for layoff because of their age, higher salaries, and retirement eligibility,[84] documents that expressed concern over the company's aging workforce and aging management team, and a discriminatory statement made by the CEO sometime a year and a half before the RIFs.[85]  After reviewing this record, the district court concluded that the E.E.O.C.'s evidence was insufficient to establish a *prima facie* case that age discrimination was the defendant's standard operating procedure during the RIFs.[86]

Similarly, after reviewing the entire record in this case, the Court concludes that Plaintiffs' proof is insufficient to establish a pattern or practice of age discrimination.  Although Plaintiffs have produced evidence that may indicate that discrimination did occur during the divestiture, they have failed to put forth the "substantial proof" necessary to show that intentional age discrimination was Defendants' standard operating procedure.[87]

---

[83]*Id.* at 1052.

[84]*Id.* at 1052-53.

[85]*McDonnell Douglas Corp.*, 191 F.3d at 953.

[86]*McDonnell Douglas Corp.*, 17 F. Supp. 2d. at 1053.

[87]*King v. Gen. Elec. Co.*, 960 F.2d 617, 624 (7th Cir. 1992).

Typically, a plaintiff will meet their burden by buttressing statistical evidence demonstrating substantial disparities with evidence of general discriminatory policies or specific instances of discrimination.[88]  Here, as noted above, Plaintiffs' statistical evidence does not show significant disparities.  As a consequence, Plaintiffs' other proof must be correspondingly stronger in order for their claim to survive summary judgment.[89]  Unfortunately for Plaintiffs, their circumstantial and anecdotal proof cannot shoulder this burden.  Noticeably lacking from Plaintiffs' proof is evidence showing that Defendants had an age bias corporate culture or that a corporate policy of discrimination had been adopted.  The absence of such evidence in this case proves to be fatal.  It is important to recognize that Plaintiffs are not claiming that discrimination was the regular practice for a particular manager or even a particular director group, but rather that it was the standard operating procedure throughout the Wichita Division to discriminate based on age.  Thus, in order for Plaintiffs to succeed on their claim, they must show company-wide discrimination.  Without either of the aforementioned pieces of evidence or statistical evidence demonstrating significant disparities company-wide, the Court finds that no reasonable jury could find that age discrimination was the regular practice at the large employment site of the Wichita Division, as opposed to a couple director groups.  Accordingly, the Court finds that summary judgment is merited on Plaintiffs' pattern-or-practice disparate treatment claim.

---

[88]*See E.E.O.C. v. Chi. Miniature Lamp Works*, 947 F.2d 292, 299 (7th Cir. 1991).

[89]*See In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1085 (W.D.N.Y. 1994) (stating that when either statistical or anecdotal evidence is lacking, "the other must be correspondingly stronger for plaintiffs to meet their burden.").

### *Disparate Impact*

In addition to authorizing recovery on a disparate treatment theory, the ADEA also allows recovery on a disparate impact theory.[90]  Disparate impact claims involve "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified."[91]  "To establish a prima facie case of disparate impact age discrimination, plaintiffs must show that a specific identifiable employment practice or policy caused a significant disparate impact on a protected group."[92]  If the plaintiff succeeds in making a *prima facie* showing, the burden of production and persuasion of showing that the action taken was based on reasonable factors other than age shifts to the defendant.[93]

Defendants contend that Plaintiffs cannot establish a *prima facie* case for two reasons. First, Defendants argue that the practice or policy identified by Plaintiffs – excessive subjectivity in the selective rehire process and the use of ill-defined criteria in an age biased culture – is insufficient to support a disparate impact claim under the ADEA.  Second, Defendants claim that Plaintiffs' statistics do not show that a practice or policy had a significant adverse impact on older workers.

Because the Court finds that even if Plaintiffs had sufficiently identified a practice or policy their claim would still fail because they have not shown that the alleged practice or policy has created a significant disparity, it will not address Defendants' first argument and instead go

---

[90]*Smith v. City of Jackson, Miss.*, 544 U.S. 228, 240 (2005).

[91]*Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quoting *Teamsters*, 431 U.S. at 335-36 n.15).

[92]*Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1200 (10th Cir. 2006) (quoting *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1242 (10th Cir. 1991)).

[93]*Meacham v. Knolls Atomic Power Lab.*, 128 S. Ct. 2395, 2406 (2008).

directly to the second one.  Whether a disparity is sufficiently significant to give rise to liability under the ADEA is a question that must be resolved on a case-by-case basis.[94]  While there is no "rigid mathematical formula" for determining whether a disparity is significant,[95] courts have adopted various tests to aid them in making this determination.  For example, some courts have looked to whether the disparity is statistically significant.[96]  Others have looked to the 80% rule enunciated in the E.E.O.C.'s Uniform Guidelines on Employee Selection Procedures,[97] which states that an employer's selection criterion has an adverse impact, for purposes of the plaintiff's *prima facie* case, where members of a protected group are selected at a rate less than four-fifths that of the allegedly preferred counterpart.[98]  While still others have looked at whether the disparity is both statistically and practically significant.[99]

Here, Plaintiffs point the Court to the fact that, in the aggregate, each one of their expert's analyses showed that older workers were adversely affected at a statistically significant level by the divestiture.  It is Plaintiffs' position that because there was a disparity and this disparity was statistically significant, they have shown that the policy or practice in question has

---

[94]*Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1424 (9th Cir. 1990); *see also Moore v. Sw. Bell Tele. Co.*, 593 F.2d 607, 608 (5th Cir. 1979) (per curium) ("The United States Supreme Court has not ruled definitively on just what threshold mathematical showing of variance along racial lines suffices as a 'substantial disproportionate impact.'").

[95]*Watson*, 487 U.S. at 994-95.

[96]*See, e.g., Clark v. Pennsylvania*, 885 F. Supp. 694, 707-08 (E.D. Pa. 1995).

[97]*See, e.g., Gaskey v. Fulton Bellows, LLC*, 2007 WL 869621, at *8-9 (E.D. Tenn. Mar. 20, 2007); *Brown v. New Haven Civil Serv. Bd.*, 474 F. Supp. 1256, 1260 (D. Conn. 1979); *Jackson v. Nassau County Civil. Serv. Comm'n*, 424 F. Supp. 1162, 1167 (E.D.N.Y. 1976).

[98]*See* 29 C.F.R. §§ 1607.1, 1607.4(D) (2008).

[99]*See* Barbara Lindemann & Paul Grossman, EMPLOYMENT DISCRIMINATION LAW 131 (4th ed. 2007); *see also Thomas v. Metroflight, Inc.*, 814 F.2d 1506, 1511 n.4 (10th Cir. 1987) (suggesting that courts may require, in addition to statistical significance, that the observed disparity be substantial).

caused a significant disparate impact.  The Court disagrees.  It is important to recognize that the term "statistical significance' is a term of art within the science of statistics which means simply that the disparity observed was unlikely to have been produced by chance."[100]  Statistical significance does not tell us whether the disparity we are observing is meaningful in a practical sense nor what may have caused the disparity.  In cases where there is a great deal of data, even small differences may be highly statistically significant.[101]  Even though the differences between Dr. Mann's expected and actual values were highly statistically significant, they lack practical significance.  If forty-eight more people over the age of 40 would have been hired, Plaintiffs' hiring statistics would not have been statistically significant under Dr. Mann's analysis.  Likewise, if sixty more people would have been recommended for hire, Plaintiffs' recommendation statistics would not have been statistically significant under Dr. Mann's analysis.  In light of these facts, the Court finds that Plaintiffs have failed to show that workers over the age of 40 have suffered an adverse effect sufficient to give rise to a disparate impact claim.[102]

Further support for the Court's conclusion that Plaintiffs have failed to show that workers over the age of 40, as a class, were adversely impacted by Defendants' policy can be found in the fact that Dr. Mann's statistics do not show a statistically significant impact consistently across

---

[100]*Stagi v. Nat'l R.R. Passenger Corp.*, 2009 WL 2461892, at *12 (E.D. Pa. Aug. 12, 2009).

[101]*Carpenter v. Boeing Co.*, 456 F.3d 1183, 1202 (10th Cir. 2006).

[102]*See Waisome v. Port Auth.*, 948 F.2d 1370, 1376 (2d Cir. 1991); *see also McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 280 (5th Cir. 2008) (suggesting that statistically significant statistics may not be sufficient to support an inference of adverse impact under certain circumstances); David H. Kaye & David A. Freedman, *Reference Guide on Statistics*, *in* REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 124 (Federal Judicial Center 2d ed. 2000) ("When practical significance is lacking – when the size of the disparity or correlation is negligible – there is no reason to worry about statistical significance.").

the individual director groups.[103]  In fact, Dr. Mann's analyses show that only a small number of the twenty-plus director groups had statistically significant disparities.  As a matter of law, this proof is insufficient to show a disparate impact across the class of older employees.[104] Accordingly, summary judgment is warranted on Plaintiffs' ADEA disparate impact individual and collective action claims.

## LMRA § 301 Claim

Based on Plaintiffs' complaint, it appears that Plaintiffs are asserting multiple theories of recovery under § 301.  Defendants have moved for summary judgment on only one, though[105]: the allegation that Boeing violated its CBA with the IAM when IAM members who did not receive job offers from Spirit were not allowed to vote on the proposed CBA between Spirit and the IAM.[106]  In their motion, Defendants contend that summary judgment is warranted on this theory for the following four reasons: (1) it is barred by the applicable statute of limitations; (2) Plaintiffs have not identified the provision of the CBA that Boeing allegedly breached nor have they offered evidence in support of a finding that Boeing indeed did breach the CBA; (3) Plaintiffs have not presented evidence to support a finding that the IAM breached its duty of fair

---

[103]*See Kelber v. Forest Elec. Corp.*, 799 F. Supp. 326, 333 (S.D.N.Y. 1992) (finding that the plaintiff's statistics were insufficient to establish a disparate impact claim because they were not statistically significant).

[104]*Cf. Carpenter v. The Boeing Co.*, 2004 WL 2661691, at *4 (D. Kan. Feb. 24, 2004) (stating, in the class certification context, that the plaintiffs' statistics were insufficient to show a class-wide disparate impact because there were significant segments of the defendant's population in which no statistically significant disparities existed).

[105]Defendants also asked for summary judgment on any § 301 claim raised by any named plaintiff who was not represented by the IAM in their motion.  In their response, Plaintiffs stated that they are not bringing any individual § 301 claims for named plaintiffs who were not represented by the IAM.  As a consequence, Defendants' request is moot.

[106]This is the only theory for which Plaintiffs have sought class certification.  *See* Doc. 294, p. 40 ("[T]he LMRA class' claims are based on the same legal theory: the defendants prohibited IAM members that it perceived not to support the proposed contract changes that would potentially affect the divestiture of the Wichita Division from voting on a contract, although it was their contractual right to do so and encouraged the Union no [sic] to pursue grievances.").

representation; and (4) Plaintiffs cannot prove any casual connection between any alleged breach

and their purported damages, as the proposed CBA between Spirit and the IAM was not

approved initially.[107]

Because Plaintiffs' § 301 claim based on their inability to vote on the proposed CBA

between Spirit and the IAM is a hybrid claim, Plaintiffs must prove both that Boeing violated the

CBA and that the Union breached its duty of fair representation.[108]  In their response, Plaintiffs

claim that Boeing breached § 21.3 of the CBA by not allowing them to vote.  Section 21.3

provides that

> [a]ll terms and conditions of employment included in this Agreement shall be
> administered and applied without regard to race, color, religion, national origin,
> status as a disabled or Vietnam era veteran, age, gender, or the presence of a
> disability, except in those instances where age, gender, or the absence of a
> disability may constitute a bone fide occupational qualification.  If administration
> and application of the contract is not in contravention of federal or state law such
> administration or application shall not be considered discrimination under this
> Section 21.3.

Plaintiffs' decision to rely on § 21.3 as the basis of their claim that Boeing violated the

CBA by not allowing them to vote on the proposed CBA between Spirit and the IAM is a

curious one.  As is clear from the above quote, § 21.3 says absolutely nothing about voting; it is

only a general anti-discrimination provision.  Thus, in order for this provision to have been

violated, there must be an underlying provision dealing with voting that was administered or

applied in a discriminatory fashion.  In their briefing, Plaintiffs failed to identify any CBA

---

[107]Plaintiffs contend in their response that Defendants' decision to move for summary judgment is a clear attempt to prevent Plaintiffs from having a fair chance to prove their claim.  The Court disagrees.  The parties have engaged in extensive discovery for over three years.  The fact that this discovery has focused on class certification issues does not detract from the afore stated fact.  Plaintiffs' have sought class certification on the theory that Boeing violated § 301 by not allowing due-paying members to vote on the proposed CBA.  Thus, Plaintiffs have had ample opportunity to obtain whatever proof they need to prosecute this claim.

[108]*See Hinkley v. Roadway Exp., Inc.*, 249 Fed. Appx 13, 16 (10th Cir. 2007).

provision dealing with an IAM member's right to vote on a proposed CBA.  For this reason

alone, summary judgment is warranted on this claim.[109]  Furthermore, Plaintiffs have failed to

show that Boeing had any say whatsoever in determining which IAM members would be

allowed to vote.  Assuming for the moment, though, that such a provision existed and Boeing did

participate in the decision making process for deciding who would be able to vote on the

proposed CBA, Plaintiffs' claim would still fail because there is absolutely no evidence to

support a finding that the determination of who was eligible to vote was based on age.  It is

uncontroverted that all Boeing IAM members who did not receive a job offer from Spirit,

regardless of age, were not eligible to vote on the proposed CBA between Spirit and the IAM.

Therefore, in light of Plaintiffs' failure to show that Boeing violated its CBA with the IAM, the

Court finds that summary judgment is warranted on Plaintiffs' § 301 claim alleging that Boeing

violated the CBA when IAM members who did not receive job offers from Spirit were not

allowed to vote on the proposed CBA between Spirit and the IAM.[110]

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment on

Plaintiffs' ERISA § 510 claim, and Plaintiffs' § 301 claim alleging that Boeing violated its CBA

with the IAM when IAM members who did not receive job offers from Spirit were not allowed

to vote on the proposed CBA between Spirit and the IAM, (Doc. 298), is hereby GRANTED.

---

[109]*See Lampkin v. U.S. Postal Serv.*, 2004 WL 2211605, at *4 (N.D. Ill. Oct. 1, 2004); *see also Abdelmesih v. Waldorf-Astaria*, 1998 WL 740940, at *6 (S.D.N.Y. Oct. 21, 1998) (stating that an employer does not violate the CBA for taking actions that are not prohibited by the CBA); *Greenslade v. Chi. Sun-Times*, 930 F. Supp. 323, 330 (N.D. Ill. 1996) (same).

[110]In cases where the Court finds that the CBA has not been violated, the Court does not need to first determine whether the union breached its duty before granting summary judgment on the plaintiff's claim.  *See, e.g.*, *Bliesner v. Comm. Workers of Am.*, 464 F.3d 910, 914 (9th Cir. 2006); *Laurin v. Providence Hosp.*, 150 F.3d 52, 61-62 (1st Cir. 1998); *Dougherty v. Parsec, Inc.*, 1994 WL 20090, at *3 (6th Cir. Jan. 21, 1994); *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 664 (7th Cir. 1992).

**IT IS FURTHER ORDERED** that Plaintiffs' motion to certify a class under the LMRA and ERISA (Doc. 287) is hereby DENIED as moot.

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment on Plaintiffs' ADEA pattern or practice of intentional age discrimination collective action claim and Plaintiffs' ADEA disparate impact individual and collective action claims (Doc. 307) is hereby GRANTED.

**IT IS FURTHER ORDERED** that Defendants' motion to decertify Plaintiffs' ADEA collective action (Doc. 307) is hereby DENIED as moot.

**IT IS SO ORDERED.**

Dated this 30th day of June, 2010, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE